UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE
_____
                                        :
BASF CORPORATION,                       :
                                        :
                    Plaintiff,          :
                                        :
          v.                            :    Consol. Court No. 12-00422
                                        :
UNITED STATES,                          :
                                        :
                    Defendant.          :
_____:

## **PROPOSED ORDER**

Upon considering Plaintiff's Motion for Summary Judgment, and upon

consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that Plaintiff' Motion for Summary Judgment be, and hereby is

granted; and it is further

**ORDERED** that Defendant shall reliquidate all entries of Betatene® 7.5%N

under subheading 2936.90.01, HTSUS; and it is further

**ORDERED** that Defendant shall refund all excess duties collected on the

imported merchandise, with interest as provided for by law.


                              _____
                                   Lisa W. Wang, Judge

Dated: _____
          New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE
_____
                                                    :
BASF CORPORATION,                                   :
                                                    :
                                    Plaintiff,      :
                                                    :
                          v.                        :    Consol. Court No. 12-00422
                                                    :
UNITED STATES,                                      :
                                                    :
                                    Defendant.      :
_____:

## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

BASF Corporation, plaintiff, pursuant to Rule 56 of the rules of the United States Court of International Trade, respectfully moves this Court for summary judgment in its favor and against the defendant, the United States. Summary judgment in favor of the plaintiff is appropriate because there are no genuine issues of material fact, and plaintiff is entitled to judgment in its favor as a matter of law, as supported by plaintiff's Memorandum of Law and accompanying documents in support of this motion for summary judgment.

Plaintiff moves for summary judgment in its favor because, as a matter of law, the proper tariff classification for the imported merchandise is subheading 2936.90.01 and not under subheading 2106.990.99, as liquidated. Plaintiff further moves this court for an order directing defendant to reliquidate the involved entries, to refund the excess duties collected by defendant, with interest as provided by law, and for all other relief the Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests that its motion for summary judgment be granted.

Respectfully submitted,

/s/Frederic D. Van Arnam, Jr.
Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
100 William Street, Suite 305
New York, New York 10038

Tel: (212) 725-0200, ex. 126
rvanarnam@barnesrichardson.com
*Attorneys for Plaintiff*

Dated:      October 29, 2024
            New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE
_____
                                     :

BASF CORPORATION,                :

                       :

              Plaintiff,   :    **PUBLIC**

                       :

         v.           :    Consol. Court No. 12-00422

                       :

UNITED STATES,          :    Confidential Information

                       :    Redacted on Page 12

             Defendant. :    and Exhibits 1 and 6
_____:

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
100 William Street, Suite 305
New York, New York 10038

Tel: (212) 725-0200, ex. 126
rvanarnam@barnesrichardson.com
*Attorneys for Plaintiff*

Dated:    October 29, 2024
           New York, New York

TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................i-iii

TABLE OF AUTHORITIES ........................................................iii-vii

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ........................................................1

INTRODUCTION ........................................................................1

RELEVANT PORTIONS OF THE TARIFF SCHEDULE ......................3

    1.    Subheadings Under Which the Imported Merchandise
        was Liquidated ...........................................................3

    2.    Subheading Under Which BASF Claims Classification ...........3

    3.    Other Relevant Tariff Provisions ......................................4

RELEVANT PORTIONS OF THE EXPLANATORY NOTES..................5

QUESTION PRESENTED FOR DECISION......................................6

    1.    Whether the imported merchandise is classified as a
        provitamin under 2936.90.01, HTSUS as alleged in BASF's
        consolidated complaint? ................................................6

STATEMENT OF FACTS ...........................................................6

    1.    The Role of the Ingredients in Betatene .........................8

    2.    The Manufacturing Process ..........................................12

    3.    The Uses of Betatene ..................................................15

SUMMARY OF ARGUMENT .....................................................17

JURISDICTION AND STANDARD OF REVIEW ..............................19

i

ARGUMENT ..................................................................................21

I.   This Court Is to Apply a Two-Step
     Analysis in a Classification Dispute ...................................21

II.  Historically, Formulated Vitamins and Provitamins,
     Including Beta-Carotene, Have Been
     Classified Under Heading 2936 .......................................23

     A.   Tariff Classification of Formulated Vitamins
          and Provitamins. ......................................................24

     B.   The Beta-Carotene
          Litigations. ...............................................................27

III. The Imported Merchandise is Properly
     Classified in Heading 2936 Pursuant to GRI 1 .....................32

     A.   Betatene is Eo Nomine Provided
          for in Heading 2936....................................................33

          1. Beta-Carotene is Provitamin A ..............................35

          2. The Beta-Carotene in Betatene is Natural..........................37

          3. The Natural Beta-Carotene is in a Solvent .........................37

              a. The Reference to "Solvent" in Heading 2936
                 Contains no Conditional Language................................39

              b. Even if Chapter 29 Note 1(e) Applies to Heading 2936
                 Betatene Is Still Within the Scope of Heading 2936......41

                  i. The Solvent is Normal and Necessary for
                     Putting up Fat-Soluble Vitamins and
                     Provitamins for Safety and Transport ......................41

                  ii. The Solvent Does Not Render the Beta-Carotene
                      Particles Particularly Suitable for
                      Specific Rather than General Use.............................44

4.  The Natural Beta-Carotene in a Solvent is
    Formulated Consistent with Chapter 29, Note 1(f) ............53

    a.  Natural Provitamins in a Solvent is
        a Product of Heading 2936 that May Be
        Stabilized for Preservation or Transportation ...............54

    b.  The Natural Beta-Carotene in Soybean Oil
        in Betatene is Stabilized by Ingredients
        Contemplated by the ENs ................................................55

    c.  The Stabilizing Ingredients are Added In Quantities
        Necessary for Preservation or Transport of the
        Beta-Carotene Oily Droplets in the Beadlet..................57

    d.  The Stabilizing Ingredients Do Not Alter the
        Character of the Basic Product and Render it
        Particularly Suitable for Specific Use
        Rather than General Use ................................................59

IV.   Betatene in Excluded from Heading 2106
      Because it is Classifiable in Heading 2936...........................................63

CONCLUSION.............................................................................................64

CERTIFICATE OF COMPLIANCE .........................................................65

iii

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alcan Food Packaging (Shelbyville) v. United States,* 771 F.3d 1364,
(Fed. Cir. 2014) ..................................................................................... 21

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................... 19

*Adickes v. S.H. Kress* & Co., 398 U.S. 144 (1970) ............................................. 20

*Am. Net.* & *Twine Co. v. Worthington,* 141 U.S. 468 (1891) ............................. 20

*Anhydrides* & *Chems., Inc. v. United States,* 130 F.3d 1481,
(Fed. Cir. 1997) ..................................................................................... 20

*BASF Corp. v. United States,*
482 F.3d 1324 (Fed. Cir. 2007) ......................................................... *passim*

*BASF Corp. v. United States,*
391 F. Supp.2d 1246 (Ct. Int'l Trade 2005) ................................... 27, 28, 42

*BASF Corp. v. United States,*
798 F. Supp.2d 1353 (Ct. Int'l Trade 2011) ................................... 28, 29, 35

*Bausch* & *Lomb, Inc.,* 148 F. 3d 1363 (Fed. Cir. 1998) .................................... 21

*BP Am. Prod. Co. v. Burton,*
549 U.S. 84 (2006) ..................................................................................... 40

*CamelBak Prods., LLC v. United States,*
649 F.3d 1361 (Fed. Cir. 2011) ................................................................ 34

*Carl Zeiss, Inc. v. United States,*
195 F.3d 1375 (Fed. Cir. 1999) ................................................................ 34

*Connecticut Nat'l Bank v. Germain,*
503 U.S. 249, 253-54 (1992) ..................................................................... 40

*Degussa Corp. v. United States,*
508 F.3d 1044 (Fed. Cir. 2007) ................................................................ 36

iv

*Dependable Packaging Solutions, Inc. v. United States*,
757 F. 3d 1374 (Fed. Cir. 2014) ................................................................22

*EM Indus., Inc. v. United States,* 22 CIT 156,
999 F. Supp. 1473 (1998) ........................................................................ 22

*Estate of Cowart v. Nicklos Drilling Co.*,
505 U.S. 469, 475 (1992) ..........................................................................40

*GE-Med. Sys. Group v. United States*,
247 F.3d 1231 (Fed. Cir. 2001) ...............................................................33

*Kahrs Int'l, Inc. v. United States,* 713 F.3d 640 (Fed. Cir. 2013) ............ 21

*Libas, Ltd. v. United* States,
193 F.3d 1361 (Fed. Cir. 1999) ........................................................... 39-40

*National Advanced Sys. v. United States*,
26 F.3d 1107 (Fed. Cir. 1994) ..................................................................34

*Nidec Corp. v. United States*,
68 F.3d 1333 (Fed. Cir. 1995) ..................................................................33

*North. Am. Processing Co. v. United States*,
236 F.3d 695 (Fed. Cir. 2001) ..................................................................34

*Orlando Food  Corp. v. United States,* 140 F.3d 1437,
(Fed. Cir. 1998)........................................................................................ 21

*Roche Vitamin, Inc. v. United States*,
772 F.3d 728 (Fed. Cir. 2014) .........................................................*passim*

*Roche Vitamins, Inc. v. United States*,
922 F. Supp.2d 1353 (Ct. Int'l Trade 2013) .............................7, 29, 30, 31

*Roche Vitamins, Inc. v. United States*,
750 F. Supp.2d 1367 (Ct. Int'l Trade 2010) .................................28, 29, 37

*Rollerblade, Inc. v. United States*,
282 F.3d 1349 (Fed. Cir. 2002) .................................................22, 33, 63

*Rubin v. United States*,
449 U.S. 424, 430 (1981) .................................................................... 40-41

*Sandoz Chemical Works, Inc. v. United States,*
43 C.C.P.A. 152, 156, C.A.D. 623 (1956) ................................................................40

*Schlumberger Tech. Corp. v. United States,*
845 F.3d 1158 (Fed. Cir. 2017) ...............................................................................33

## STATUTES AND REGULATIONS

19 U.S.C. § 1515 ....................................................................................................19

28 U.S.C. § 1581(a) ...............................................................................................19

USCIT Rule 56(a) ...................................................................................................1

USCIT R. 56(c) .......................................................................................................19

General Rule of Interpretation 1.........................................................................4-5

Chapter 29 Note 1(b) ........................................................................................35, 37

Chapter 29 Note 1(e) ....................................................................................*passim*

Chapter 29 Note 1(f) .....................................................................................*passim*

Heading 2106...........................................................................18, 22, 26, 63

Subheading 2106.90.99 .................................................................................1, 2, 3

Heading 2936...............................................................................................*passim*

Subheading 2936.90.01 ................................................................................ *passim*

## OTHER AUTHORITIES

Explanatory Note 29.36 ................................................................................*passim*

Explanatory Notes, Chapter 29.....................................................36, 38, 39, 40

*Random House Webster's Unabridged Dictionary*, p. 1557 (2nd Ed. 1998)..........6, 37

NY 851655 (May 8, 1990), *revoked by* HQ 955754 (Aug. 22, 1994) ........................24

NY 850781 (Mar. 30, 1990), *revoked by* HQ 955867 (Aug. 22, 1994).....................24

NY 850780 (Mar. 30, 1990), *revoked by* HQ 955867 (Aug. 22, 1994).....................24

NY 839134 (Apr. 27, 1989), *revoked by*, HQ 953829 (July 26, 1993)......................24

*Classification Disputes Settled by the Harmonized System Committee*
*at its First Ten Sessions (1988-1992)* p. 35 (WCO 1994) ..........................................24

HQ 953829 (July 26, 1993) ..........................................................................................25

HQ 955754 (Aug. 22, 1994) ..........................................................................................25

HQ 955867 (Aug. 22, 1994) ..........................................................................................25

NY 890990 (Jan. 12, 1994) ...........................................................................................25

NY 890993 (Jan. 13, 1994) ...........................................................................................25

*Amendments to the Compendium of Classification Opinions*
*Arising from the Classification of Certain Vitamin-Based Preparations,*
Annex A to Doc. 41.279E (HSC/20/Nov.97) p. A/1............................................ 25-26

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE

———————————————————————
                                        :

BASF CORPORATION,                  :

                                :

                       Plaintiff,    :     **PUBLIC**

                                :

                    v.         :     Consol. Court No. 12-00422

                                :

UNITED STATES,                   :     Confidential Information

                                :     Redacted on Pages 12

                     Defendant.  :     and Exhibits 1 and 6

———————————————————————:

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

This memorandum is submitted pursuant to Rule 56(a) of the Rules of the United States Court of International Trade in support of Plaintiff's Motion for Summary Judgment. Plaintiff BASF Corporation ("BASF" or "plaintiff") moves for judgment in its favor because, as a matter of law, the proper tariff classification of the imported merchandise is subheading 2936.90.01, Harmonized Tariff Schedule of the United States (HTSUS 2011 or 2012), and not under subheadings 2106.90.99, HTSUS (2011 or 2012) as liquidated by defendant ("United States" or "defendant").

## INTRODUCTION

This case concerns the tariff classification of formulated beta-carotene imported by BASF under the tradename Betatene® 7.5% N (the "imported merchandise" or "Betatene"). The imported merchandise is a dark red powder made up of very fine individually microencapsulated beadlets that are approximately 240 to 300 micron in size, with each beadlet consisting of a beta-

carotene carotenoid mixture (hereafter "beta-carotene"), derived from the alga *Dunaliella salina,* dissolved in soybean oil and enrobed in a protective matrix of gelatin and sucrose, with ascorbyl palmitate and tocopherols as antioxidants, and with silicon dioxide as an anti-caking agent and flow aid.  Plaintiff's Statement of Undisputed Material Facts ("PSUMF"), ECF No. 67-1 at ¶7.  By its very nature, beta-carotene is both organic coloring matter and provitamin A.  PSUMF at ¶¶ 9, 10, 11.  It is highly sensitive, and it must be formulated and stabilized to protect it against oxygen, moisture, sunlight, and stresses that would cause the beta-carotene to degrade and to lose its ability to color and to be provitamin A. PSUMF at ¶¶ 16, 17, 18.  It is also pyrogenic if not stabilized. PSUMF at ¶16

BASF imports Betatene in bulk form.  Thereafter, it sells Betatene to companies that primarily use it to manufacture human dietary supplements such as tablet and hard capsule, PSUMF at ¶47, though nothing about the Betatene formulation prevents it from being used in different applications either as a source of provitamin A or as a colorant.  PSUMF at ¶45-52.

U.S. Customs and Border Protection ("CBP") classified the imported merchandise upon liquidation under the residual, catchall provision, subheading 2106.90.99 as "[f]ood preparations not elsewhere specified or included: [o]ther: [o]ther."  BASF argues that the imported merchandise is classifiable under the *eo nomine* subheading 2936.90.01 as "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . . : [o]ther, including provitamins and natural concentrates."

BASF believes no material facts are in dispute and that the parties agree that this Court has jurisdiction to decide BASF's claim. Instead, the dispute at issue concerns the question of law as to how the imported merchandise is to be classified under the HTSUS. Therefore, the matter may be decided by summary judgment and BASF respectfully submits that subheading 2936.90.01 is the legally sustainable classification for the imported merchandise.

## RELEVANT PORTIONS OF THE
## HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

1.  <u>Subheading Under Which the Imported Merchandise was Liquidated</u>

**2106 (HTSUS 2011, 2012)**      Food preparations not elsewhere specified or included:

2106.90                                        Other:

2106.90.99                                        Other.

For both years, this subheading was dutiable at 6.4 percent *ad valorem*.

2.  <u>Subheading Under Which BASF Claims Classification</u>

**2936 (HTSUS 2011, 2012)**      Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrate), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent . . . :

2936.90.01                                        Other, including provitamins and natural concentrates

For both years, this subheading was duty-free.

3.     Other Relevant Tariff Provisions

**General Rule of Interpretation 1 (HTSUS 2011, 2012)**

1. The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions . . ..

**Chapter 29, Note 1 (HTSUS 2011, 2012)**

1. Except where the context otherwise requires, the headings of this chapter apply only to:

(a) Separate chemically defined organic compounds, whether or not containing impurities;

(b) Mixtures of two or more isomers of the same organic compound (whether or not containing impurities), except mixtures of acyclic hydrocarbon isomers (other than stereoisomers), whether or not saturated (chapter 27);

(c) The products of headings 2936 to 2939 or the sugar ethers, sugar acetals and sugar esters, and their salts, of heading 2940, or the products of heading 2941, whether or not chemically defined;

(d) Products mentioned in (a), (b) or (c) above dissolved in water;

(e) Products mentioned in (a), (b) or (c) above dissolved in other solvents provided that the solution constitutes a normal and necessary method of putting up these products adopted solely for reasons of safety or for transport and that the solvent does not render the product particularly suitable for specific use rather than for general use;

(f) The products mentioned in (a), (b), (c), (d) or (e) above with an added stabilizer (including an anticaking agent) necessary for their preservation or transport.

4

(g) The products mentioned in (a), (b), (c), (d), (e) or (f) above with an added antidusting agent or a coloring or odoriferous substance added to facilitate their identification or for safety reasons, provided that the additions do not render the product particularly suitable for specific use rather than for general use;

(h) The following products, diluted to standard strengths, for the production of azo dyes: diazonium salts, couplers used for these salts and diazotizable amines and their salts.

## RELEVANT PORTIONS OF THE EXPLANATORY NOTES TO THE HARMONIZED COMMODITY DESCRIPTION AND CODING SYSTEM

**Explanatory Note 29.36**

Sub-Chapter XI

PROVITAMINS, VITAMINS AND HORMONES GENERAL

\*          \*          \*          \*          \*

29.36

\*          \*          \*          \*          \*

This heading includes:

(a) Provitamins and vitamins, whether natural or reproduced by synthesis, and derivatives thereof used primarily as vitamins.

(b) Concentrates of natural vitamins (e.g., of vitamin A or of vitamin D); these are enriched forms of these vitamins. These concentrates may be used as such (e.g., for adding to animal feeding stuffs), or they may be worked up for the isolation of the vitamin.

(c) Intermixtures of vitamins, of provitamins or of concentrates, such as, for instance, natural concentrates of vitamins A and D in various proportions, to which an additional quantity of vitamin A or D has been added subsequently.

(d) The above products diluted in any solvent (e.g., ethyl oleate, propane-1,2-diol, ethanediol, vegetable oils).

5

The products of this heading may be stabilised for the purposes of preservation or transport :

- by adding anti-oxidants,

- by adding anti-caking agents (e.g., carbohydrates),

- by coating with appropriate substance (e.g., gelatin, waxes or fats), whether or not plasticised, or

- by adsorbing on appropriate substances (e.g., silicic acid),

provided that the quantity added or the processing in no case exceeds that necessary for their preservation or transport and that the addition or processing does not alter the character of the basic product and render it particularly suitable for specific use rather than for general use.

## QUESTION PRESENTED FOR DECISION

1.      Whether the imported merchandise is classified as a provitamin under 2936.90.01, HTSUS as alleged in BASF's consolidated complaint?

## STATEMENT OF FACTS

Beta-carotene is a carotenoid, which is a group of red and yellow pigments found in many plants or produced synthetically.  PSUMF at ¶8.  In addition to being an important food colorant that imparts color in the spectrum of yellow to orange to red, beta-carotene is provitamin A, and one important use of it is as a safe source of vitamin A in dietary supplement products.[1] PSUMF at ¶9-11.

---

[1] A provitamin is a substance which is converted into a vitamin within an organism.  *See* "Provitamin," *Random House Webster's Unabridged Dictionary*, p. 1557 (2nd Ed. 1998) ("a substance that an organism can transform into a vitamin, as carotene, which is converted to vitamin A in the liver").  Beta-carotene is a safe source of vitamin A as it is metabolized by the human body into vitamin A alcohol,

Beta-carotene, however, is an extremely sensitive compound, prone to oxidation, degradation and decomposition when exposed to oxygen, moisture, humidity, ultraviolet rays or stresses.  PSUMF at ¶16, 17.  When handled improperly, beta-carotene can be pyrogenic, meaning it self-ignites when exposed to air.  PSUMF at ¶16.  Also, beta-carotene is insoluble in water and therefore must be formulated before it can become bioavailable to humans or so it can impart color to foodstuffs.  PSUMF at ¶12, 18.

Companies like BASF overcome these challenges by creating formulations of beta-carotene, which formulations are mixtures of the active ingredient beta-carotene with other inactive ingredients.  PSUMF at ¶19, 20.  In these mixtures, the inactive ingredients serve to carry, stabilize, protect and preserve the beta-carotene, thus allowing for safe handling, storage and transportation and to ensure the bioavailability of the provitamin A and its color strength in end use applications.  PSUMF at ¶19, 20.  A "stabilizing matrix of some kind is necessary for any beta-carotene product, and beta-carotene must be processed and combined with other ingredients to be commercially usable as either a provitamin A or colorant."  *Roche Vitamin, Inc. v. United States*, 772 F.3d 728, 730 (Fed. Cir. 2014), *citing Roche Vitamins, Inc. v. United States*, 922 F. Supp.2d 1353, 1362 (Ct. Int'l Trade 2013).

---

also known as retinol.  One molecule of beta-carotene can form two molecules of retinol.  Overdosage of vitamin A will lead to adverse effects in humans and this can be avoided by using beta-carotene instead, as the body will convert provitamin A to vitamin A only if needed.

*1.  The Role of the Ingredients in Betatene*

In Betatene, beta-carotene is the source of provitamin A and the ability to impart color.  PSUMF at ¶15.  The other ingredients are considered formulation ingredients, and their purpose is to carry and stabilize the beta-carotene or are processing aids to keep the beadlets from agglomerating.  PSUMF at ¶¶ 27-29, 36-40.

The ingredients used in the Betatene were chosen by BASF to work together to carry, stabilize and preserve the beta-carotene by protecting it from oxidation and degradation caused by temperature, moisture, humidity, ultraviolet rays, and stress.  PSUMF at ¶20.  As described below, the formulation ingredients come together via the formulation process to create beadlets that stabilize the oily droplets of beta-carotene particles in a matrix of gelatin and sucrose, with antioxidants present to add additional stability and preservation.  PSUMF at ¶¶ 27-29, 36-40.  During the development of a formulation such as Betatene, the stability of the formulation as a bulk product and in applications is tested.  The composition, percentage and cost of ingredients is changed until a satisfactory stability is achieved.  Thus, these processing ingredients are present in amounts no more than necessary to accomplish this goal.  PSUMF at ¶¶ 55, 56.  If the formula was altered, or an ingredient removed, then the stability of the beta-carotene would be compromised.  *Id*.

The ingredients used in Betatene are as follows:

*Beta-Carotene*

This is the active ingredient in Betatene.  PSUMF at ¶14.  It contains a natural mix of trans- and cis- beta-carotene (94.5%) and a small amount of its isomer alpha-carotene (3.5%). PSUMF at ¶21, 22.  Because it is derived from algae, *de minimis* levels of other substances (2%), such as lutein and zeaxanthin, may be present in the Betatene as impurities not removed during the extraction process.[2] PSUMF at ¶23.  Nothing in Betatene's formulation changes the beta-carotene's inherent character as a source of provitamin A or its ability to color. PSUMF at ¶44, 45.

*Soybean Oil*

Beta-carotene can impart color to food stuffs or be bioavailable to the human body as provitamin A only if formulated.  *Roche Vitamins*, 772 F. 3d at 730.  It is insoluble in water and therefore must be formulated into very fine particles for commercial application, as only when present in the form of very fine particles can beta-carotene impart color or be absorbed on ingestion.  PSUMF at ¶29.  One way to overcome the challenge of bioavailability is first to dissolve it in an organic solvent such as soybean or other vegetable oils, as beta-carotene is fat soluble.  PSUMF at ¶27.  After the beta-carotene is dissolved with the soybean oil, the soybean oil functions as a carrier for it, and additionally the soybean oil acts also as a stabilizer by preventing oxygen exposure.  PSUMF at ¶27, 28.  These tiny droplets of oil

---

[2]  These substances do not provide any provitamin A activity.

containing the beta-carotene particles are then embedded in the protective matrix during the next part of the formulation process. PSUMF at ¶31-42.  The soybean oil in Betatene functions as a solvent, a carrier and a stabilizer for the beta-carotene during all stages from extraction through the formulation process into the Betatene formulation, through subsequent use of Betatene by BASF's customers, and into the human body via digestion. PSUMF at ¶27.

*Gelatin*

Gelatin is a natural polymer derived from collagen found in animal tissues. It is a film forming polymer, and upon drying with the other ingredients forms a dense, impermeable, and physically stable matrix.  PSUMF at ¶¶36-38.  The gelatin in Betatene is porcine gelatine, and together with the sucrose forms the stabilizing matrix.  *Id.*  This non-brittle, elastic matrix safeguards the beta-carotene oily droplets from exposure to oxygen, moisture, humidity or UV rays and provides mechanical stability against external stresses that could cause the beadlet to crack and expose the beta-carotene to those elements.  *Id.*  It also acts as an emulsifier during the formulation.

*Sucrose*

Sucrose is a disaccharide of glucose and fructose.  It works with the gelatin to form the matrix embedding the beta-carotene droplets. PSUMF at ¶¶ 36-38.  Also, the plasticizing effect created by the interaction of the sucrose and the gelatin gives mechanical stability to the beadlet, which prevents damage during storage, handling or use.  PSUMF at ¶37.

10

*Ascorbyl Palmitate*

Ascorbyl palmitate is used as an antioxidant in Betatene.  PSUMF at ¶39. It provides a stabilizing function by attacking oxygen that would degrade the beta-carotene.  *Id.*

*Mixed Tocopherols/Tocopherol-Rich Extract*

Mixed tocopherols, also known as tocopherol-rich extract, are used also as an antioxidant in Betatene.  *Id.*  Like ascorbyl palmitate, the mixed tocopherols help stabilize the beta-carotene by preventing oxidation. *Id.*

*Silicon Dioxide*

Betatene uses silicon dioxide as a flow aid and anti-caking agent.  PSUMF at ¶40.  By adhering to the outer surface of the beadlets, it keeps them from agglomerating, producing a flowable powder.  *Id.*  It remains in Betatene as a by-product of the manufacturing process.

*Water*

The beadlets are dried until a certain amount of residual moisture is present in the Betatene.  PSUMF at ¶41.  It serves no purpose and is a by-product of the manufacturing process.  Further drying results in a matrix that may be more brittle.

The following chart shows the percentages by weight of each ingredient.

| Betatene Product | Ingredients | 1 Gram Typically Contains | % by Weight | Reason for Inclusion in Product |
|---|---|---|---|---|
| | | [mg] | [%] | |
| Betatene 7.5% N | | | | |
| | Beta-carotene, alpha carotene and residual carotenoids derived from algae | [   ] | [   ] | source of provitamin A |
| | Gelatin | [   ] | [   ] | form protective matrix with sucrose |
| | Sucrose | [   ] | [   ] | form protective matrix with gelatin |
| | Soybean Oil | [   ] | [   ] | solvent/stabilizer/carrier |
| | Ascorbyl palmitate | [   ] | [   ] | antioxidant |
| | Mixed Tocopherols | [   ] | [   ] | antioxidant |
| | Silicon Dioxide | [   ] | [   ] | anticaking/flow aid |
| | water | [   ] | [   ] | residual moisture |

*See*, Plaintiff's Exhibit ("Pl. Ex.") 1, ECF No. 67-2, Plaintiff's Response to

Defendant's First Interrogatories and Request for Production Directed to Plaintiff,

("*Plaintiff's Interrogatory Responses*") at p. 8.

### 2. *The Manufacturing Process*

As mentioned above, a stabilizing matrix is needed for beta-carotene

products, *Roche Vitamin*, 772 F.3d at 730, and the imported Betatene is no

different. Unlike other beta-carotenes that are synthesized, Betatene is obtained

naturally from the alga *Dunaliella salina*. PSUMF at ¶21. The algae are grown in open air, saltwater lagoons in Australia using sunlight and consuming carbon dioxide. PSUMF at ¶24. The algae produce carotenoids to protect themselves from the sunlight. PSUMF at ¶24. The algae are then harvested from the lagoons, and the carotenoids are extracted using d-limonene. PSUMF at ¶25. This extract is then prepared and further concentrated as a suspension in the soybean oil, resulting in an oily dispersion consisting of approximately 30 percent beta-carotene and 70 percent soybean oil. PSUMF at ¶26.

Next, the beta-carotene oily dispersion is transported to a tolling facility in Japan operated by Riken Vitamin Co., Ltd, where it is formulated into microspheres, also known as beadlets. PSUMF at ¶30. This process involves the following steps. Mixed tocopherols are introduced as an antioxidant into the beta-carotene/soybean oil dispersion in a first phase. PSUMF at ¶31. This mixture is then heated. *Id.* At the same time, in a second phase using heat and shear force, the gelatin is dissolved with the sucrose and the antioxidant ascorbyl palmitate in water. PSUMF at ¶32. The two phases are then combined during a homogenization phase, creating an emulsion of all the ingredients. PSUMF at ¶33.

The emulsion is then sprayed into a spray cooler tower. PSUMF at ¶34. This results in the creation of liquid microspheres, or droplets, of the emulsion, with each microsphere containing a proportional amount of the ingredients. *Id.* The droplets freeze when sprayed into the cold air in the tower. *Id.* After thawing, the droplets are dried using fluidized bed dryers. PSUMF at ¶35. A fluidized bed is a device

serving to maintain particles in a fluidized state (i.e., continuous motion) by blowing air up from the bottom of the tower.  Air flow and temperature are controlled to dry the individual droplets, and to cause the gelatin and sucrose in each droplet to combine into solid beadlets measuring 240-300 micrometers that embeds the beta-carotene oily droplets and antioxidants in a protective matrix.  *Id.*

Upon drying, the gelatin and sucrose form a dense, tight, and amorphous matrix that strongly hampers the access of oxygen and moisture to the embedded oily drops of beta-carotene within the matrix. PSUMF at ¶36.  The gelatin, a protein, and the sucrose, a carbohydrate, function to plasticize the matrix, making the beadlets less brittle.  PSUMF at ¶37.  In turn, this helps protect the beadlets from cracking during storage and handling, and it prevents the beadlets from sticking together.  *Id.*  Each beadlet consists of millions of micron-sized droplets of beta-carotene dissolved in soybean oil. PSUMF at ¶44.

Silicon dioxide is also introduced into the process, where it functions as an anti-caking agent and flow aid, keeping the individual beadlets from agglomerating to each other or sticking to production equipment. PSUMF at ¶40.

After drying, the beadlets, now in powder form, are collected.  PSUMF at ¶41. Additional processing includes sieving to remove coarse and fine fractions, and batch blending.   At this point, Betatene has been produced.  PSUMF at ¶42.  The cross-section of a typical beadlet is represented by the following, with the blue colored area the gelatin and sucrose protective matrix, the white area the silicon

14

dioxide anticaking agent, and the orange area the millions of droplets of beta-carotene particles dissolved in the soybean oil in each beadlet.



### 3.  The Uses of Betatene

As discussed above, beta-carotene has two inherent characteristics.  It is provitamin A and organic coloring matter.  However, it must be formulated to stabilize it and to render it commercially suitable for use as a source of provitamin A or as a colorant.  *Roche Vitamins*, 772 F.3d at 730.  It is not a commercial product absent formulation. PSUMF at ¶18.

BASF and other companies produce beta-carotene formulations that are optimized for a range of commercial application, such as oily dispersions typically used for coloring certain foods or soft capsules, beadlet-based powders for tablets and hard capsule, or cold-water dispersible powders intended for applications in

cold water. Different ingredients may be used in the various formulations. For example, where a customer desires a product without porcine gelatin for kosher or halal reasons, a fish or bovine gelatin might replace it. PSUMF at ¶57. Or where a vegetarian or vegan product is needed, instead of porcine gelatine, the formulator could use a non-animal source such as maltodextrin or gum arabic. *Id.* These replacement ingredients perform the same stabilizing functionality in the matrix as the porcine gelatin. A client might desire a product free of genetically modified organisms, so soybean oil might be replaced by olive oil, but the difference in oil type does not change the role of the oil as a solvent and carrier for the beta-carotene particles, as well as providing protection and stabilization against oxidation. *Id.*

In all cases, however, the formulations do not chemically modify the beta-carotene. PSUMF at ¶¶ 45, 46. It remains provitamin A and a colorant, albeit now bioavailable and stabilized. These formulations, while optimized for certain end uses, can be used for different applications as a source of provitamin A or color. PSUMF at ¶¶ 49-52.

Betatene is no different than the other beta-carotene products in the marketplace. Like products previously before this court, such as the Beta-Tab 20% product in the *Roche Vitamins* case and the Betavit® 10% and 20% products (later renamed Beta-Carotene 10% DC and 20% DC) at issue in *BASF Corporation v. United States*, 798 F. Supp.2d 1353 (Ct. Int'l Trade 2011), Betatene is formulated to optimize its use in tablets and hard capsules, and is marketed by the company as such. PSUMF at ¶47. Like the beta-carotene formulations in the *Roche Vitamins,*

16

*BASF* and in this case, they are microencapsulated beadlets, with the beadlets consisting of a gelatin and sucrose matrix, with added antioxidants, which stabilizes and preserve the beta-carotene particles within that matrix. PSUMF at ¶¶ 7, 20, 42.

And like the formulations in the *Roche Vitamins* and *BASF* cases, nothing about the Betatene formulation prevents it from being used either as a source of provitamin A or as a colorant in various applications. PSUMF at ¶¶ 49-52. While optimized for tablets or hard capsules, nothing about the formulation prevents it from being used as a source of provitamin A in other nutritional supplements or pill forms such as chewable gummies or effervescent tablets. PSUMF at ¶51. It can provide provitamin A to fortified foods such as nutritional supplement bars or beverages. PSUMF at ¶50. Betatene's formulation does not prevent it from being used to color foods (and to add provitamin A to those foods too). PSUMF at ¶52.

## SUMMARY OF ARGUMENT

The tariff classification of Betatene® 7.5% N is subheading 2936.90.01. General Rule of Interpretation ("GRI") 1 of the HTSUS provides that classification is according to the headings and any relative section or chapter notes. The tariff term "Provitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent" in heading 2936 covers natural beta-carotene, which is provitamins A, in a solvent. Chapter 29, Note 1 expands heading 2936 to allow for natural provitamins, including isomeric mixtures thereof, in solvents to be stabilized with other substances if the "added stabilizer (including an anticaking

17

agent) [is] necessary for their preservation or transport."  Explanatory Note 29.36 expands on Chapter 29, Note 1(f) to permit the presence of the stabilizer if that addition does not 1) alter the character of the vitamin or provitamin and 2) render it particularly suitable for specific use rather than general use.  Because Betatene consists of microencapsulated beadlets made of provitamin A (beta-carotene) in a solvent (soybean oil) stabilized in a plasticized gelatin and sucrose matrix with antioxidants and silicon dioxide as an anticaking agent, which stabilizer does not alter the beta-carotene's provitamin A characteristics nor render the Betatene a specific use rather than a general use, Betatene remains within the scope of the *eo nomine* reference to "Provitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent" and Chapter Note 1(f)'s characterization of a permissible stabilizer.  Therefore, classification under heading 2936 at subheading 2936.90.01 is correct.

In turn, this means that Betatene is "elsewhere specified or included" in a more specific tariff provision than the tariff classification in which it was liquidated, heading 2106.  Heading 2106 is a residual, catch-all basket provision that is only appropriate when the imported merchandise is not more specifically provided for in another tariff classification.  Because Betatene is specifically provided for in heading 2936, heading 2106 cannot be sustained as the classification for Betatene.

## JURISDICTION AND STANDARD OF REVIEW

BASF brings this action pursuant to 19 U.S.C. § 1515 and this court has jurisdiction pursuant to 28 U.S.C. § 1581(a).  PSUMF at ¶2.  The protests at issue in this case were denied by CBP on August 16, 2012, and March 4, 2013.  Thereafter, BASF filed timely summons on December 27, 2012, and March 19, 2013, which were assigned court numbers 12-00422 and 13-00109.  *See BASF Corporation v. United States*, court no. 12-00422, ECF No. 1; *BASF Corporation v. United States*, court no. 13-00109, ECF No.1.  All liquidated duties, taxes and fees owed on the entries had been paid prior to filing the summonses. PSUMF at ¶3.  Court of International Trade court nos. 12-00422 and 13-00109 were consolidated into consolidated case no. 12-00422 on January 19, 2022.  *See BASF Corporation v. United States*, court no. 12-00422, ECF No. 29; *BASF Corporation v. United States*, court no. 19-00195, ECF No. 29.  Thereafter, on March 27, 2024, consolidated court no. 13-00318 was reassigned from the Honorable Richard K. Eaton to the Honorable Lisa W. Wang.  *BASF Corporation v. United States*, consolidated court no. 12-00422, ECF No. 56.

Summary judgment is appropriate under Rule 56 when "there is no genuine issue as to any material fact . . . ." USCIT R. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  This standard does not require that no facts be in dispute.  *Liberty Lobby*, 477 U.S. at 248.  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id*.  To determine whether material

facts are in dispute, the evidence must be considered in a light most favorable to the

non-moving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

Furthermore, ambiguity in classification cases is resolved "in favor of the importer,

since the intention of Congress to impose a higher duty should be expressed in clear

and unambiguous language." *Am. Net. & Twine Co. v. Worthington*, 141 U.S. 468,

474 (1891); *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed.

Cir. 1997) ("[R]evenue statutes, which are neither remedial nor in implementation

of public policy, are in doubtful cases construed in favor of the citizen, lest burdens

be imposed beyond the statutory revenue-producing purpose").

     The primary issue before this Court is whether Betatene is classifiable as a

provitamin under subheading 2936.90.01. If the Court finds that Betatene is a

provitamin of heading 2936, then as a matter of law a decision must enter for

BASF, as the United States' entered classification is a residual, catch-all provision

that only applies when the merchandise is "not elsewhere specified or included."

This is a legal question that can be resolved without trial. Because no genuine

issues of material fact exist in this case, and because the question for this court

involves the legal construction of the tariff, therefore summary judgment is

appropriate.

## ARGUMENT

I.   **This Court Is to Apply a Two-Step
     Analysis in a Classification Dispute**

The court employs a two-step process when analyzing classification issues.
"[F]irst, [it] construe[s] the relevant classification headings; and second [it]
determine[s] under which of the properly construed tariff terms the merchandise at
issue falls." *Bausch & Lomb, Inc.*, 148 F. 3d 1363, 1365 (Fed. Cir. 1998) (citing
*Universal Elects., Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997).  The first
step in this analysis is a question of law, while the second is one of fact.

Because no genuine issue exists as to what the imported merchandise is, this
case raises the question of law of which tariff classification is correct.  Merchandise
entered into the United States is classified under the HTSUS. *Orlando Food Corp.
v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998).  "The HTSUS scheme is
organized by headings, each of which has one or more subheadings; the headings set
forth general categories of merchandise, and the subheadings provide a more
particularized segregation of the goods within each category." *Alcan Food
Packaging (Shelbyville) v. United States*, 771 F.3d 1364, 1366 (Fed. Cir. 2014)
(citations and quotations omitted).

The principles set forth in the GRIs provide the framework for tariff
classification. *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013).
The court's review starts with GRI 1, which provides that "for legal purposes
classification shall be determined according to the terms of the headings and any

relative section or chapter notes." The GRIs are applied sequentially, so if the proper heading can be determined via application of GRI 1, then "the court is not to look to the subsequent GRIs." *Dependable Packaging Solutions, Inc. v. United States*, 757 F. 3d 1374, 1377-78 (Fed. Cir. 2014).

Furthermore, the heading under which the imported goods were classified, heading 2106, is a "basket" provision applicable to goods "not elsewhere specified or included." The classification of imported merchandise in a basket provision is only appropriate when there is no tariff category that covers the merchandise more specifically. *EM Indus., Inc. v. United States*, 22 CIT 156, 999 F. Supp. 1473, 1480 (1998). That is because basket provisions are construed as broad, catch-all provisions that capture articles for which more specific headings do not exist elsewhere in the tariff. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002), *citing EM Indus., Inc.*

For the following reasons, if the Court concludes, as it should, that the imported merchandise is properly classified pursuant to GRI 1 under heading 2936, then as a matter of law that classification is more specific than heading 2106. Judgment must enter for BASF, classifying the merchandise under 2936.90.01.

## II.    Historically, Formulated Vitamins and Provitamins, Including Beta-Carotene, Have Been Classified Under Heading 2936

The tariff classification of formulated vitamins and provitamins, both under the HTSUS as well as under the Harmonized Commodity Description and Coding Systems (the "Harmonized System"),[3] has evolved since 1993, resulting in both CBP and the World Customs Organization ("WCO") directing classification of formulated vitamins and provitamins into heading 2936.  More on point for the tariff classification of formulated beta-carotene, the U.S. Court of Appeals for the Federal Circuit has affirmed two decisions of the U.S. Court of International Trade on the tariff classification of formulated beta-carotene.  These decisions created two paths for the classification of formulated beta-carotene based on its use: 1) where the principal use of the beta-carotene formulation is to color, then classification is in heading 3204 as a colorant[4]; but 2) where the use of the beta-carotene formulation is as provitamin A, then classification of the formulation is in heading 2936 as a provitamin.

---

[3]  The Harmonized System is a multipurpose international product nomenclature developed by the World Customs Organization ("WCO").  The system is used by more that 200 countries as the foundation for their Customs tariffs.  *See*, What is the Harmonized System (HS)?  World Customs Organization; Topics; Nomenclature and Classification of Goods; Overview, https://www.wcoomd.org/en/topics/nomenclature/overview/what-is-the-harmonized-system.aspx (last visited Oct. 13, 2024).

[4]  If the colorant is derived from a natural rather than synthetic source, then heading 3203 would be the correct heading.

A. *Tariff Classification of Formulated Vitamins and Provitamins*

Prior to 1992, formulated vitamins and provitamins were classified by CBP (then U.S. Customs Service) under the HTSUS as medicaments in subheading 3003.90.  Like Betatene, these rulings involved fat soluble vitamins in beadlets. *See*, NY 851655 (May 8, 1990), *revoked by* HQ 955754 (Aug. 22, 1994) (classifying as a medicament three vitamin A acetate formulations, each vitamin A-acetate enrobed in a beadlet consisting of gelatin, lactose, and glycerine); NY 850781 (Mar. 30, 1990), *revoked by* HQ 955867 (Aug. 22, 1994) (classifying vitamin E acetate in gelatin and lactose beadlets).  *See also*, NY 850780 (Mar. 30, 1990), *revoked by* HQ 955867 (Aug. 22, 1994); NY 839134 (Apr. 27, 1989), *revoked by*, HQ 953829 (July 26, 1993).  *See* Pl. Ex. 2, ECF No. 67-3, copies of these and other CBP administrative rulings cited in this memorandum of law.

Effective February 1992, the WCO clarified its position that heading 2936 provides for formulated vitamins.  Specifically, the Harmonized System Committee ("HSC") issued a ruling classifying a formulation consisting of vitamins A and $D_3$ dispersed in a matrix of gelatin and carbohydrates, with an antioxidant vitamins under subheading 2936.28, endorsing the conclusion reached by the WCO's Scientific Sub-Committee that "the **matrix could be regarded as a stabilizer within the meaning of Note 1(f) to Chapter 29** and, therefore, agreed that the product should be classified in heading 29.36." *Classification Disputes Settled by the Harmonized System Committee at its First Ten Sessions (1988-1992)* p. 35 (WCO 1994) (emphasis added).

24

After the HSC had issued its vitamin $AD_3$ ruling, U.S. Customs changed its position on the classification of formulated vitamin and provitamin products, revoking its existing rulings and issuing new rulings.  As a result, formulated vitamins that had been classified in heading 3003 as medicaments were reclassified under heading 2936 as vitamins and provitamins.  *See*, Pl. Ex. 2, ECF No. 67-3:  HQ 953829 (vitamin $AD_3$); NY 890990 (vitamin E); NY 890993 (vitamin $D_3$); HQ 955754 (vitamin A); HQ 955867 (vitamin E). Like the composition of the imported Betatene, the vitamin products in the 1993 and 1994 rulings consisted of an active vitamin ingredient enrobed in a protective matrix coating consisting of gelatin and a carbohydrate, along with an antioxidant.

The reclassification of formulated vitamins and provitamins under heading 2936 became more clearly defined by 1997.  That year, the HSC amended its *Compendium of Classification Opinions*[5] to reflect the following classifications for formulated vitamins:

| | | |
|---|---|---|
| **2936.21** | 1. | **Preparations consisting of vitamin A** (approximately 15% to 17% by weight) stabilised in a matrix with antioxidants or other additives for preservation or transport. |
| **2936.28** | 2. | **Preparations consisting of vitamin E** (approximately 50% by weight) stabilised in a |

---

[5]    The *Compendium* is to be given the same level of persuasive respect as given the *Explanatory Notes to the Harmonized Commodity Description and Coding System* ("*ENs*"), i.e., while neither is legally binding or dispositive, the *Compendium* opinions provide commentary on the scope of each heading of the HTSUS and are indicative of the proper interpretation of the headings.  *See*, 54 *Fed. Reg.* 35127 (Aug. 23, 1989).  Moreover, the *Compendium* "should receive considerable weight."  *Id.*

|          |    | matrix with antioxidants and other additives or adsorbed on amorphous silica for preservation or transport. |
|----------|----|------------------------------------------------------|
| 2936.28  | 3. | **Preparations consisting of a mixture of vitamins A and D$_3$** (approximately 15% to 17% by weight) stabilised in a matrix with antioxidants for preservation or transport. |

*See*, Pl. Ex. 3, ECF No. 67-4, *Amendments to the Compendium of Classification Opinions Arising from the Classification of Certain Vitamin-Based Preparations,* Annex A to Doc. 41.279E (HSC/20/Nov.97) p. A/1.  At that time the HSC also issued three classification rulings addressing vitamin A, classifying it in subheading 2936.21.  *Id.* at pp. A/2 and A/3.

Thus, by the end of 1997 both the U.S. and the WCO had issued rulings reclassifying formulated vitamins and provitamins stabilized by a protective matrix and antioxidants under heading 2936.  Neither the U.S. nor the WCO have revoked these rulings.

Considering this, CBP classifying the imported Betatene outside of heading 2936 and in the residual provision under heading 2106 is contrary to its published rulings and those of the WCO.  Like the products classified by the U.S. and the WCO, Betatene is a product specially called out in heading 2936 and Chapter 29, Note 1:  an active natural provitamin of heading 2936, dissolved in a solvent and stabilized in a protective matrix with antioxidants, *i.e.*, "[p]rovitamins . . . natural . . . in any solvent."

B. *The Beta Carotene Litigations*

The very nature of beta-carotene being both organic coloring matter and provitamin A was reviewed in two court cases, *BASF Corp. v. United States*, 482 F.3d 1324 (Fed. Cir. 2007) ("*BASF I*") (classifying BASF's Lucarotin® 1% formulated beta-carotene product as a colorant in subheading 3204.19.35) and *Roche Vitamins, Inc. v. United States,* 772 F.3d 728, 730 (Fed. Cir. 2014) (classifying Roche's BetaTab® 20% formulated beta-carotene product as a provitamin in subheading 2936.10.00). These two decisions direct tariff classification of formulated beta-carotene products, such as Betatene, according to their principal use as either a colorant or as a provitamin.

Like Betatene, Lucarotin®, the formulated beta-carotene product in *BASF I*, was composed of a dispersion of beta-carotene in soybean oil, which oil functioned as a carrier and stabilizer for the beta-carotene. *BASF Corp. v. United States*, 391 F. Supp.2d 1246, 1249-1250 (Ct. Int'l Trade 2005) (finding of fact 3, 14). In turn, this oily dispersion of dissolved beta-carotene was embedded in very fine beadlets of a dextrin (a polysaccharide) and d-glucose (a sugar) matrix, with dl-alpha tocopherol and ascorbyl palmitate as antioxidants and tricalcium phosphate as a flow aid. *Id. at* 1249 (finding of fact 3). The product was formulated and marketed for use as a colorant in food products and other emulsions. *Id. at* 1250 (Findings of Fact 22, 23).

The trial court held that the Lucarotin® 1% formulated beta-carotene product was classifiable as a colorant in subheading 3204.19.35 (HTSUS 1999). The court construed the meaning of subheading 3204.19.35, "[b]eta carotene and other

27

carotenoid coloring matter," using the canon of construction *noscitur a sociis* and concluded it covered both pure beta-carotene and beta-carotene coloring matter. *Id.* at 1255, 1256 (conclusions of law 25, 27).  Because Lucarotin® 1% was beta-carotene coloring matter, not pure beta-carotene, the court held it was classified under subheading 3204.19.35 as "[b]eta carotene and other carotenoid coloring matter." *Id. at* 1256 (Conclusion of Law 28).

On appeal, the Federal Circuit affirmed.  *BASF I*, 482 F. 3d 1324.  The court acknowledged that the beta-carotene imparted the essential character of the Lucarotin® 1% formulation and that it was formulated for use as a colorant.  Therefore, the Federal Circuit, applying the *eo nomine* rule of tariff construction and the specificity rules, concluded that the decision of the Court of International Trade was correct, and affirmed classification of the Lucarotin® 1% formulation under subheading 3204.19.35 as "[b]eta carotene and other carotenoid coloring matter." *Id*. at 1327.  Thus, the Federal Circuit directed beta-carotene formulations primarily used as a colorant into subheading 3204.19.35 (now 3204.18.00).

A few years later, both BASF and Roche Vitamins sued at the CIT seeking to have formulated beta-carotene intended for use as a provitamin classified under subheading 3204.19.35, but duty-free under the special tariff program called the Pharmaceutical Appendix, or, in the alternative, under heading 2936 as a provitamin.  Both parties brought summary judgment motions seeking either classification.  *See, Roche Vitamins, Inc. v. United States*, 750 F. Supp.2d 1367 (Ct. Int'l Trade 2010); *BASF Corp. v. United States,* 798 F. Supp.2d 1353 (Ct. Int'l Trade

2011) ("*BASF II*").  Both parties' motions were denied, as the courts found questions of fact existed requiring trial.  *Roche Vitamins* at 1369; *BASF II* at 1355.

Thereafter, a trial was had in the *Roche Vitamins* case.[6] *Roche Vitamins* involved a product imported by Roche Vitamins called BetaTab® 20%, which was composed of approximately 20-30% beta-carotene, embedded in beadlets consisting of a gelatin and sucrose matrix, with dl-alpha tocopherols, sodium ascorbate and ascorbyl palmitate as antioxidants and corn starch.[7] *Roche Vitamins, Inc. v. United States*, 922 F. Supp. 2d 1353, 1361 (Ct. Int'l Trade 2013).

The CIT classified the BetaTab® 20% under subheading 2936.10.00 as "Provitamins, unmixed"[8] and not under subheading 3204.19.35.  *Id. at* 1363.  The facts produced at trial established that BetaTab® 20% was formulated and sold to be a source of provitamin A in tablets and capsules and not formulated and sold for use as a colorant.  *Id*.  Therefore, the product was not principally used as coloring matter and thus could not be classified as such under heading 3204.  *Id*.

---

[6]    Because the *Roche Vitamins* case was going to trial first, the *BASF II* case was stayed pending final disposition of *Roche Vitamins*.  See, *BASF Corp. v. United States*, Court No. 02-00558, ECF No. 109.

[7]    While not reported in the decision as an ingredient of BetaTab® 20%, during the trial Roche's primary fact witness testified that during the first phase of producing BetaTab® 20%, the beta-carotene was dissolved in an unnamed organic solvent and mixed with antioxidants.  *See* Pl. Ex. 4, ECF No. 67-5, excerpt from Roche Vitamins Inc. v. United States, court no. 04-00175 ECF 194.

[8]    The subheadings under heading 2936 were renumbered in 2007.  As a result, from 2008 forward provitamins are classified under subheading 2936.90.01.

Instead, the court concluded that BetaTab® 20% was "included in the class of goods covered by Heading 2936 and its subheadings." *Id.* at 1364. Significantly, the CIT held that formulated beta-carotene was not disqualified from heading 2936 based on it being formulated. *Id* at 1363-64. At trial, the CIT found that the stabilizing ingredients in the formulation were necessary and did not render the beta-carotene suitable for a specific rather than a general use, even though the high potency and high bioavailability made it preferable for the manufacture of tablets in the dietary supplement industry. *Id* at 1362. The court recognized that a "stabilizing matrix of some kind is necessary for any beta-carotene product." *Id*. In this case, the matrix forming ingredients were the gelatin, sucrose, and the antioxidants, with the corn starch functioning as an anticaking agent. The court also found that BetaTab® 20% did not contain any ingredients "specifically prepared for tableting." *Id*.

On appeal, the U.S. Court of Appeals for the Federal Circuit affirmed. *Roche Vitamins, Inc. v. United States*, 772 F.3d at 733. The Federal Circuit noted that it was undisputed that the stabilizing ingredients in the formulation were not present in quantities greater than necessary to achieve stabilization. *Id* at 732. It also concluded that the formulation process did not alter the beta-carotene's character as provitamin A, nor did it prepare the product for tableting. *Id* at 732-33. Because the BetaTab® 20% formulation could be used as a source of provitamin A in foods, beverages, and vitamin products, it remained suitable for general use as provitamin A, even though it was formulated and primarily marketed for tablets or capsules. *Id*

30

at 733.  In its decision, the Federal Circuit noted that the stabilizers used in the
BetaTab® 20% "were essentially the same as those used to stabilize other vitamins
and beta carotene products . . .." *Id* at. 732.

 The decision in *Roche Vitamins* very clearly directs classification of
formulated vitamin and provitamin products used as vitamins or provitamins to
heading 2936.  Both the Court of International Trade and the Federal Circuit in
*Roche Vitamins* were clear that the formulation process did not change the
character or function of the active ingredient, in that the beta-carotene remained a
source of provitamin A that could function as such in foods, beverages and dietary
supplements.  *Roche Vitamins*, 922 F. Supp. 2d at 1362; *Roche Vitamins*, 772 F.3d
at 732, 733.  The courts also concluded that the inert ingredients used to create the
formulated product were not present in quantities greater than necessary to achieve
stabilization, nor were they added to provide downstream characteristics required
to make vitamin tablets.  922 F. Supp. 2d at 1362; 772 F.3d at 732.  The courts
noted that the ingredients used to stabilize the beta-carotene were essentially the
same as those used to stabilize other vitamins and beta-carotene formulations.  922
F. Supp. 2d at 1362; 772 F.3d at 732.

 After the *BASF I* and the *Roche Vitamins* decisions, the United States has
followed the dichotomy the decisions created.  Thus, beta-carotene formulations
used as provitamin A have been classified under heading 2936 as a provitamin
while those used as a colorant have been classified under heading 3204 (or 3203 if
the beta-carotene in the colorant is natural rather than synthetic).  *See* Pl. Ex. 5,

ECF No. 67-6 list of the more than 60 court cases stipulated on agreed statements of fact according to this dichotomy.

### III.    The Imported Merchandise is Properly Classified in Heading 2936 Pursuant to GRI 1.

Considering this, Betatene must be classified in subheading 2936.90.01 as "[p]rovitamins . . . natural . . . whether or not in any solvent . . .: [o]ther, including provitamins and natural concentrates" because of its principal use as provitamin A rather than as a colorant.  As will be demonstrated later in this memorandum of law, the Betatene formulation is like BetaTab® 20%, as well as the other products stipulated by the parties under subheading 2936.90.01 including the BASF formulations Betavit® 10%, Betavit® 20%, Beta-Carotene 10% DC and Beta-Carotene 20% DC.  *See Roche Vitamins*, 772 F.3d at 732 (noting that the stabilizers used in Beta-Tab were essentially the same as those used to stabilize other vitamin and other beta-carotene products).  *See also*, Pl. Ex. 6, ECF No. 67-7, which sets out the compositions of these various products.   Each of these products uses gelatin and sucrose to create a protective matrix around the small beta-carotene particles to protect the beta-carotene from air, water, light, ultraviolet rays and physical stress. Each uses antioxidants and anticaking agents.  The beta-carotene in Betatene and in BetaTab® 20% are both first dissolved in a solvent, soybean oil for Betatene and an unidentified solvent for BetaTab® 20%.[9]  The inert ingredients in Betatene, like

---

[9]    See Pl. Ex. 4, ECF No. 67-5 (Roche witness testifies that beta-carotene is first dissolved in a solvent).  Another way to achieve the necessary fine particles of beta-carotene is by milling an aqueous suspension of beta-carotene.  The beta-

those in BetaTab® 20% and the other products stipulated in the wake of *Roche*

*Vitamins*, stabilize and preserve the active ingredient beta-carotene so it can be

used as a source of provitamin A.  Thus, classifying Betatene in subheading

2936.90.01 based on its use as a provitamin rather than as a colorant is consistent

with the Federal Circuit decisions in *Roche Vitamins* and *BASF I.*

A.    *Betatene is Eo Nomine Provided for in Heading 2936*

Tariff classification under the HTSUS is hierarchical and requires that goods

be classified under the most specifically descriptive tariff heading.  *GE-Med. Sys.*

*Group v. United States*, 247 F.3d 1231, 1235 (Fed. Cir. 2001).  There are three main

types of headings under the HTSUS: *eo nomine*, use, and basket provisions.  An *eo*

*nomine* provision describes commodities by well-known names or terms and

includes all items falling into that category regardless of form.  *Nidec Corp. v.*

*United States,* 68 F.3d 1333, 1336 (Fed. Cir. 1995).  A use provision, however,

describes articles by their principal or actual use.  *Schlumberger Tech. Corp. v.*

*United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017). Basket provisions are residual,

catch-all provisions that capture goods not elsewhere classifiable in the tariff.

*Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002).  *Eo nomine*

and use provisions are more specific than basket provisions because of the "not

specified or included elsewhere" language found in basket provisions.

Heading 2936 falls into the *eo nomine* category.  It reads as follows in

---

carotene in the BASF products listed on the chart in Pl. Ex. 6, ECF No. 67-7 are
milled into fine particles that are bioavailable and can color.

pertinent part: "Provitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . .."  It is an *eo nomine* tariff provision that incorporates all forms of the named article including improved forms; in this case, all forms of natural provitamins in solvents.  *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364–65 (Fed. Cir. 2011); *National Advanced Sys. v. United States*, 26 F.3d 1107, 1111 (Fed. Cir. 1994) (absent limiting language or indicia of contrary legislative intent, *eo nomine* tariff provisions cover all forms of the named article).[10]

Tariff classification under the HTSUS implicates not just the language of the headings at issue, but where applicable the General Notes, the General Rules of Interpretation ("GRIs"), the Additional U.S. Rules of Interpretation ("U.S. GRIs"), section and chapter notes.  *North. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001).  According to GRI 1, "classification shall be determined according to the terms of the heading and relevant section of chapter notes."  The language of the heading and any applicable section or chapter notes establish whether the product is classifiable under that heading, with those terms construed according to their common and commercial meaning.  *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

In this case, the tariff classification of Betatene turns on the tariff description set out in heading 2936, and application of Chapter 29, Note 1 to the extent Note 1

---

[10] As discussed earlier in this brief, the tariff heading being defended by the defendant is a basket provision: "Food preparations **not elsewhere specified or included** . . ." (emphasis added).

is not otherwise preempted by the context of the heading's description. Specifically, to be covered by heading 2936 and Note 1 to Chapter 29, the imported merchandise must be, in pertinent part, 1) a provitamin or vitamin; 2) of natural or synthetic origin; 3) either in, or not in, a solvent, and 4) formulated in a manner consistent with Note 1. The facts establish that Betatene meets these criteria.

### 1.    Beta-carotene is Provitamin A

Beta-carotene is a form of provitamin A, which is converted by the body into vitamin A if the body needs vitamin A. PSUMF at ¶¶ 9, 10.   Unlike the pure, synthetic beta-carotene in *Roche Vitamins*, *BASF I*, and *BASF II*, the beta-carotene in Betatene is a mixture of natural beta-carotene and its isomer, natural alpha carotene. *See* Pl. Ex. 7, ECF No. 67-8, *Betatene® 7.5% N Vitamin A Activity (USA Region)*. Alpha-carotene is also provitamin A. *Id.* Per Chapter 29, Note 1(b), "[m]ixtures of two or more isomers of the same organic compound (whether or not containing impurities)" are within the scope of the headings of Chapter 29. Thus, the beta-carotene mixed with a small amount of its isomer alpha carotene is not excluded from classification in Chapter 29.

Also present with these isomers are *de minimis* amounts of other substances, such as lutein and zeaxanthin. PSUMF at ¶23.   These other substances are impurities present in the starting algal materials, and they are not vitamins or provitamins. *Id.* BASF does not deliberately leave these impurities in Betatene to provide provitamin or vitamin activity, as they do not have those chemical

properties.[11] *Id. See*, *Degussa Corp. v. United States*, 508 F.3d 1044, 1049 (Fed. Cir. 2007) (substances deliberately left in a product to render it suitable for a specific use are not permissible impurities).

Thus, beta-carotene, as an isomeric mixture with small amounts of alpha-carotene and *de minimis* levels of permissible impurities, is within the scope of

---

[11] The *ENs* for Chapter 29 provide guidance on what constitutes an "impurity." In pertinent part, the *ENs* provide:

> The term "impurities" applies exclusively to substances whose presence in the single chemical compound results solely and directly from the manufacturing process (including purification). These substances may result from any of the factors involved in the process and are principally the following:
>
> (a)  Unconverted starting materials.
>
> (b)  Impurities present in the starting materials.
>
> (c)  Reagents used in the manufacturing process (including purification).
>
> (d)  By-products.
>
> It should be noted, however, that such substances are **not** in all cases regarded as "impurities" permitted under Note 1 (a). When such substances are deliberately left in the product with a view to rendering it particularly suitable for specific use rather than for general use, they are **not** regarded as permissible impurities.

As documented above, the impurities in Betatene are impurities present in the algae starting material, PSUMF at ¶23, and were not left in Betatene to give it a specific use as their presence does not change the ability of the beta-carotene to be provitamin A or to color. *Id.* They are permissible impurities as contemplated by Chapter 29, Note 1(b).

heading 2936 and Note 1(b) as provitamin A.  It satisfies the first requirement of heading 2936.[12]

### 2.  The Beta-Carotene in Betatene is Natural

The beta-carotene in Betatene is derived from a natural source.  It is obtained from the alga *Dunaliella salina*, which algae are grown in open air, saltwater lagoons.  PSUMF at ¶21.   The algae are harvested, and the beta-carotene is extracted from the algae.  PSUMF at ¶25.   As such, the beta-carotene in Betatene is naturally derived rather than synthetically produced and meets that requirement in heading 2936.

### 3.  The Natural Beta-Carotene is in a Solvent

A solvent is a "substance that dissolves another to form a solution."  *See* "Solvent," *Random House Webster's Unabridged Dictionary*, p. 1818 (2nd Ed. 1998) Once extracted from the algae, the beta-carotene used to formulate Betatene is dissolved in a solvent, the soybean oil, creating an oily dispersion of approximately 30 percent beta-carotene and 70 percent soybean oil.   PSUMF at ¶26.   The soybean oil functions as a carrier for the beta-carotene particles now dissolved in the oil. PSUMF at ¶27.   It functions as a carrier for the dissolved beta-carotene particles as

---

[12] The trial court in *Roche Vitamins* addressed the reference in *EN* 29.36 that heading 2936 "excludes: . . .  Provitamin A (α- ß- and ɣ- carotenes . . .because of their **use** as colouring substances (heading 32.03 or 32.04)," finding that the *ENs'* reference to use as a coloring substances in headings 32.03 or 32.04 only excluded provitamin A when used as a coloring substance.  *Roche Vitamins*, 750 F. Supp. 2d 1367, 1376 (Court Int'l Trade 2010).  The court held that neither this *EN*, nor Chapter 29, Note 2(f), which states that Chapter 29 does not cover organic or synthetic coloring matter of headings 3203 and 3204, "preclude certain beta-carotene products from classification under, <u>inter alia</u>, Heading 2936 . . .."  *Id.* at 1375.

it is transported from Australia to Japan where it will be formulated into beadlets. PSUMF at ¶27, 30.   It functions as a carrier for the dissolved beta-carotene particles as they are transported through the different phases of the beadlet formulation process.   PSUMF at ¶27.   It continues to function as a carrier for the dissolved beta-carotene particles in their state as oily droplets within the beadlets that make up Betatene.   PSUMF at ¶27.   It functions as a carrier for the dissolved beta-carotene particles in the oily droplets in Betatene when it is being absorbed by the human body after having been further manufactured into a human supplement and then consumed by a human. PSUMF at ¶27, 29.

At all times from when the beta-carotene is dissolved in soybean oil, it remains in this solvent.  PSUMF at ¶27.  If a beadlet were cut into a cross section and put under an electron microscope, oily droplets consisting of the beta-carotene particles dissolved in soybean oil would be visible.  PSUM at ¶58.   This is the same soybean oil initially used to dissolve the beta-carotene after being harvested in Australia. PSUMF at ¶27.

Heading 2936's *eo nomine* reference to including vitamins and provitamins dissolved in a solvent is reinforced by the *Explanatory Notes to the Harmonized Commodity Description and Coding System*, ("*ENs*").  The *ENs* mirror the language of heading 2936, recognizing that vitamins and provitamins in any solvent can stay in heading 2936:

This heading [2936] includes:

(a) **Provitamins** and vitamins**,** whether natural or reproduced by synthesis, and derivatives thereof used primarily as vitamins.

\*          \*          \*          \*          \*

(d) **The above products diluted in any solvent** (e.g., ethyl oleate, propane-1,2-diol, ethanediol, **vegetable oils**).

*See*, *EN*s at Chapter Notes to Chapter 29 (emphasis added).  Thus, the *EN*s reinforce what the heading makes clear.  Natural provitamins dissolved in a solvent, including vegetable oils (*i.e.* soybean oil), are provided for *eo nomine* in heading 2936.

> a.    The Reference to "Solvent" in Heading
>          2936 Contains No Conditional Language

Chapter 29, Note 1 states that "[**e]xcept where the context otherwise requires**, the headings of this chapter apply only to:"

\*          \*          \*          \*          \*

 (e) Products mentioned in (a), (b) [isomeric mixtures with impurities] or (c) above dissolved in other solvents provided that the solution constitutes a normal and necessary method of putting up these products adopted solely for reasons of safety or for transport and that the solvent does not render the product particularly suitable for specific use rather than for general use.

(emphasis added).  This Note builds on additional requirements for use of a solvent with products of Chapter 29.

Like the headings and subheadings, section and chapter notes to the HTSUS are statutory law, codified at 19 U.S.C. § 1202.  *Libas, Ltd. v. United* States, 193

F.3d 1361, 1364 (Fed. Cir. 1999). To interpret their meaning, "the beginning point must be the language of the statute." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475 (1992). Statutory text, unless otherwise defined, is "generally interpreted in accordance with [its] ordinary meaning." *BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91 (2006).

In the case of Chapter 29, Note 1, the starting point is the exclusionary language conditioning that Note: "**[e]xcept where the context otherwise requires**, the headings of this chapter apply only to . . .." (emphasis added). Such "context" is found in Heading 2936, where its reference to a provitamin in a solvent contains no conditional or limiting language for the presence of the solvent. Of the forty-two headings in Chapter 29, only heading 2936 incorporates a specific reference to a good of that heading being dissolved in a solvent, and per the *eo nomine* language of heading 2936, a provitamin in a solvent remains in heading 2936 regardless of the reason for the solvent. *Sandoz Chemical Works, Inc. v. United States*, 43 C.C.P.A. 152, 156, C.A.D. 623 (1956) (tariff acts, like all statutes, interpreted to carry out the legislative intent).

Because the context of heading 2936 "otherwise requires" its own interpretation – one with no conditions on the reason for the presence of a solvent --, reference to Chapter 29, Note 1(e) is inapposite and reserved for construing the legal meaning of the remaining forty-one headings in Chapter 29 where no mention of a solvent is found in the heading language. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[w]hen the words of a statute are unambiguous, then,

this first canon is also the last: 'the judicial inquiry is complete'") (*quoting Rubin v. United States*, 449 U.S. 424, 430 (1981)).    Thus, the soybean oil solvent does not need to stabilize the beta-carotene solely for safety or transportation for the beta-carotene to remain classified as provitamin A, as the context of heading 2936 does not require those limitations. Heading 2936 expressly allows for vitamins and provitamins to remain within heading 2936 "whether or not in **any** solvent" (emphasis added), unconditionally.  Because Betatene contains beta-carotene in a solvent, it remains within the scope of heading 2936.

        b.    Even if Chapter 29 Note 1(e) Applies to Heading 2936,
              <u>Betatene Is Still Within the Scope of Heading 2936</u>

Assuming *arguendo* this Court were to construe heading 2936's reference to "whether or not in **any** solvent" as not constituting "context otherwise requir[ing]" that the heading be read as drafted and without application of Chapter Note 1(e), then that Note would be implicated but Betatene would remain in heading 2936. This Chapter Note sets out additional conditions that 1) the solvent be a normal and necessary method of putting up products of Chapter 29 solely for reasons of safety or transport, and 2) the solvent does not render the product particularly suitable for specific use rather than for general use.

        i.    The Solvent is Normal and Necessary
              for Putting Up Fat-Soluble Vitamins
              <u>and Provitamins for Safety and Transport</u>

As for the first extra condition, the soybean oil functions as a carrier for the beta-carotene particles, transporting the beta-carotene from the moment it is dissolved in the soybean oil in Australia, through shipment to Japan, through the

41

beadlet formulation process, through the use of Betatene by BASF's customers, and into the human digestion track where it is metabolized. PSUMF at ¶¶27, 30. *See also*, *BASF Corp. v. United States*, 391, F. Supp.2d 1246, 1250 (Ct. Int'l Trade 2005), *aff'd*, *BASF Corp. v. United States*, 482 F.3d 1324 (Fed. Cir. 2007) ("The beta-carotene is dissolved in the soybean oil, which functions as a carrier for the beta-carotene").

Dissolving beta-carotene in oil is a normal and common first step for fat soluble vitamins and provitamins, which need to be made bioavailable and stabilized. PSUMF at ¶¶18, 20. *See also* Pl. Ex. 8, ECF No. 67-9, Deposition Transcript of Defendant's Expert Witness Dr. Stuart Cantor, ("*Cantor Dep.*") at p. 33: 2-18 ("Vitamin A is a fat-soluble product. So you're going to mix it with oil to disperse it"); pp. 34: 20 – 35:6 (confirming that vitamin D would be dissolved in oil before formulation); p. 35: 7-16 (confirming that vitamin E would be dissolved in oil before formulation). In turn, this allows the beta-carotene to be bulk shipped economically. *Id*. at p. 75: 6-8 ("So you were adding the soybean oil – you're doing it to – to bulk ship it"). A 30 percent beta-carotene, 70 percent vegetable oil solvent has become the standard concentration for oil dispersions, as too much oil results in too viscous a dispersion, and companies like BASF then would be shipping more carrier oil and less beta-carotene around the globe. Pl. Ex. 9, ECF No. 67-10, Deposition Transcript of USCIT Rule 30(b)(6) of BASF Corporation by Dr. Christian Kopesel ("*Kopesel Dep.*") p. 38: 18 – p. 39: 9; p. 36: 16-22 ("we have to ship the material from Australia to Japan and it's very difficult to do this with crystallin[e]

material.  It's much easier to have it, if its long distance, to have it in a stabilized barrel consisting of oil and the carotenoid").

The soybean oil first added in Australia continues transporting the beta-carotene particles in a 30% /70% ratio through the formulation process in Japan and into the beadlet's matrix in the form of the oily droplets.  Pl. Ex. 8, ECF No. 67-9, *Cantor Dep*. at p. 96: 8-13 ("Q. . . . And I'm asking, is that --- that droplet of oil [in a beadlet], can it trace its origin back to when it was in a 30/70 percent solution packed bulk to be sent to Japan for further processing?  A. Okay. Yeah."); Pl. Ex. 10, ECF No. 67-11, Deposition Transcript of Plaintiff's Expert Witness Dr. Marc Myers, ("*Myers Dep*.") at p. 107: 14-21 ("Q.  Those droplets, they would be droplets of the oil beta-carotene dispersion that was made in Australia?  A.  Yes.  Q. Okay.  So it travels all the way through into these very, very, very tiny beadlets?  A. Correct").  No additional soybean oil is added at any time during Betatene's production.  Pl. Ex. 8, ECF No. 67-9, *Cantor Dep*. at p. 97: 6-7 ("Q. But are they diluting the oil?  A. No").

Thereafter, the soybean oil continues to carry the beta-carotene into the human body, where the beta-carotene is metabolized.   Pl. Ex. 9, ECF No. 67-10, Kopesel Dep. p. 53: 20 – 54: 3 ("Q. . . .And so is there any other function that the soybean oil is performing within the Betatene 7.5 percent N besides the stability that it provides?  A.  It helps later when it has come into the body and [the] tablet is

43

digested, that the beta-carotene becomes dissolved and can be metabolized by the body").[13]

As such, dissolving beta-carotene in oil is a normal and necessary way to stabilize and transport (*i.e.*, carry) the beta-carotene or other fat-soluble vitamins or provitamins as an oily dispersion.  The soybean oil's role as a solvent remains as a carrier and stabilizer for the beta-carotene particles through the entire life cycle of the Betatene, from extraction to production, through use in a nutritional supplement, and into the human body upon ingestion.

> ii.    The Solvent Does Not Render the
> Beta-Carotene Particles Particularly
> Suitable for Specific Rather than General Use

The next condition is that the solvent does not render the product particularly suitable for specific use rather than for general use.  The concept of what is a specific use rather than a general use for formulated beta-carotene was addressed at length in the *Roche Vitamins* case, albeit in the context of Chapter 29, Note (f) rather than Note (e).  In concluding that the formulation of the BetaTab 20% product was not a specific use product, the Federal Circuit highlighted the following factors:

---

[13] The presence of the oil also provides a stabilizing feature by enrobing the beta-carotene particles, which is required because beta-carotene is unstable and degrades when exposed to oxygen. PSUMF at ¶28.  *See also*, Pl. Ex. 8, ECF No. 67-9, *Cantor Dep.* at p. 76: 4-12; Pl. Ex. 9, ECF No. 67-10, *Kopesel Dep.* at p. 36: 11:22 ("Oil is not permeable for oxygen, so it is an oxygen barrier"). Pl. Ex. 10, ECF No. 67-11, *Myers Dep.* at p. 110: 9-14.

1.     The manufacturing process did not change BetaTab 20%'s functionality as provitamin A. Nor did it change the character of the beta-carotene as provitamin A. *Roche Vitamins*, 772 F.3d 728, 732.

2.     BetaTab 20% was not specifically prepared for tableting, notwithstanding that its composition made it preferable for use in making tablets. The record showed that it did not have any ingredients added specifically for tableting, such as tableting excipients. *Id.*

3.     The BetaTab 20% remained suitable for general use because, even as formulated for use in tablets and capsules, it could be used as provitamin A in foods, beverages and vitamin products. *Id.*

When these three criteria are applied to Betatene, the evidence establishes that like BetaTab 20%, Betatene remains suitable for general use as a source of provitamin A in different applications. As such, the soybean oil solvent in Betatene has not rendered the beta-carotene particles in Betatene suitable for a specific use.

As for the first factor highlighted by the *Roche Vitamins* court, neither the solvent nor any other ingredient in Betatene causes it to lose its status as provitamin A or its ability to function as provitamin A. PSUMF at ¶49. Both experts and BASF's fact witness recognized that nothing about the formulation had altered the beta-carotene's ability to be provitamin A. Dr. Cantor, the defendant's expert, testified as follows:

Q. What, if anything, about the formulation of the imported merchandise has changed the Beta-Carotene molecule in th[e] imported merchandise's inherent ability to be a colorant and/or to be a source of provitamin A?

A. In this case, I would say that the Beta-Carotene was not chemically modified. It will remain a source of vitamin A . . ..

Pl. Ex. 8, ECF No. 67-9, *Cantor Dep.* at p. 135: 15-22; *see also, id.*, at p. 81: 2-7 (Q . .

. And what about the formulation of the imported product prevents it from being

used as provitamin A?  A. Okay.  I mean, it's going to be converted – I mean, it is

provitamin A its going to get converted to vitamin A").

    Dr. Myers, plaintiff's expert, testified as follows on this issue:

> Q.  Now is there anything about the formulation process where these inerts you just testified to which are brought in to stabilize the beta-carotene, do they at all change either or both of those inherent characteristics [source of provitamin A and ability to color]?
>
> A.  No. . . . There's no physical or chemical changes that are occurring to the beta-carotene. It is still maintaining the structure that it has from the time it was extracted out of the algae till it is in the final formulation.
>
> Q.  So the formulation and processing has not chemically modified the beta-carotene"
>
> A.  That is correct.  It has not changed.

Pl. Ex. 10, ECF No. 67-11, *Myers Dep.* at p. 111: 21 – 112: 13.  *See* also Pl. Ex. 11,

EDF No. 67-12, Expert Report of Expert Witness Dr. Marc A. Myers, ("*Myers Expert*

*Report*"), p. 10.

    Finally, Dr. Kopesil, BASF's fact witness[14], also testified that the formulation

did not prevent it from functioning as provitamin A:

---

[14] Dr. Kopesil, while testifying as a fact witness, is very credentialled in vitamin and provitamin formulation.  The current expert for formulation at BASF, Dr. Kopesil is a PhD chemist with a thesis in carotenoids and 30 years of experience in the field, including formulation.  Pl. Ex. 9, ECF No. 67-10, *Kopesel Dep.* p. 14: 15-25; p. 17: 5-14.  In fact, Dr. Cantor gave his opinion that Dr. Kopesel was an expert on the formulation of microencapsulated vitamins and provitamins.  Pl. Ex. 8, ECF No. 67-

> Q.  And likewise, what, if anything, about the formulation of the Betatene 7.5 percent N would prevent it from functioning as a source of provitamin A?
>
> A.  Nothing.  It will function as a provitamin A source.

Pl. Ex. 9, ECF No. 67-10, *Kopesel Dep*. at p. 103: 10-16; *see also id*. at p. 107: 19-23

("Q.  Is there anything about the formulation process that does anything to change

the – the chemistry of the beta-carotene mo[lecule]?  A. No").

Thus, the sworn testimony clearly establishes that the formulation of

Betatene, including the presence of the solvent, does not chemically modify the

beta-carotene or render it unable to be provitamin A.  The record is equally clear on

the second factor set out in *Roche Vitamins*, in that the composition of Betatene,

including the presence of the solvent, does not specifically prepare it for tableting.

Again, the uncontroverted evidence establishes that Betatene does not contain any

ingredients specifically added for tableting, such as tableting excipients. PSUMF at

¶¶53, 54.  Pl. Ex. 1, ECF No. 67-2, *Plaintiff's Interrogatory Responses* at p 11.

("However, Betatene® 7.5% N cannot be made into a vitamin supplement or tablet

by BASF's customers without the customer adding tableting fillers, binders,

excipients, and disintegrants required by its manufacturing processes, as Betatene®

7.5% N does not contain any of those tableting ingredients").  *See also id*. at pp. 14,

16, 25, 26.

In Dr. Myer's expert report, he stated that Betatene does not contain any

tableting excipient in its formulation.  Specifically, he wrote:

---

9, *Cantor Dep*. at p. 62:25 – p. 63:1 ("Q. So would you consider him expert in that area?  A. Yeah").

> For use in tablets, Betatene® 7.5% N is an ingredient that would
> be blended with other tablet ingredients. This could include (but
> not limited to) other vitamin ingredients, mineral powders and a
> variety of other health ingredients. Tableting ingredients used by
> tablet manufacturers are not present in the Betatene® 7.5% N
> beadlet. Common excipients for tablet manufacturing such as
> diluents, binders, disintegrants and lubricants are not present in
> the Betatene® 7.5% N. None of these are present in the Betatene
> 7.5% N.

Pl. Ex. 11, ECF No. 67-12, *Myers Expert Report*, p.11.

Lastly, and most telling, defendant confirmed that Betatene does not contain

any tableting excipients needed by tablet manufactures to create tablets that could

contain Betatene as a source of provitamin A.  At defendant's 30(b)(6) deposition,

the defendant's spokesperson testified on direct examination as follows:

> Q.  Okay.  And do you know if it's, in its condition as imported, is
> used as provitamin A in a tablet without the addition of
> additional ingredients?
>
> A.  Based on what I've reviewed, our understanding is that
> additional ingredients would be needed to create the final product
> of dietary supplements.
>
> Q.  And are any of those additional ingredients found in the
> imported product?
>
> A.  The general tableting excipients, or dietary supplement
> excipients, are not in Betatene 7.5.

Pl. Ex. 12, ECF No. 67-13, Deposition Transcript of USCIT Rule 30(b)(6) of

Defendant by Arim Kim ("*Kim Dep.*") p. 23: 11-20.

Having found that the BetaTab 20% contained none of the tablet excipients

needed to make finished vitamin tablets, the *Roche Vitamins* court noted that the

non-beta-carotene ingredients in BetaTab 20% "were essentially the same as those

used to stabilize other vitamins and beta-carotene products that were marketed for use as colorant" and that those stabilizers were not added to make BetaTab 20% particularly suitable for tableting. *Roche Vitamins*, 772 F.3d at 732. The same is the case with Betatene. While the role of the stabilizers in Betatene is discussed in greater detail later in this memorandum at pages 53 to 62, which is incorporated by reference herein, Betatene's formulation is like that of other fat-soluble vitamins, such as vitamins A, D and E, which are first dissolved in oil or other solvent, and then put up in a matrix, typically of gelatin and a sugar or other carbohydrate. Pl. Ex. 8, ECF No. 67-9, *Cantor Dep.* at p. 33: 9 – 38: 15. As Dr. Cantor testified:

> Q. So I guess what I'm trying to understand is this beadlet a common way to formulate vitamins and provitamins?
>
> A. Yes.
>
> Q. And if you have a fat-soluble vitamin, and you want to make so that it can provide vitamin activity, it's first going to be put up in [a] lipid, dissolved in a lipid?
>
> A. Yes.
>
> Q. And that's common to all these vitamins?
>
> A. Yeah.

Pl. Ex. 8, ECF No. 67-9, *Cantor Dep.* at p. 38: 6 – 17.

Dr. Cantor makes clear that dissolving fat-soluble vitamins or provitamin in a fat-based solvent, such as soybean oil, and then formulating a protective stabilizing matrix around drops of the vitamin/solvent dispersion, is the norm for stabilizing those types of vitamins and provitamins. Consistent with the *Roche*

49

*Vitamins* court's observation that BetaTab 20% formulation is consistent with other vitamin and provitamin formulation seeking to stabilize the active ingredient rather than make it particularly suitable for tableting, so too is the formulation of Betatene. None of Betatene's ingredients, including the soybean oil, are specifically added for tableting, as they are there to stabilize and carry the beta-carotene.

The third factor set out by the *Roche Vitamins* court is that formulated beta-carotene remains suitable for general use if it can be used as provitamin A in a variety of products, including foods, beverages, and vitamin products. This is the test, even for products like Betatene, which, like the BetaTab 20% product, have a formulation optimized for use as provitamin A in tablets and capsules. Again, the evidence supports a finding that Betatene is a general use source of provitamin A because it can be used in a variety of applications if the user so desired, and that the presence of the solvent in the imported merchandise does not prevent such applications.

On several occasions at his deposition, the defendant's expert Dr. Cantor confirmed that nothing about the formulation of Betatene prevented it from being used in applications other than tablets or hard capsules. He conceded that the imported merchandise could be used to fortify foods:

> Q. Okay. But again, my question was, what about the formulation that prevents it from being used that way?
>
> A. Manufacturers can do whatever they want. If someone wants to do that and – and people accept it, you know, then okay.

Pl. Ex. 8, ECF No. 67-9, *Cantor Dep*. at p. 116: 11- 16.  He then testified that the

imported merchandise could be used to make vitamin gummies:

> Q.  And the same thing with using the imported product in a
> gummy.  Is there anything that prevents someone from using it in
> a gummy?
>
> A.  Nothing prevents it.

*Id*. at p. 116: 17-20.  Then he confirmed it could be used to make a vitamin

effervescents:

> Q.  And what about the formulation of the imported product
> prevents it from being used in an effervescent?
>
> A.  If the manufacturer wanted to do that, they can do it.
> Depends upon, you know, how well it's going to sell, but they can
> do whatever they want.

*Id*. at p. 117: 8-13.  And he admitted Betatene could be used as a source of

provitamin A in a fortified beverage:

> Q.  So you're talking about consumer perception.  I'm asking
> about the physical science of the imported merchandise.  Is there
> anything that prevents it from being used as a source of
> provitamin A in a fortified beverage?
>
> A.  Again, manufacturers can do whatever they want, it depends
> upon what's going to make them the best income.

*Id*. at p. 118, lines 16-24.  Finally, he confirmed that nothing about Betatene's

formulation prevented it from being used as a food additive or as a colorant:

> Q.  On page 8 of your report, you say that the protective matrix
> makes the product not suitable for use as a colorant or as a food
> additive.  I just want to be clear, when we say not suitable that's
> different than saying it physically cannot be used as a colorant or
> physically cannot be used as a food additive?

>    A.   Nothing prevents any manufacturer from doing whatever
>    they want they want . . ..

*Id*. at p. 125, lines 17-25.

Plaintiff's witnesses testified similarly.  *See*, Pl. Ex. 9, ECF No. 67-10,

*Kopesel Dep*. p. 106: 23 – 107: 5 (Betatene can be used in gummies); p. 107: 6-13

(Betatene can be used in effervescents); p. 107: 14-18 (Betatene can be used as a

colorant).  *See also,* Pl. Ex. 10, ECF No. 67-11, *Myers Dep*. at p. 114:  10-13

(Betatene can be used to fortify foods); p. 114: 14-18 (Betatene can be used as a

colorant).  As Dr. Myers stated in his expert witness report:

>    Nothing in the formulation of Betatene® 7.5% N prevents it from
>    only being used as a provitamin A in supplements (capsules and
>    tablets) but, the formulation can also be used as a colorant and
>    for other applications, such as food fortification. Nothing in the
>    formulation will prevent it from being used as a vitamin and/or
>    colorant. It can be used as a vitamin source in other applications
>    such as Functional Foods (bars, chews, beverages and the like).

Pl. Ex. 11, ECF No. 67-12, *Myers Expert Report*, at p.11.

Betatene's formulation, including the presence of the soybean oil solvent,

does not prevent it from general use as a source of provitamin A in a variety of

applications other than tablets or hard capsules.  Like BetaTab 20% in *Roche*

*Vitamins*, Betatene is optimized and advertised for use in tablets and hard capsule,

but, like BetaTab 20%, nothing about its formulation prevents it from functioning

as provitamin A or a colorant in different application if the user so desired.

Therefore, and to the extent necessary, Betatene satisfies Chapter 29, Note 1

(e).  It contains an isomeric mixture of provitamin A dissolved in a solvent, with the

solvent being a normal and necessary method of putting up beta-carotene and other

fat-soluble vitamins and provitamins for safety or transport, and the use of the

solvent does not render the beta-carotene particularly suitable for a specific use per

the *Roche Vitamins* criteria.

> 4. The Natural Beta-Carotene in a Solvent is
> Formulated Consistent with Chapter 29, Note 1(f)

The oily beta-carotene dispersion in each beadlet is stabilized further by the

gelatin and sucrose matrix and the anti-oxidants added during formulation.

PSUMF at ¶¶36-42.  These additional stabilizers are permissible per Chapter 29,

Note 1(f), which note provides:

> (f) The products mentioned in (a), (b) [isomeric mixtures with
> impurities], (c), (d) or (e) [isomeric mixtures with impurities in a
> solvent] above with an added stabilizer (including an anticaking
> agent) necessary for their preservation or transport.

This note, and the *ENs* to heading 2936 interpreting it, were front and center

in *Roche Vitamins*.  As the *Roche Vitamins* court noted, the *ENs* provide further,

albeit non legally binding, insight into the meanings of the headings.  *Roche*

*Vitamins*, 772 F.3d at 731.  The *ENs* to heading 2936 provide, in pertinent part,

that Heading 2936 includes:

> (a) **Provitamins** or vitamins, whether **natural** or reproduced
> by synthesis, . . .
>
> (b) Concentrates of natural vitamins . . .
>
> (c) Intermixtures of vitamins, of provitamins or of concentrate
>
> (d) **The above products diluted in any solvent** (**e.g**., ethyl
> oleate, propane-1, 2-diol, ethanediol, **vegetable oils**).

The **products of this heading** may be stabilised for the purposes of
preservation or transport:
- by adding anti-oxidants,
- by adding anti-caking agents (e.g., carbohydrates),
- by coating with appropriate substance (e.g. gelatins, waxes or fats),
  whether or not plasticised), or
-  by adsorbing on appropriate substances (e.g. silicic acid),

**provided** that the quantity added or the processing in no case exceeds
that necessary for their preservation or transport and that the addition
or processing does not alter the character of the basic product and
render it particularly suitable for specific use rather than for general
use.

*See*, *ENs* at 29.36 (emphasis added).

Thus, the *ENs* to heading 2936 establish that "products of this heading"
remain in heading 2936 if they are stabilized for preservation or transport, and
those stabilizing ingredients meet certain criteria.  An analysis of each of these
factors establishes that Betatene, like BetaTab 20%, the other beta-carotene
formulations stipulated as provitamin A (*see*, Pl. Ex. 5, ECF No. 6), and the other
fat-soluble vitamins classified by U.S. Customs and the WCO in heading 2936 (*see,
supra* pp. 23 to 26), is stabilized by the beadlet's protective matrix and added
antioxidants.

> a.    Natural Provitamins in a Solvent is
>         a Product of Heading 2936 that May Be
>         Stabilized for Preservation or Transportation

The first question is whether a provitamin, such as beta-carotene, dissolved
in a solvent is a "product of this heading" that can therefore be stabilized further as
described in the *ENs*. The structure of heading 2936 and the *ENs* answers this

question in the affirmative.  The substances listed in parts (a), (b) and (c) of the *ENs* are the *eo nomine* references listed as covered merchandise in heading 2936, as is the reference in part (d) to those substances being dissolved in a solvent.  Clearly stated, a natural provitamin dissolved in a solvent is a product described by *eo nomine* reference in heading 2936, meaning that the *ENs*' reference to "products of this heading" being stabilized for preservation or transportation by anti-oxidants, carbohydrates, and gelatins applies to provitamin A dissolved in a solvent, just as it would apply to other vitamins in a solvent classified in heading 2936.  *See*, Pl. Ex. 8, ECF No. 67-9, *Cantor Dep.* at p. 33: 23 – p. 34:19 (vitamin A is dissolved in oil and then microencapsulated in beadlets); p. 34: 20 – p. 35:6 (vitamin D is dissolved in oil and then microencapsulated in beadlets); 35: 7-16 (vitamin E is dissolved in oil and then microencapsulated in beadlets).

        b.      The Natural Beta-Carotene in Soybean
                Oil in Betatene is Stabilized By
                Ingredients Contemplated by the ENs.

As discussed in this memorandum, beta-carotene particles, in oily droplets, are mixed with gelatin, sucrose (a carbohydrate-based plasticizer), ascorbyl palmitate (an anti-oxidant) and mixed tocopherols (an anti-oxidant).  PSUMF at ¶¶36-42.  The sucrose and gelatin create a protective plasticized matrix around the beta-carotene oily droplets and anti-oxidants, resulting in the creation of the very fine, microencapsulated beadlets. PSUMF at ¶¶36-38.  Silicon dioxide functions as an anti-caking agent. PSUMF at ¶40.

Thus, the matrix ingredients stabilize the beta-carotene particles in the oily droplets for the purpose of preserving them, and this is done using the types of ingredients contemplated by the *ENs*. Upon drying, the gelatin and sucrose work together to create the protective matrix that enrobes (*i.e.*, a coats) the beta-carotene oily droplets. PSUMF at ¶¶36-38. The plasticizing effect of the sucrose working with the gelatin gives both chemical and mechanical stability to the beadlet, preventing the beta-carotene from being exposed to light, moisture, or oxygen, and protecting the beadlet from cracking or suffering other physical damage that could result in the beta-carotene oxidizing and degrading. *Id.* These ingredients are not added to increase palatability, and they are not tableting excipients. PSUMF at ¶ 54.

The *ENs* also contemplate the presence of antioxidants and anti-caking agents. BASF uses ascobyl palmitate and mixed tocopherols as antioxidants to protect the beta-carotene by preventing oxidation. PSUMF at ¶39. It uses silicon dioxide as an anti-caking agent, which keeps the beadlets from agglomerating or sticking together. PSUMF at ¶40.

In sum, the inert ingredients that stabilize the beta-carotene oily droplets in the beadlets that make up the Betatene formulation are those identified as permissible stabilizers in the *ENs*. They are the exact same or similar ingredients to those found by the *Roche Vitamins* court to stabilize BetaTab 20% and they are the exact same or similar ingredients to those used by BASF to stabilize its other beta-carotene formulations previously stipulated in heading 2936 after the *Roche*

*Vitamins* decision.  See, Pl. Ex. 5, ECF No. 6.  They are the exact same or similar ingredients to those used as stabilizers in fat-soluble vitamin formulations that U.S. Customs and the WCO reclassified into heading 2936 and confirmed by defendant's expert.  *See, supra* pages 23 to 26, and page 42.

c.    The Stabilizing Ingredients are Added in Quantities Necessary for Preservation or Transport of <u>the Beta-Carotene Oily Droplets in the Beadlets</u>

The facts establish that 1) Betatene consists of natural provitamin A (beta-carotene) in a solvent (soybean oil); 2) that a natural provitamin in a solvent is a "product of this heading [*i.e.*, heading 2936]"; 3) a "product of this heading" can be further stabilized consistent with the *ENs*, and 4) the beta-carotene oily droplets are stabilized by the plasticized gelatin and sucrose matrix containing the antioxidants, with silicon dioxide as an anticaking aid.  The ENs, however, require that the stabilizer satisfy two conditions not included in the statutory language in Chapter 29, Note 1(f).  The first is that the "quantity [of stabilizer] added or the processing in no case exceeds that necessary for their preservation or transport." Betatene satisfies this condition.

BASF uses no more of its formulation ingredients than necessary to stabilize and preserve the beta-carotene particles for use as provitamin A when it formulates Betatene.  PSUMF at ¶55.  If one ingredient was removed or reduced from the formulation, the stability of the beta-carotene would be compromised. *Id*.

Furthermore, BASF, like its competitors, has cost considerations when it creates its formulations, and uses no more of any ingredient than necessary to make

57

a stable formulation.  PSUMF at ¶56; Pl. Ex. 1, ECF No 67-2, *Plaintiff's*

*Interrogatory Responses* at pp. 11, 14.  As Dr. Kopesel testified at BASF's 30(b)(6)

deposition:

> Q.  Okay, now you're a formulator and you have been formulating
> your entire career so when you are formulating a product, what
> are the factors that you would consider for determining how much
> of a certain ingredient would go into that formulation?
>
> A.  I would use as much ingredient which is necessary to stabilize
> the beta-carotene and make it suitable for the application.
>
> Q.  Would you ever use any more than is necessary to stabilize
> the beta-carotene?
>
> A.  No because due to cost reasons we typically use only the
> amount of ingredients which are necessary.

*See*, Pl. Ex. 9, ECF No. 67-10, *Kopesel* Dep. p. 104: 25 − 105: 17.  *See also*, Pl. Ex. 11,

ECF No. 12, *Myers Expert Report*, p.11 ("Betatene® 7.5% N does not contain more

inert ingredients tha[n] are necessary to stabilize and preserve the Beta-carotene.

BASF, when formulating Betatene® 7.5% N has cost considerations and uses no

more than is necessary to make a stable formulation").

Equally important, no tableting ingredients or excipients are found in

Betatene, and none of the inert ingredients used in the Betatene formulation

provide such role.  PSUMF at ¶54.  Their role is to stabilize and preserve the beta-

carotene oily droplets, and not to be tableting excipients.  *See*, Pl. Ex. 1, ECF No 67-

2, *Plaintiff's Interrogatory Responses* at pp 11 ("During the development of a

formulation such as Betatene® 7.5% N, the stability of the formulation as a bulk

product and in applications is tested. The composition, percentage and cost of ingredients is changed until a satisfactory stability is achieved").

For these reasons, the quantity of stabilizer used by BASF does not exceed that necessary for creating a stable and preserved beta-carotene formulation.  This requirement in the *ENs* is thus satisfied.

> d.  The Stabilizing Ingredients Do Not
> Alter the Character of the Basic Product
> and Render it Particularly Suitable for
> <u>Specific Use Rather than General Use</u>

The second condition set out in the *EN* 29.36 is that the "addition [of the stabilizer] or processing does not alter the character of the basic product and render it particularly suitable for specific use rather than for general use."  This condition is similar to the condition found in Chapter Note 29 1(e), discussed above at pages 41 through 53, which argument is incorporated herein as it relates to the similar language of Chapter Note 29 1(f).

After analyzing this second condition, the Federal Circuit in *Roche Vitamins* found that BetaTab 20%, a microencapsulated beta-carotene formulation, with the beta-carotene first dissolved by a solvent and then stabilized by a matrix of gelatin and sucrose with added antioxidants and an anticaking flow aid, remained suitable for general use because the formulation did not chemically modify or change the beta-carotenes' ability to be provitamin A or a colorant.  *Roche Vitamins*, 772 F. 3d. at 732.  The Federal Circuit also found that the BetaTab 20% formulation did not render the product particularly suitable for specific use rather than general use because it could be used as a source of provitamin A in a variety of applications,

including beverages, foods and vitamin products, even though it was optimized and sold for use in tablets and capsules.  *Id.*  It also found that the stabilizer used in BetaTab 20%, a stabilizer "essentially the same as those used to stabilize other vitamins and other beta-carotene products . . .", *id.*, contained no ingredients specifically added for tableting, such as tableting excipients.  *Id.*

As previously addressed at pages 44 through 53, the stabilizing ingredients in Betatene do not alter the character of the beta-carotene and render it particularly suitable for specific use rather than for general use.  Specifically:

- Betatene's formulation does not chemically modify, physically change or otherwise alter the beta-carotene particles or their inherent ability to be provitamin or to color. *See supra* pages 45 to 47.

- Betatene's formulation does not prevent the beta-carotene particles from being provitamin A or deter the human body's ability to convert it to vitamin A. *See supra* pages 45 to 47.

- Betatene contains no ingredients specifically added for tableting such as excipients, fillers, diluents, binders, disintegrants, or lubricants.  *See supra* pages 47 to 48.

- Betatene's composition of an active ingredient (either a provitamin or vitamin) dissolved in a solvent and then embedded in a beadlet consisting of a stabilizing matrix with antioxidants is a common way to stabilize fat-soluble vitamins and provitamins.  *See supra* pages 49 to 50.

- Betatene's formulation, while optimized for use in tablets and hard capsules, remains a general source of provitamin A that can be used in a variety of applications if the user so chooses. *See supra* pages 50 to 52.

- Betatene can be used as a source of provitamin A in tablets and hard capsules. *See* PSUMF at ¶47.

- Betatene can be used as a source of provitamin A in vitamin gummies. *See supra* pages 51, 52.

- Betatene can be used as a source of provitamin A in effervescents. *See supra* pages 51, 52.

- Betatene can be used as a source of provitamin A in a fortified beverage. *See supra* pages 51, 52.

- Betatene can be used as a source of provitamin A to fortify foods. *See supra* pages 50, 52.

- Betatene can be used as a colorant. *See supra* pages 51, 52.

Betatene, therefore, is stabilized in a manner consistent with the test set out in *Roche Vitamins*. Its gelatin and sucrose plasticized matrix and antioxidants enrobe and stabilize the beta-carotene in the oily droplets the same way that the gelatin and sucrose plasticized matrix and antioxidants enrobe and stabilize the solvent-dissolved beta-carotene in BetaTab 20%. The ingredients are used to stabilize and are not tableting excipients. The Betatene formulation was developed to create a stable and preserved beta-carotene, and the ingredients used are in amounts no more than necessary to achieve that goal. And, like BetaTab 20%, it

can be used in a variety of different applications if the user so chooses, notwithstanding it is optimized for use in tablet and capsules.  It remains a general use product classifiable in heading 2936.

Having satisfied both conditions set out in the *ENs* to heading 2936, no obstacle remains preventing the classification of Betatene in heading 2936 along with the beta-carotene and vitamin formulations previously classified by the Federal Circuit, CBP and the WCO.  Betatene consists of: 1) a provitamin; 2) of natural origin; 3) dissolved in a solvent, and 4) formulated in a manner consistent with Chapter Note 1 and the *ENs* to heading 2936. It is *eo nomine* provided for in heading 2936, and specifically classifiable at subheading 2936.90.01 as "[o]ther, including provitamins and natural concentrates."

### III.    Betatene is Excluded from Heading 2106 Because it is Classifiable in Heading 2936

As discussed earlier in this brief, the heading the United States is defending, heading 2016, is a residual, catch-all provision.  It is less specific than *eo nomine* heading 2936 and must yield to heading 2936 because Betatene is a "[p]rovitamin . . .natural . . . in any solvent" and thus is "elsewhere specified or included" under heading 2936.

Plaintiff's position is now before the Court.  If the Court agrees that Betatene satisfies the *eo nomine* language of heading 2936 and Chapter 29, Note 1, then as a matter of law Betatene must be classified under heading 2936 and excluded from heading 2106. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002).  The imported products, being specified and included elsewhere in heading 2936, cannot be classified in heading 2106.  Judgment must be for BASF, holding that the imported merchandise is classifiable under subheading 2936.90.01, and free of duty.

## CONCLUSIONS

For the reasons stated herein, summary judgment should be entered in favor of BASF.  The Court should hold that the imported product -- Betatene® 7.5% N – be classified under subheading 2936.90.01, HTSUS, and order CBP to reliquidate the subject entries with that classification and to refund the excess duties paid by BASF, with interest as provided for by law.

Respectfully submitted,

/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email:  rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*

Dated:  October 29, 2024
New York, NY

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Standard Chambers Procedures of the U.S. Court of International Trade, this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment contains 14,742 words, as determined by Microsoft Word. This word count is within the limit of 15,000 words as "so ordered" by this court in response to plaintiff's motion for leave to file a brief in excess of the 14,000-word limit set out in Rule 2(B) of the USCIT's Standard Chambers Procedures. *See*, *BASF Corporation v. United States*, court no. 12-00422, ECF No. 66.

/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email: rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*

Dated: October 29, 2024
New York, NY