UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: LISA W. WANG, JUDGE

| | |
|---|---|
| ———————————————— : | |
| BASF CORPORATION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Consol. Court No. 12-00422 |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |
| ———————————————— : | |

## <u>**ORDER**</u>

Upon consideration of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

**ORDERED** that defendant's cross-motion for summary judgment is granted;

**ORDERED** that plaintiff's motion for summary judgment is denied; and it is further

**ORDERED** that judgment is entered for defendant.


_____
JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: LISA W. WANG, JUDGE

_____
                                              :
BASF CORPORATION,                             :
                                              :
                              Plaintiff,       :
                                              :
                    v.                        :          Consol. Court No. 12-00422
                                              :
UNITED STATES,                                :          **NON-CONFIDENTIAL**
                                              :
                              Defendant.       :
_____    :

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

                              BRIAN M. BOYNTON
                              Principal Deputy Assistant Attorney General

                              PATRICIA M. McCARTHY
                              Director

                              JUSTIN R. MILLER
                              Attorney-In-Charge
                              International Trade Field Office

*Of Counsel:*
Michael A. Anderson              LUKE MATHERS
Office of the Assistant Chief Counsel    Trial Attorney
International Trade Litigation    Department of Justice, Civil Division
U.S. Customs and Border Protection    Commercial Litigation Branch
                              26 Federal Plaza, Room 346
                              New York, New York 10278
                              (212) 264-9236
Dated:  January 10, 2025        *Attorneys for Defendant*

# **TABLE OF CONTENTS**

BACKGROUND ........................................................................................................... 2

QUESTION PRESENTED ............................................................................................ 9

SUMMARY OF ARGUMENT ..................................................................................... 9

ARGUMENT ................................................................................................................ 10

I.    Standard of review .......................................................................................... 10

II.   Betatene is not classifiable as an all-purpose provitamin of heading 2936 because its application-specific formulation fails to satisfy the conditions set forth in note 1 to chapter 29 ..................................................................................................................... 13

    A.    Betatene's additives do more than stabilize for preservation or transport—as BASF's own expert acknowledges ...................................................................... 14

    B.    Betatene contains more additives than necessary for preservation or transport, as evidenced by equally stable beta-carotene formulations that contain more beta-carotene and less additives by weight .............................................................. 17

    C.    Betatene's processing has rendered it particularly suitable for specific use in dietary supplements, but unsuitable for general use, as the uncontradicted evidence shows ........... 18

    D.    BASF's remaining arguments are unavailing ............................................. 23

III.   Betatene is a "[f]ood preparation[]" of heading 2106 "not elsewhere specified or included" in the HTSUS ................................................................................................. 24

CONCLUSION ............................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ADC Telecomms., Inc. v. United States,*
    916 F.3d 1013 (Fed. Cir. 2019) ............................................................ 11

*Am. Net & Twine Co. v. Worthington,*
    141 U.S. 468 (1891) ............................................................................... 12

*Anhydrides & Chems., Inc. v. United States,*
    130 F.3d 1481 (Fed. Cir. 1997) ............................................................ 12

*Drygel, Inc. v. United States,*
    541 F.3d 1129 (Fed. Cir. 2008) ............................................................ 11

*Encino Motorcars, LLC v. Navarro,*
    584 U.S. 79 (2018) ................................................................................. 12

*H. Reisman Corp. v. United States,*
    17 C.I.T. 1260 (1993) ............................................................................ 13

*Mondelez Glob. LLC v. United States,*
    253 F. Supp. 3d 1329 (Ct. Int'l Trade 2017) ...................................... 25

*Nature's Touch Frozen Foods (W.) Inc. v. United States,*
    639 F. Supp. 3d 1287 (Ct. Int'l Trade 2023) ................................. 12, 25

*Nutricia N. Am., Inc. v. United States,*
    666 F. Supp. 3d 1363 (Ct. Int'l Trade 2023) ................................. 25, 26

*Orlando Food Corp. v. United States,*
    140 F.3d 1437 (Fed. Cir. 1998) ............................................................ 25

*RKW Klerks Inc. v. United States,*
    94 F.4th 1374 (Fed. Cir. 2024) ....................................................... 10, 11

*Roche Vitamins, Inc. v. United States,*
    750 F. Supp. 2d 1367 (Ct. Int'l Trade 2010) ............................. 15, 16, 24

*Roche Vitamins, Inc. v. United States,*
    772 F.3d 728 (Fed. Cir. 2014) ...................................................... *passim*

*Roche Vitamins, Inc. v. United States,*
    922 F. Supp. 2d 1353 (Ct. Int'l Trade 2013) ........................... 15, 20, 23

*Rocknel Fastener, Inc. v. United States,*
    267 F.3d 1354 (Fed. Cir. 2001) ............................................................ 11

*Shamrock Bldg. Materials, Inc. v. United States*,
   119 F.4th 1346 (Fed. Cir. 2024) ........................................... 21

*StoreWALL, LLC v. United States*,
   644 F.3d 1358 (Fed. Cir. 2011) ............................................ 11

*Trijicon, Inc. v. United States*,
   686 F. Supp. 3d 1336 (Ct. Int'l Trade 2024) ...................... 13

*Universal Elecs. Inc. v. United States*,
   112 F.3d 488 (Fed. Cir. 1997) .............................................. 20

**Statutes**

28 U.S.C. § 2640(a)(1) .............................................................. 24

**Harmonized Tariff Schedule of the United States**

General Rules of Interpretation:

   General Rule of Interpretation 1 ............................................. 11, 12

   General Rule of Interpretation 3(c) ........................................ 12

   General Rule of Interpretation 6 ............................................. 12, 26

Chapter 21:

   Heading 2106 ............................................................ 10, 24, 25, 26

      Subheading 2106.10 ............................................................ 26

      Subheading 2106.90 ............................................................ 26

         Subheading 2106.90.99 ................................................. 8, 9, 25, 26

Chapter 29:

   Note 1 to Chapter 29 ............................................................ *passim*

      Note 1(a) to Chapter 29 ..................................................... 13

      Note 1(f) to Chapter 29 ...................................................... 13

   Heading 2936 ...................................................................... *passim*

      Subheading 2936.90.01 ....................................................... 9

**Regulations**

21 C.F.R. § 184.1245 .................................................................................................. 3

21 C.F.R. § 73.2095 .............................................................................................. 3, 21

21 C.F.R. § 73.95 ...................................................................................................... 3

**Rules**

Fed. R. Evid. 408(a)(1) ............................................................................................ 24

USCIT Rule 56(a) .................................................................................................... 10

**Other Authorities**

*Carotenoid*, <u>Merriam-Webster Online Dictionary</u>, https://www.merriam-
webster.com/dictionary/carotenoid ..................................................................... 2

*Disperse*, <u>Merriam-Webster Online Dictionary</u>, https://www.merriam-
webster.com/dictionary/disperse ........................................................................ 6

Explanatory Note 29.36 ............................................................................ 2, 9, 14, 22

Jonathan H. Choi, *The Substantive Canons of Tax Law*, 72 Stan. L. Rev. 195 (2020) ............... 12

*Preservation*, <u>Merriam-Webster Online Dictionary</u>, https://www.merriam-
webster.com/dictionary/preservation ................................................................. 16

*Preserve*, <u>Merriam-Webster Online Dictionary</u>, https://www.merriam-
webster.com/dictionary/preserve ....................................................................... 16

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: LISA W. WANG, JUDGE

_____
                                        :
BASF CORPORATION,                       :
                                        :
                      Plaintiff,        :
                                        :
           v.                           :        Consol. Court No. 12-00422
                                        :
UNITED STATES,                          :        **NON-CONFIDENTIAL**
                                        :
                      Defendant.        :
_____ :

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Beta-carotene is a naturally occurring form of provitamin A that gives carrots and pumpkins their distinctive orange color.  Commercially, it is used to color products, fortify foods, or provide a safe source of vitamin A in dietary supplements like multi-vitamin tablets and hard capsules.  Ingredient suppliers like BASF Corporation formulate a range of beta-carotene products designed for these applications.  Some of those products are multi-purpose; others, like BASF's Betatene 7.5% N ("Betatene," for short), are designed for one kind of use.

U.S. Customs and Border Protection classified Betatene as a "[f]ood preparation[]" of heading 2106 "not elsewhere specified or included" in the Harmonized Tariff Schedule of the United States (HTSUS), but BASF claims it should instead be classified as a general-use "provitamin" of heading 2936.  The HTSUS, under which imported goods are taxonomically classified, sets conditions on the classification of provitamins like beta-carotene.  To be classifiable as a provitamin, a beta-carotene formulation must not (1) have more additives than necessary to (2) stabilize the product for purposes of preservation or transport, nor be (3) "particularly suitable for specific use rather than for general use."  *Roche Vitamins, Inc. v.*

*United States*, 772 F.3d 728, 731 (Fed. Cir. 2014) (quoting Explanatory Note 29.36 (3d ed. 2002)).  Each of these three conditions is necessary.  Failing just one precludes classification as a provitamin.

Betatene fails all three.  Its additives do not merely stabilize for preservation or transport.  As BASF's own expert acknowledges, they also emulsify and prepare the product for tableting.  Those additives are also in quantities greater than necessary for stabilization for preservation or transport.  BASF and at least one other manufacturer make formulations with less additives and higher concentrations of beta-carotene that are just as stable as Betatene.  And Betatene is particularly suitable for use as a dietary-supplement ingredient, but not suitable for beta-carotene's other uses.  That Betatene could *theoretically* be used for other purposes, as BASF emphasizes, is not enough; BASF has failed to show, as it must, that Betatene is in fact *suitable* for general use.  Accordingly, for any one of these reasons, Betatene does not qualify as a "provitamin" of heading 2936, and must instead be classified as a "[f]ood preparation[] not elsewhere specified or included" of heading 2106.

## BACKGROUND

"Beta-carotene is a carotenoid" that is also "a form of provitamin A."  ECF No. 69, Plaintiff's Statement of Undisputed Material Facts (Pl.'s SUMF) ¶¶ 8–9, 11.   Carotenoids are yellow, orange, and red pigments abundant in plants.  *Carotenoid*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/carotenoid; Gov't Ex. 1, USCIT Rule 30(b)(6) Deposition of Dr. Christian Köpsel (Köpsel Dep.) at 19:24–20:5 (explaining that carotenoids are responsible for fall foliage's red, orange, and yellow hues)  They impart color to familiar fruits and vegetables: beta-carotene in particular is abundant in carrots, pumpkins, mangoes, and other "[i]ntensively yellow and orange colored" produce.  Gov't Ex. 2 at 3.  And

in humans, beta-carotene is converted into vitamin A when needed by the body.  Pl.'s SUMF ¶ 10.  As such, beta-carotene has multiple commercial uses: as a colorant in foods, beverages, and cosmetics; a food and beverage fortifier; or an ingredient in dietary supplements.  Gov't Ex. 2 at 4 (listing "indications for beta-carotene" such as "[g]ood cosmetic effects," use "as a colorant in" foods and beverages, and "fortification of" foods, beverages, and "food supplement preparations," among other things); 21 C.F.R. § 73.95 ("The color additive [beta]-carotene may be safely used for coloring foods generally, in amounts consistent with good manufacturing practice …."); *id.* § 73.2095 (same, for "coloring cosmetics generally"); *id.* § 184.1245 (providing that beta-carotene is a food substance generally recognized as safe that may be used as a "nutrient supplement," or in "processed fruits and fruit juices" and "infant formula," among other foods and beverages).

The beta-carotene in the Betatene imported by BASF comes from algae, specifically a species called *Dunaliella salina*.  Pl.'s SUMF ¶¶ 21.  "The algae are grown in open air, saltwater lagoons in Australia using sunlight and consuming carbon dioxide."  *Id.* ¶ 24.  "The algae are then harvested from the lagoons, and the beta-carotene is extracted from these algae."  *Id.* ¶ 25.  After extraction, "the beta-carotene is then dissolved in soybean oil, resulting in a concentrated oil dispersion consisting of approximately 30 percent beta-carotene particles and 70 percent oil."  *Id.* ¶ 26.  "[Thirty] percent has become a standard concentration [of beta-carotene] for oil dispersion[s] in the market" because higher concentrations are too "viscous" to be commercially practical, and lesser concentrations are not as cost-effective to ship due to their containing more "carrier oil" than necessary.  Köpsel Dep. at 38:23–40:7.  At this point in the manufacturing process for Betatene, the "soybean oil is a solvent into which the beta-carotene is dissolved,"

This Page Contains Confidential Information

which "enrobes the beta-carotene particles" and "protects and preserves them from oxygen exposure during the transportation and formulation steps." Pl.'s SUMF ¶¶ 27–28.

This 30 percent beta-carotene by weight oil dispersion is a commercially usable product in its own right called "30% Natural Beta-Carotene in soybean oil." Gov't Ex. 3. As an oil dispersion, it is warranted to be shelf stable up to five years. Gov't Ex. 4 at 13 (explaining that BASF's "dispersions" have a "5 year … shelf life"). Apart from being the starting point for manufacturing Betatene, it is also marketed as a colorant for food products. *Id.* at 11.

To make Betatene, however, this "30% Natural Beta-Carotene in soybean oil" is shipped from Australia to a "facility in Japan where it is formulated into microspheres, also known as beadlets," through a process called microencapsulation. Pl.'s SUMF ¶ 30. Through this process, antioxidants are first added to the oil dispersion. *Id.* ¶ 31. Separately, "using heat and shear force," gelatin is "dissolved with sucrose" and an antioxidant in water. *Id.* ¶ 32. The two separate mixtures "are then combined during a homogenization phase, creating an emulsion of all the ingredients." *Id.* ¶ 33. "The emulsion is then sprayed into a spray cooler tower" to create frozen "droplets." *Id.* ¶ 34. The thawed droplets are subsequently dried, causing "the gelatin and sucrose in each droplet to combine into solid beadlets …." *Id.* ¶ 35. This creates a hardened gelatin-sucrose matrix that enrobes the droplets of beta-carotene. *Id.* ¶¶ 36–37.

By the end of its processing, Betatene is guaranteed to contain at least 7.5 percent beta-carotene by weight. Köpsel Dep. at 101:15–18. The remainder of Betatene is largely its gelatin-sucrose matrix.[1] As a beadlet, Betatene is shelf stable up to three years. Gov't Ex. 4 at 13

---

[1] Betatene contains at least ▮▮▮▮▮ gelatin by weight, and ▮▮▮▮▮ sucrose by weight—a combined ▮▮▮▮▮ of the product. Pl.'s SUMF ¶ 43. Soybean oil makes up ▮▮▮▮▮ ▮▮▮▮ and the rest of the product is comprised of antioxidants, anti-caking agents, and residual water. *Id.*

This Page Contains Confidential Information

(explaining that BASF's "beadlets" have a "3 year … shelf life"); Gov't Ex. 5 at 4 ("When properly stored in the unopened original container, shelf life is 36 months after the date of manufacture.").

It is feasible, however, to create similar formulations with more beta-carotene and less gelatin and sucrose. For example, Roche Vitamins made a formulation called "BetaTab," which contained 20 percent beta-carotene by weight and less gelatin and sucrose than Betatene. ECF No. 69-6 at 2. And BASF's "Betavit" products contain either 10 or 20 percent beta-carotene by weight and less gelatin and sucrose than Betatene. *Id.*[2]

Back to Betatene: microencapsulation is "expensive." Gov't Ex. 6, Deposition of Dr. Marc Meyers (Meyers Dep.) at 61:24–62:6. To justify the expense of microencapsulating an ingredient, there must be a purpose for it—for example, for "[a]ppearance," or for delayed release of an ingredient—particularly in the food industry where margins are razor thin. *Id.* at 15:22–16:8, 58:11–13, 61:24–62:6; *see id.* at 34:7–18 (explaining that one cent of additional production cost per unit rendered a microencapsulated food ingredient prohibitively expensive). Here, Betatene's microencapsulation "serves several crucial functions." Gov't Ex. 7, Expert Report of Dr. Marc Meyers (Meyers Report) at 14. One is stabilization: "By shielding beta-carotene from oxygen, moisture, and physical pressures, the gelatin-sucrose matrix ensures its stability." *Id.* Another is emulsification: "Gelatin acts as an emulsifier, facilitating the integration of beta-carotene with the soybean oil mixture." *Id.* And yet another is "mechanical strength" for tableting. *Id.*

---

[2] BASF's chart states that Betatene "typically" contains up to ████████ beta-carotene by weight, ECF No. 69-6 at 2, but as BASF explained at its deposition, Betatene's beta-carotene concentration is "generally around ████████" by weight. Köpsel Dep. at 101:15–18.

Dietary-supplement tablets are created using a machine called a "tablet press" that exerts pressure directly on powders, or mixtures of powders and beadlets, to compress them into solid shapes like discs. *See* Meyers Report at 14; Gov't Ex. 8, Expert Report of Dr. Stuart Cantor (Cantor Report) at 6–7; *see also* Gov't Ex. 9, Deposition of Dr. Stuart Cantor (Cantor Dep.) at 106:7–19. To incorporate beta-carotene into a tablet, it is necessary to use a formulation that is capable of withstanding the "shear forces encountered during direct compression tableting." Cantor Report at 6–8. Otherwise, upon compression, the matrix would burst, and the oily beta-carotene would leak out. *Id.* at 8.

Betatene's gelatin-sucrose matrix "prevent[s] beadlet cracking due to external stresses" caused by "direct compression on tableting machines." Meyers Report at 14. Thus, beyond providing stability for preservation or transport, the matrix "provide[s] desired flexibility and durability in tablet compression for end-use applications." Meyers Report at 14; Meyers Dep. at 74:8–12 (agreeing that "the gelatin sucrose matrix doesn't just stabilize[; i]t also provides … mechanical strength"); Cantor Report at 7 (explaining that Betatene "was designed specifically to survive the shear forces encountered during direct compression tableting").

And because Betatene "has this particular kind of beadlet" (as opposed to a water-dispersible[3] beadlet) "it's specifically going to be used to make a tablet or a hard capsule or something along those lines[.]" Köpsel Dep. at 55:19–56:9, 57:16–22.[4] Betatene's "rigid gelatin

---

[3] Dispersibility refers to a formulation's ability to distribute evenly throughout a medium (such as cold water) without lumping. *Disperse*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/disperse.

[4] The hard-capsule manufacturing process also subjects ingredients to mechanical stress, but less so than during tableting. Cantor Dep. at 108:3–10, 111:24–114:8.

shell," in other words, renders it "not suitable to be used as a colorant or a food additive."
Cantor Report at 8.

Betatene will only "slightly colorize" when put in water, as it was "not designed" or
"optimized for" coloration. Köpsel Dep. at 56:19–57:4 (explaining that Betatene's "main
purpose is tableting indications"). Indeed, due to its processing, Betatene "is not water
dispersible." Gov't Ex. 10 (explaining that Betatene "should not be used in effervescent tablets
because it is not water dispersible"). To provide color, Betatene's gelatin-sucrose matrix must
first be dissolved away, so that the "beta-carotene dispersed in oil" within the matrix can be
released. Meyers Dep. at 89:7–17, 95:3–15.

Similarly, Betatene's gelatin-sucrose matrix creates problems when used as a food
additive, as it will burst when being chewed and cause a "funny taste" as the oil inside "ooze[s]
out." Cantor Dep. at 115:15–116:10, 139:4–15. This is not an issue for dietary supplements, as
they "have very little sensory focus": "You pop it in your mouth, you swallow it, you are not
really tasting it." Meyers Dep. at 67:14–22; *accord* Cantor Dep. at 115:15–116:10.

BASF thus markets Betatene as a "tablet grade," directly compressible powder for use in
dietary supplements like tablets and hard capsules. Gov't Ex. 5 at 1, 3; Gov't Ex. 11. Betatene
"is intended to be used specifically for that application." Cantor Report at 7; Gov't Ex. 5 at 3
("Betatene 7.5% N is intended for use as a source of mixed carotenoids in dietary
supplements."). BASF does not market Betatene for any other uses. Gov't Ex. 5 at 3; Gov't Ex.
11 at 2 (listing "[d]ietary supplements" as the sole "[a]pplication[]" for Betatene). Although
BASF performs "suitability and stability" testing on all its formulated beta-carotene products,
and has tested the suitability of Betatene's formulation for use in tableting, it has not tested
Betatene's suitability for any other use. Gov't Ex. 12; Köpsel Dep. at 30:22–31:3. Nor has

BASF provided any evidence of its customers using Betatene in anything other than a dietary supplement.  In fact, BASF has not heard of Betatene being used for any other purpose, and has never talked with a customer about using Betatene as a colorant or food additive.  Köpsel Dep. at 82:8–83:12.

Other formulated beta-carotene products that BASF and its competitors make, containing varying concentrations of beta-carotene and different properties, are marketed for these uses. Currently, BASF markets a variety of beta-carotene formulations for imparting color or fortifying foods and beverages, such as "Beta-Carotene 20% CWD/R," which is "a red-colored, cold-water dispersible powder used to impart color to water-based products including effervescent tablets and beverages," and "30% Natural Betacarotene SOY," which is "an oil-soluble dispersion of beta-carotene that is used to readily impart color to oil-based products such as margarine and salad dressings."  Cantor Report at 8; Gov't Ex. 4 at 11; Gov't Ex. 13. Manufacturers use formulations like these when they want to fortify or color foods or beverages, rather than expending the "extra money and labor" necessary to use Betatene for such purposes. Cantor Dep. at 138:4–23, 142:9–21; Cantor Report at 8.

As for the administrative history of this case, BASF imported the Betatene at issue in four entries made between March 2011 and October 2012.  Pl.'s SUMF ¶ 5.  At liquidation, Customs classified the product under subheading 2106.90.99, HTSUS, dutiable at 6.4 percent *ad valorem*. *Id.* ¶ 6.  BASF protested Customs' classification; Customs denied BASF's protests; and BASF subsequently brought this case.

## QUESTION PRESENTED

Whether Betatene is properly classified as:

(1) "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent: Other, including provitamins and natural concentrates," of subheading 2936.90.01, HTSUS (2011 and 2012); or

(2) "Food preparations not elsewhere specified or included: Other: Other," of subheading 2106.90.99, HTSUS (2011 and 2012).[5]

## SUMMARY OF ARGUMENT

 Betatene is not classifiable as a provitamin of heading 2936.  Note 1 to chapter 29, as informed by the explanatory notes, sets forth three requirements for classifying a provitamin formulation under heading 2936.  To be classifiable as a provitamin, a formulation must not (1) have more additives than necessary to (2) stabilize the product for purposes of preservation or transport, nor be (3) "particularly suitable for specific use rather than for general use."  *Roche Vitamins, Inc. v. United States*, 772 F.3d 728, 731 (Fed. Cir. 2014) (quoting Explanatory Note 29.36 (3d ed. 2002)).  Betatene fails all three.

First, Betatene's additives do not merely stabilize beta-carotene for preservation or transport.  Its gelatin-sucrose matrix also emulsifies and provides mechanical strength for withstanding the tableting process.  Those functions go beyond merely keeping beta-carotene stable while sitting on the shelf or being shipped.

---

[5] There are no material differences between the versions of the relevant HTSUS provisions and explanatory notes in effect at the time of entry in 2011 and 2012.  Explanatory Note 29.36 (5th ed. 2012) is reproduced in Gov't Ex. 14.

Second, Betatene's gelatin and sucrose are added in quantities greater than necessary for stabilizing beta-carotene for preservation or transport.  Similar beta-carotene formulations contain more beta-carotene and less gelatin and sucrose, while remaining just as stable as Betatene—if not more so.

And third, Betatene is particularly suitable for specific use in dietary supplements but not suitable for general use.  That Betatene could theoretically be used as a colorant or a food additive under commercially unrealistic conditions, as BASF insists, does not demonstrate Betatene's suitability for general use.

For any one of these reasons, Betatene does not meet note 1 to chapter 29's terms and cannot be classified under heading 2936.  It is therefore classifiable as a "[f]ood preparation[] not elsewhere specified or included" of heading 2106.

## ARGUMENT

### I.    Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a).  Because there is no dispute as to any material facts, the Court's determination "of the classification of the goods collapses into a determination of the proper meaning and scope of the HTSUS terms that, as a matter of statutory construction, is a question of law."  *RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024) (quotation omitted).

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category."  *ADC Telecomms.,*

*Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019) (quotation omitted). "The first four digits of an HTSUS provision constitute the heading, whereas the remaining digits reflect subheadings." *Id.* (quotation omitted). The HTSUS also contains "General Rules of Interpretation (GRIs) that govern the classification of merchandise." *RKW Klerks*, 94 F.4th at 1378. "The GRI[s] apply in numerical order, meaning that subsequent rules are inapplicable if a preceding rule provides proper classification." *ADC Telecomms.*, 916 F.3d at 1017 (quotation omitted).

"GRI 1 provides, 'classification shall be determined according to the terms of the headings and any relative section or chapter notes.'" *RKW Klerks*, 94 F.4th at 1378 (quoting GRI 1). Thus, "[w]hen applying GRI 1, [a] court first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading." *Id.* (quotation omitted). Where a tariff term is not defined in the HTSUS, "the term's correct meaning is its common meaning," which is "presumed to be the same as its commercial meaning." *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (quotation omitted). "In order to determine the common commercial meaning of a tariff term, courts may consult dictionaries, encyclopedias, scientific authorities, and other reliable information sources." *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011). That includes the World Customs Organization's Explanatory Notes to the Harmonized Tariff Schedule, which, though not binding, "are 'generally indicative' of the proper interpretation of a tariff provision." *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008) (quotation omitted). Courts credit "the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it." *Id.*

11

After determining the heading under which a good is classified pursuant to GRI 1, the Court must then determine the applicable subheading pursuant to GRI 6. "[T]he classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the [preceding GRIs] on the understanding that only subheadings at the same level are comparable." GRI 6.

One final point on the legal framework of tariff classification: BASF argues that "ambiguity in classification cases is resolved 'in favor of the importer, since the intention of Congress to impose a higher duty should be expressed in clear and unambiguous language.'" BASF Br. at 20 (quoting *Am. Net & Twine Co. v. Worthington*, 141 U.S. 468, 474 (1891), and citing *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997)). That is not the case. This substantive canon did not survive the New Deal-era Supreme Court, *see* Jonathan H. Choi, *The Substantive Canons of Tax Law*, 72 Stan. L. Rev. 195, 251–54 (2020), and since then, the Court has made clear that statutes must be given a "fair reading" absent a textual command otherwise, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018). As such, no substantive canon can displace the statutory rules governing classification. *Nature's Touch Frozen Foods (W.) Inc. v. United States*, 639 F. Supp. 3d 1287, 1307 (Ct. Int'l Trade 2023) (under the HTSUS, "canons and duty rates do not control classification—the text of the headings and subheadings do"). Indeed, GRI 3(c) requires that ambiguity be resolved in favor of "the heading which occurs last in numerical order," not the heading with the lower duty rate. Accordingly, any ambiguity in the HTSUS's terms must be resolved using the statute's own interpretive rules and traditional tools of statutory construction—not an outdated canon that is contradicted by the HTSUS's plain text.

II.    **Betatene is not classifiable as an all-purpose provitamin of heading 2936 because its application-specific formulation fails to satisfy the conditions set forth in note 1 to chapter 29**

Because the terms of the Government's heading are met only if BASF's merchandise is not specified elsewhere in the HTSUS, the analysis starts with BASF's proffered heading: heading 2936.  *See Trijicon, Inc. v. United States*, 686 F. Supp. 3d 1336, 1342–43 (Ct. Int'l Trade 2024) (merchandise was classified under a heading covering lamps "not elsewhere specified or included" only after concluding that the importer's heading without such a limitation did not describe the merchandise).  Heading 2936 provides for "[p]rovitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent[.]"

There is no dispute that beta-carotene counts as a provitamin.  But the merchandise at issue is not just beta-carotene; it is a formulation thereof, containing gelatin, sucrose, soybean oil, and other substances.  The question, then, is whether Betatene's particular formulation of beta-carotene still qualifies as a provitamin.

That question is answered by note 1 to chapter 29.  The note's "careful listing" of requirements specifies which formulations count as "[p]rovitamins" of heading 2936.  *H. Reisman Corp. v. United States*, 17 C.I.T. 1260, 1264 (1993).  "Except where the context otherwise requires, the headings of [chapter 29] apply only to … [s]eparate chemically defined organic compounds, whether or not containing impurities," and such compounds "with an added stabilizer (including an anticaking agent) necessary for their preservation or transport."  Note 1(a) and (f) to Chapter 29.  The explanatory notes, in turn, "provide further insight as to the proper classification of merchandise under heading 2936."  *Roche Vitamins, Inc. v. United*

13

*States*, 772 F.3d 728, 731 (Fed. Cir. 2014) ("*Roche III*").  Heading 2936's explanatory note

provides in relevant part that

> The products of this heading may be stabilised for the purposes of
> preservation or transport:
>
> - by adding anti-oxidants,
>
> - by adding anti-caking agents (e.g. carbohydrates),
>
> - by coating with appropriate substance (e.g. gelatin, waxes or
> fats), whether or not plasticized, …
>
> **provided** that the quantity added or the processing in no case
> exceeds that necessary for their preservation or transport and that
> the addition or processing does not alter the character of the basic
> product and render it particularly suitable for specific use rather
> than for general use.

*Id.* (quoting Explanatory Note 29.36 (3d ed. 2002)) (emphasis omitted); *see* Gov't Ex. 14

(containing the same language).

Thus, to be classifiable as a "[p]rovitamin[]" of heading 2936, a product must meet each

of these three requirements: (1) the stabilizer must be added for the purposes of "preservation or

transport" of the product; (2) "the amount of stabilizer added" must not be "more than necessary

for preservation or transport"; and (3) "the addition of stabilizer ingredients" must not "render

the basic product, beta-carotene, particularly suitable for specific use rather than for general use."

*Roche III*, 772 F.3d at 732.  Betatene's formulation fails each requirement.

### A. Betatene's additives do more than stabilize for preservation or transport—as BASF's own expert acknowledges

To begin, Betatene's gelatin-sucrose matrix not only stabilizes for preservation and

transport but also prepares it for tableting.  As BASF's own expert explained, the "matrix serves

several crucial functions": stabilization, emulsification, *and* mechanical strength for tableting.

Meyers Report at 14.  In other words, "the gelatin[-]sucrose matrix *doesn't just stabilize*[; i]t also

provides … mechanical strength."  Meyers Dep. at 74:8–12 (emphasis added).  Betatene's

gelatin-sucrose matrix thus "provide[s] desired flexibility and durability in tablet compression

for end-use applications" in addition to providing some stability.  Meyers Report at 14.

That conclusion makes sense.  Betatene's gelatin-sucrose matrix could not have been

added solely for purposes of preservation or transport because the very product from which

Betatene is made—an oil dispersion containing 30 percent beta-carotene by weight but lacking

any gelatin or sucrose—is *more* stable.  That product is stable for up to five years and is safely

shipped from Australia to Japan to make Betatene—which, by contrast, is stable for only up to

three years if its packaging is left unopened.  Gov't Ex. 4 at 13; Gov't Ex. 5 at 4.  The gelatin-

sucrose matrix thus serves the additional purpose of preparing Betatene for use in dietary

supplements, a use which requires the mechanical strength that the matrix provides.  *See* Cantor

Report at 6–8.  That precludes Betatene's classification under heading 2936.

The analysis of the *Roche* decision confirms this.  There, the case went to trial because it

was disputed whether the gelatin-sucrose matrix of BetaTab, a microencapsulated beta-carotene

formulation containing 20 percent beta-carotene by weight, "facilitates tableting and provides

more than 'stabilis[ation] for the purposes of preservation or transport[.]'"  *Roche Vitamins, Inc.*

*v. United States*, 750 F. Supp. 2d 1367, 1381 (Ct. Int'l Trade 2010) ("*Roche I*").  After trial,

however, the Court found that BetaTab's additives were only "added as stabilizers," and

therefore classified the product under heading 2936.  *Roche Vitamins, Inc. v. United States*, 922

F. Supp. 2d 1353, 1363 (Ct. Int'l Trade 2013) ("*Roche II*"); *see Roche III*, 772 F.3d at 732

("Expert testimony established that the sucrose and gelatin additives function as stabilizers ….").

But here, BASF's own expert confirms that Betatene's gelatin-sucrose matrix is not

merely added as a stabilizer for preservation or transport but also emulsifies and "provide[s]

desired flexibility and durability in tablet compression."  Meyers Report at 14; Meyers Dep. at 74:8–12 (agreeing that "the gelatin sucrose matrix doesn't just stabilize[; i]t also provides … mechanical strength").  In other words, it undisputedly "facilitates tableting and provides more than 'stabilis[ation] for the purposes of preservation or transport[.]'"  *Roche I*, 750 F. Supp. 2d at 1381.

And, to be clear, "mechanical strength" for tableting is not a form of stabilization for preservation, as both side's experts agree and as the plain meaning of "preservation" confirms.  As noted, BASF's expert concluded that Betatene's inert ingredients *both* stabilize *and* "provide desired flexibility and durability in tablet compression …."  Meyers Report at 14 (separately discussing the two); Meyers Dep. at 74:8–12.  The Government's expert concurred that "protecting an active ingredient against mechanical stresses" is "[n]ot necessarily … stabilizing the active ingredient," but instead "protecting that dosage form from rupturing" during tableting or the hard-capsule manufacturing process.  Cantor Dep. 108:3–10, 111:24–114:8; *see* Cantor Report at 7–8.

These conclusions accord with the plain meaning of "preservation."  "Preservation" is "the preparation of food for future use (as by canning, pickling, or freezing) to prevent spoilage." *Preservation*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/preservation; *see Preserve*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/preserve ("to keep or save from decomposition").  But Betatene's gelatin-sucrose matrix undisputedly does not stabilize only for the purpose of keeping beta-carotene from spoiling or decomposing—it also protects the beta-carotene inside from leaking out during tableting.  Betatene's gelatin-sucrose matrix thus prepares beta-carotene

to withstand direct-compression tableting, rather than merely stabilizing it for preservation or transport.

In sum, Betatene does not meet the requirement of note 1 to chapter 29 that its stabilizers be added solely for purposes of preservation or transport, and for that reason alone is not classifiable under heading 2936.

### B. Betatene contains more additives than necessary for preservation or transport, as evidenced by equally stable beta-carotene formulations that contain more beta-carotene and less additives by weight

But even if Betatene's gelatin-sucrose matrix did stabilize only for preservation or transport (which it does not), the quantity of gelatin and sucrose added nevertheless exceeds that which is necessary for such stabilization. The undisputed evidence shows that stable beta-carotene formulations with more beta-carotene and less gelatin and sucrose exist.

The Court need look no further than *Roche*. There, the product at issue was BetaTab, which, like Betatene, consists of beta-carotene microencapsulated in a gelatin-sucrose matrix. *See Roche I*, 750 F. Supp. 2d at 1370. But BetaTab contains 20 percent beta-carotene by weight, whereas Betatene is guaranteed to contain just 7.5 percent beta-carotene by weight. *Id.* BetaTab thus contains *more* beta-carotene and *less* gelatin and sucrose than Betatene while remaining stable, as BASF's chart comparing the two confirms. ECF No. 69-6 at 2.

And if that were not enough, consider BASF's own carotenoid portfolio. BASF markets a variety of formulations with higher beta-carotene concentrations but less gelatin and sucrose. These products range from microencapsulated beadlets containing 10 percent beta-carotene by weight to the oil dispersion from which Betatene is made that contains 30 percent beta-carotene by weight. BASF's directly compressible Betavit products, for instance, contain more beta-carotene but less gelatin and sucrose. ECF No. 69-6 at 2. The oil dispersion from which

Betatene is made also has more beta-carotene and superior stability as compared to Betatene. Gov't Ex. 4 at 13. That BASF's other formulations contain more beta-carotene and less additives by weight, while retaining stability, proves that the "quantity" of gelatin and sucrose "added" to Betatene "exceeds that necessary for [beta-carotene's] preservation or transport." *Roche III*, 772 F.3d at 731 (quotation omitted).

BASF points out that, due to "cost considerations," it "uses no more of its formulation ingredients than necessary to make a stable formulation," BASF Br. at 57–58, but that misses the point. As its expert agreed, Betatene "contains inert ingredients only at the minimum level *to provide the desired flexibility and durability for tablet compression*," Meyers Dep. at 105:4–14 (emphasis added)—not just at the minimum level necessary to stabilize for preservation or transport. In other words, BASF's argument would be the same even if the product contained only 1 percent beta-carotene by weight, as some of its formulations do. *See* Cantor Report at 6 (discussing BASF's Betatene 1% CWD N, a "cold-water dispersible product that is ideal for beverages")). It cannot be the case, though, that formulations ranging from 1 to 7.5 to 10 to 20 to 30 percent beta-carotene by weight all contain no more additives than necessary for beta-carotene's stabilization.

Betatene, containing more gelatin and sucrose than necessary for stabilizing beta-carotene merely for preservation or transport, thus cannot be classified under heading 2936.

### C. Betatene's processing has rendered it particularly suitable for specific use in dietary supplements, but unsuitable for general use, as the uncontradicted evidence shows

Finally, even if Betatene's formulation contained an appropriate quantity of additives needed to stabilize solely for preservation or transport (it does not), its processing has

nevertheless rendered it both unsuitable for general use and particularly suitable for specific use in dietary supplements.

To start, it is undisputed that Betatene is particularly suitable for use in dietary supplements. It "was designed specifically to survive the shear forces encountered during direct compression tableting, and is intended to be used specifically for that application." Cantor Report at 7. Specifically, its "plasticized gelatin shell … helps protect the solubilized oil-based carotenoids inside from leaking out during the high shear-force direct-compression tableting process." *Id.* at 8. And because Betatene "has this particular kind of beadlet" (as opposed to, say, a water-dispersible beadlet) "it's specifically going to be used to make a tablet or a hard capsule or something along those lines[.]" Köpsel Dep. at 55:19–56:9, 57:16–22. Indeed, BASF markets Betatene as a "tablet grade powder" solely for use in dietary supplements like tablets and hard capsules, Gov't Ex. 11, unlike other beta-carotene formulations it markets for multiple uses, *see, e.g.*, Gov't Ex. 13. Nor has it tested Betatene's suitability for other uses, *see* Cantor Report at 8–9 (explaining that BASF's "lack of research and application advice" for non-dietary supplement uses of Betatene "is consistent with the fact that [it] is specifically suitable for use in dietary supplements … but not suitable for general use"), or provided evidence of Betatene actually being used as anything other than an ingredient in dietary supplements.

It is likewise undisputed that Betatene "is not suitable for general uses." Cantor Report at 9. That is because BASF's expert offered no opinion as to Betatene's suitability for general use. *See generally* Meyers Report (not using any form of the word "suitable"); Meyers Dep. (same). Nor do any of BASF's statements of fact address suitability. *See generally* Pl.'s SUMF. That is fatal to BASF's claim because BASF, as the plaintiff, bears the burden to produce evidence demonstrating Betatene's suitability for general use. *Universal Elecs. Inc. v. United States*, 112

F.3d 488, 492 (Fed. Cir. 1997); *cf. Roche III*, 772 F.3d at 733 (explaining that the importer's "[e]xpert testimony" at trial "established that BetaTab is well-suited for fortifying foods with provitamin A and is suitable for general use as provitamin A" in "foods, beverages, and vitamin products" (quotations omitted)).

Even if BASF could be excused from meeting its burden of production (it cannot), the undisputed record evidence shows that Betatene is not suitable for general use. The same "rigid gelatin shell" that renders Betatene particularly suitable for use in dietary supplements renders it "not suitable to be used" for beta-carotene's remaining commercial uses: "as a colorant or a food additive." Cantor Report at 8. Other beta-carotene formulations that BASF makes are suitable for those purposes—like "Beta-Carotene 20% CWD/R," which is "a red-colored, cold-water dispersible powder used to impart color to water-based products including effervescent tablets and beverages," or "30% Natural Betacarotene SOY," which is "an oil-soluble dispersion of beta-carotene that is used to readily impart color to oil-based products such as margarine and salad dressings." *Id.*; Gov't Ex. 4 at 11; Gov't Ex. 13.

Betatene, however, will only "slightly colorize" when put in water; it was "not designed" or "optimized for this," as "[t]he main purpose is tableting indications." Köpsel Dep. at 56:19–57:4. In fact, BASF instructs that Betatene "should not be used in effervescent tablets because it is not water dispersible." Gov't Ex. 10; *cf. Roche II*, 922 F. Supp. 2d at 1361 (finding that the all-purpose BetaTab 20% was "water miscible" and "dispersible in water above twenty degrees Celsius"). To provide color, Betatene's gelatin-sucrose matrix must first be dissolved so that the "beta-carotene dispersed in oil" within can be released. Meyers Dep. at 89:7–17, 95:3–15. In other words, the product must be *deformulated*, undoing the processing it underwent in Japan, before it can color.

But deformulating Betatene so that it can color is not commercially realistic. *See Shamrock Bldg. Materials, Inc. v. United States*, 119 F.4th 1346, 1353 (Fed. Cir. 2024) (looking to a good's "commercially significant" features to determine its classification). Microencapsulation is "expensive" and margins in the food business are razor thin. Meyers Dep. at 34:7–18, 61:24–62:6. It is implausible that a manufacturer would spend the "extra money and labor" necessary to use Betatene as a colorant by deformulating it instead of buying the right formulation for the job. Cantor Dep. at 138:4–23.

Nor is Betatene suitable for use as a food additive. Its gelatin-sucrose matrix will break when being chewed and cause a "funny taste" as the oil inside "ooze[s] out." Cantor Dep. at 115:15 –116:10, 139:4–15. And "using the wrong Beta-Carotene ingredient for your application" is "going to increase your cost as a manufacturer" and "decrease the quality of your product," *id.* at 142:9–21, which once more makes Betatene's use as a funny-tasting food additive implausible in such a low-margin business. Tablets and capsules, however, "have very little sensory focus," Meyers Dep. at 67:14–22; Cantor Dep. at 115:15–116:10, making Betatene particularly suitable for use in dietary supplements.

BASF emphasizes that "nothing about [Betatene's] formulation *prevents* it from functioning as provitamin A or a colorant in" a "variety of applications other than tablets or hard capsules," if "the user so desired." BASF Br. at 52 (emphasis added).[6] Again, BASF misunderstands the standard. The standard is not theoretical possibility. It is *suitability* for general use. *Roche III*, 772 F.3d at 731. As noted, BASF's expert never opined on Betatene's suitability for general use, and BASF produced no evidence suggesting that Betatene is suitable

---

[6] BASF says nothing of Betatene's use as a colorant for cosmetics, *see* Gov't Ex. 2 at 4; 21 C.F.R. § 73.2095, further demonstrating that Betatene is not suitable for general use.

for any non-dietary-supplement use.  In fact, BASF has never heard of a customer using Betatene "for anything other than dietary supplements."  Köpsel Dep. at 82:8–14; *see id.* at 107:6–13 (explaining that "[i]t would not be efficient" to use Betatene in, for instance, an "effervescent tablet," even if nothing "would prevent a customer from using it" that way).  That a manufacturer could, theoretically, deformulate Betatene, undoing its expensive microencapsulation to use it generally as a colorant or food additive, fails to show that Betatene is suitable for such uses.  It shows just the opposite.

BASF also notes that its processing does not "chemically modify the beta-carotene or render it unable to be provitamin A," BASF Br. at 47, but that is beside the point.  If Betatene's beta-carotene were chemically modified to be something other than a vitamin or provitamin, then it of course would not be classifiable under heading 2936 (which covers vitamins and provitamins).  The question here is not whether Betatene's beta-carotene is still beta-carotene, though; it is whether BASF's processing "render[s] it particularly suitable for specific use rather than for general use."  *Roche III*, 772 F.3d at 731 (quotation and emphasis omitted).  For all the reasons just explained, it does.

BASF finally points out that, like BetaTab, Betatene lacks any tableting excipients, BASF Br. at 47–48, and has the same stabilizing ingredients, *id.* at 59–60, but that cannot save BASF's claim.  The absence of tableting excipients is irrelevant to the "suitability-for-use" inquiry under note 1 to chapter 29.  That analysis asks whether the addition of *permitted* ingredients like stabilizers and anti-caking agents has rendered the product particularly suitable for a specific use as opposed to general use.  *See* Explanatory Note 29.36.  Tableting excipients are not ingredients permitted by note 1 to chapter 29 in the first place—their presence in a

formulation precludes classification under heading 2936, even if they do not render the formulation particularly suitable for tableting.

Regardless, it was expert testimony that *BetaTab's* gelatin-sucrose matrix did not "specifically prepare [it] for tableting" or render it unsuitable "for general use" that carried the day in *Roche*. *Roche III*, 772 F.3d at 732–33 (quotations omitted). Here, however, the undisputed evidence shows that *Betatene's* gelatin-sucrose matrix does specifically prepare it for tableting and render it unsuitable for general use, despite the lack of tableting excipients or the similarity of its additives to BetaTab's. *See, e.g.*, Cantor Report at 7–9.

To that point, Betatene does not share the same properties as BetaTab, even though its ingredients overlap. BetaTab was found to be water miscible and dispersible at just above room temperature, *Roche II*, 922 F. Supp. 2d at 1361, which indicates that it is suitable for water-based applications. Betatene, by contrast, "is not water dispersible," Gov't Ex. 10, preventing it from being suitable (or "efficient," as BASF put it, Köpsel Dep. at 107:6–13) for use in water-based applications like effervescent tablets. Mere similarity of additives is thus not enough.

In sum, this case is not akin to *Roche*. The expert testimony and evidence there concerning BetaTab is not the same expert testimony and evidence here concerning Betatene. And because BASF has failed to show that Betatene is suitable for general use, rather than specific use in dietary supplements, Betatene does not meet note 1 to chapter 29's terms and cannot be classified under heading 2936.

### D. BASF's remaining arguments are unavailing

Finally, BASF raises a handful of arguments, none of which undermines the conclusion that Betatene is not a provitamin of heading 2936.

First, BASF points out that the World Customs Organization's Harmonized System Committee has classified certain provitamin formulations under heading 2936. BASF Br. at 23–26. These non-binding classification opinions can be informative, particularly where the same merchandise is at issue, but BASF does not explain how the distinct products that the Committee classified bear on Betatene's classification. *See Roche I*, 750 F. Supp. 2d at 1381 n.12.

Second, BASF gestures toward prior stipulations in other cases where the Government has agreed to classify various beta-carotene formulations under heading 2936. BASF Br. at 31–32. These prior stipulations—none of which concerns Betatene, *see* ECF No. 69-5—are inadmissible under Fed. R. Evid. 408(a)(1) and, in any event, are irrelevant to the Court's *de novo* determination of how Betatene should be classified in light of the record of this case. 28 U.S.C. § 2640(a)(1).

And third, BASF devotes much of its brief to arguing about the permissibility of soybean oil as a solvent in Betatene. BASF Br. at 37–53. The Government does not agree that a provitamin of heading 2936 can have any amount of soybean oil for any purpose—a preparation of soybean oil with one molecule of beta-carotene, or a beta-carotene preparation that contains soybean oil for reasons that note 1 to chapter 29 does not permit, is not a provitamin of heading 2936. That said, arguments over soybean oil do not address the gelatin-sucrose matrix that is the crux of this case. For all the reasons already explained, Betatene's particular microencapsulated formulation precludes its classification as a provitamin of heading 2936.

## III.    Betatene is a "[f]ood preparation[]" of heading 2106 "not elsewhere specified or included" in the HTSUS

Because Betatene is not classifiable under heading 2936, the analysis turns to the Government's proposed classification: heading 2106. Heading 2106 encompasses "[f]ood preparations not elsewhere specified or included" in the HTSUS. As we show below, "[f]ood

preparations" are specially made substances with nutritive value for human ingestion. That describes Betatene, which is particularly suitable for use in dietary supplements as a source of provitamin A. Nor is the merchandise "elsewhere specified or included" in the HTSUS. As explained, it is not classifiable as a general-use provitamin of heading 2936. Accordingly, heading 2106—and specifically, subheading 2106.90.99—describes Betatene.

First, Betatene is a "food preparation[]." "The common meaning of 'food' is that of a substance that is intended to be ingested." *Mondelez Glob. LLC v. United States*, 253 F. Supp. 3d 1329, 1335 (Ct. Int'l Trade 2017). And a "preparation" is "a substance specially prepared, or made up for its appropriate use or application, e.g. as food …." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (quotation omitted). Thus, "food preparations" are specially made-up substances (as supposed to raw, unprocessed edible products) intended to be ingested. *See Nutricia N. Am., Inc. v. United States*, 666 F. Supp. 3d 1363, 1379 (Ct. Int'l Trade 2023) ("specially-formulated combinations of nutritional substances" are "food preparations" within the meaning of heading 2106); *cf. Nature's Touch*, 639 F. Supp. 3d at 1303–04 (freezing a fruit and vegetable mixture does not constitute "preparation" under the HTSUS).

Betatene fits that description. It is not a raw nutrient but has instead been specially formulated through extensive processing, namely microencapsulation. It is intended to be ingested by humans as an ingredient in a dietary supplement. And when ingested, the body breaks down the merchandise's beta-carotene to obtain vitamin A, which has nutritive value. Thus, Betatene qualifies as a "food preparation[]"—as BASF does not appear to dispute, *see* BASF Br. at 63.

Second, Betatene is not "elsewhere specified or included" in the HTSUS. Heading 2106. Heading 2936 does not describe the merchandise for the reasons already explained. And BASF

has not identified—nor can the Government find—any other heading that might describe a beta-carotene formulation particularly suitable for use in dietary supplements.

As such, Betatene is classifiable under heading 2106, and further classifiable under subheading 2106.90.99 pursuant to GRI 6. "The products at issue are not '[p]rotein concentrates or textured protein substances' of subheading 2106.10, HTSUS and thus are classified in six-digit subheading 2106.90, HTSUS ('Other:')." *Nutricia*, 666 F. Supp. 3d at 1380. And "[t]he uncontested facts do not demonstrate that they are described by any of the eight-digit subheadings" within subheading 2106.90. *Id.* "Therefore, the correct eight-digit subheading is subheading 2106.90.99, HTSUS ('Food preparations not elsewhere specified or included: Other: Other: Other: Other: Other: Other')." *Id.*

Betatene is thus classifiable only under subheading 2106.90.99, just as Customs classified it at liquidation.

## **CONCLUSION**

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny BASF's motion for summary judgment, enter judgment in the Government's favor.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*                                        /s/ Luke Mathers
Michael A. Anderson                          LUKE MATHERS
Office of the Assistant Chief Counsel    Trial Attorney
International Trade Litigation               Department of Justice, Civil Division
U.S. Customs and Border Protection      Commercial Litigation Branch
                                                             26 Federal Plaza, Room 346
                                                             New York, New York 10278
                                                             (212) 264-9236
Dated:  January 10, 2025                      *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: LISA W. WANG, JUDGE

_____
:
BASF CORPORATION,                       :
                                        :
                    Plaintiff,          :
                                        :
        v.                              :        Consol. Court No. 12-00422
                                        :
UNITED STATES,                          :
                                        :
                    Defendant.          :
_____:

## CERTIFICATE OF COMPLIANCE

I, LUKE MATHERS, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with type-volume limitation under the Court's standard chambers procedures and contains 7,480 words.

/s/ Luke Mathers
LUKE MATHERS