UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE

_____
                                          :
BASF CORPORATION,                         :
                                          :
                         Plaintiff,       :
                                          :
            v.                            :       Consol. Court No. 12-00422
                                          :
UNITED STATES,                            :
                                          :
                         Defendant.       :
_____:

## **PROPOSED ORDER**

Upon considering Plaintiff's Motion for Summary Judgment, Defendant's

Cross-Motion for Summary Judgment, and upon consideration of other papers and

proceedings had herein, it is hereby

**ORDERED** that Plaintiff' Motion for Summary Judgment be, and hereby is

granted; and it is further

**ORDERED** that Defendant's Cross-Motion for Summary Judgment be, and

hereby is denied; and it is further

**ORDERED** that Defendant shall reliquidate all entries of Betatene® 7.5% N

under subheading 2936.90.01, Harmonized Tariff Schedule of the United States

(HTSUS 2011 or 2012), HTSUS; and it is further

**ORDERED** that Defendant shall refund all excess duties collected on the imported merchandise, with interest as provided for by law.

_____

Lisa W. Wang, Judge

Dated: _____

New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE

_____
                                          :
BASF CORPORATION,                         :
                                          :
                      Plaintiff,          :
                                          :
          v.                              :      Consol. Court No. 12-00422
                                          :
UNITED STATES,                            :
                                          :
                      Defendant.          :
_____:


**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
<u>REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**



Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
45 Broadway, Suite 3130
New York, New York 10006

Tel: (212) 725-0200, ex. 126
rvanarnam@barnesrichardson.com
*Attorneys for Plaintiff*



Dated:        March 17, 2025
              New York, New York

TABLE OF CONTENTS

Page

TABLE OF CONTENTS.........................................................................i-ii

TABLE OF AUTHORITIES ...............................................................iii-iv

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT..................................1

I.  SUMMARY OF ARGUMENT.......................................................................2

II. ARGUMENT .................................................................................8

   A.    Plaintiff's Motion Should be Granted
          Because the Betatene Satisfies the *Eo Nomine*
          Language of Heading 2936 and the Additional
          Requirements of Chapter 29, 1 ..............................................8

   B.    The Explanatory Notes Support
          Classifying Betatene Under Heading 2936 ................................15

       1.    Explanatory Notes Are Not Intended to
             Limit the Statutory Language of the Tariff ............................16

       2.    Providing Mechanical Strength to the
             Matrix is a Stabilizing for Preservation Function..................18

       3.    The Stabilizer in Betatene Does Not Exceed that
             Necessary for the Stabilization of the Beta-Carotene for
             Preservation or Transport ...........................................29

       4.    The Overwhelming Weight of Evidence
             Establishes that Betatene is Suitable
             for General Use as Provitamin A ...................................36

           a.  The Character of the Basic Product (Beta-Carotene)
               Has Not Been Altered by the Stabilizer ...........................37

           b.  The Added Stabilizer Does Not Render the Beta-
               Carotene Particularly Suitable for Specific Use
               Rather than General Use, as the Beta-Carotene in

Betatene Retains its General Use as Provitamin A ...........40

C.    Betatene is Elsewhere Specified
      or Included in Heading 2936 ...............................................................50

III.    CONCLUSIONS .......................................................................................52

CERTIFICATE OF COMPLIANCE.........................................................................53

TABLE OF AUTHORITIES

<u>CASES</u>                                                                                    <u>PAGE</u>

*Apple Inc. v. United States, 964* F.3d 1087
 (Fed. Cir. 2020) ......................................................................21

*Am. Net.* & *Twine Co. v. Worthington,* 141 U.S. 468 (1891)..............14

*Anhydrides* & *Chems., Inc. v. United States,* 130 F.3d 1481
(Fed. Cir. 1997)            ................................................. 14

*Archer Daniel Midland Co. v. United States,*
561 F.3d 1308 (Fed. Cir. 2009)................................................16

*EM Indus., Inc. v. United States,* 22 CIT 156,
999 F. Supp. 1473 (1998) ……………………………………… 50

*Libas, Ltd. v. United* States,
193 F.3d 1361 (Fed. Cir. 1999)................................................13

*Logictech, Inc. v. United States,*
532 F. Supp. 3d 1358 (Ct Int'l Trade 2021)  ........................ 14

*Rollerblade, Inc. v. United States,* 282 F.3d 1349
(Fed. Cir. 2014) ...............................................................50, 51

*Mita Copystar Am. v. United States,*
21 F.3d 1079 (Fed. Cir. 1994) ................................................51

*Roche Vitamin, Inc. v. United States,*
772 F.3d 728 (Fed. Cir. 2014) ........................................*passim*

*Roche Vitamins, Inc. v. United States,*
922 F. Supp.2d 1353 (Ct. Int'l Trade 2013) ..........................41

*Sigma-Tau HealthScience, Inc. v. United States,*
838 F.3d 1272 (Fed. Cir. 2016) ......................................16, 17

*Rubie's Costume Co. v. United States,*
337 F.3d 1350 (Fed. Cir. 2003) .............................................. 17

*United States v. Greek Orthodox Church of Evangelismo,*
49 C.C.P.A. 35 (1962).............................................................14

## STATUTES AND REGULATIONS

USCIT R. 56(c) ................................................................................... 1

Chapter 29 Note l ....................................................................... *passim*

Chapter 29 Note l(b) ...................................................................... 9

Chapter 29 Note l(c} ...................................................................... 9

Chapter 29 Note l(d) ...................................................................... 9

Chapter 29 Note l(e) ............................................................ 9, 10, 11, 17

Chapter 29 Note l(f) ................................................................ *passim*

Heading 2106 ...................................................................... 2, 50, 51

Subheading 2106.90.99 ................................................................. 50

Heading 2936 ........................................................................ *passim*

Subheading 2936.90.01 ............................................................... *passim*

## OTHER AUTHORITIES

Explanatory Note 29.36 ............................................................. *passim*

Explanatory Note 21.06 ................................................................ 50

Zhang, Xu, Zhang, Wang, Lorenzo, Zhong, "Gelatins as Emulsifiers
for Oil-In-Water Emulsions: Extraction, Chemical Composition,
Molecular Structure, and Molecular Modification," *Trends in
Food Science and Technology*, 106 (2020) at pp. 113-114. ................................. 26

iv

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LISA W. WANG, JUDGE

---

|                     | :  |                          |
| BASF CORPORATION,   | :  |                          |
|                     | :  |                          |
| Plaintiff,          | :  |                          |
|                     | :  |                          |
| v.                  | :  | Consol. Court No. 12-00422 |
|                     | :  |                          |
| UNITED STATES,      | :  |                          |
|                     | :  |                          |
| Defendant.          | :  |                          |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the U.S. Court of International Trade, plaintiff BASF Corporation ("BASF" or "plaintiff") respectfully submits this response to the defendant United States' ("defendant") cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment. For ease of readability, BASF will refer to the defendant's consolidated cross motion and opposition as its "*Cross-Motion*."[1]

---

[1] As to the *Cross-Motion*, ECF. No. 74, the defendant bears the burden of proving that there are no genuine issues of material fact, and BASF receives the benefit of all reasonable inferences. *See* USCIT Rule 56(c).

In support of its opposition to the defendant's *Cross-Motion*, BASF incorporates by reference its Motion for Summary Judgment, Memorandum in support thereof and all materials and exhibits attached thereto in support. *See* ECF. No. 68 and 69. Hereafter, reference to plaintiff's summary judgment motion and memorandum will be to plaintiff's "*Motion*." Reference to this Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment and its exhibits shall be to plaintiff's "*Response Memorandum*."

## I.    SUMMARY OF ARGUMENT

The defendant's *Cross-Motion* fails to establish that the imported product, Betatene® 7.5% N, (hereafter "Betatene" or "imported merchandise), is not a natural provitamin in a solvent as contemplated by Heading 2936 and put up in a manner allowed pursuant to Chapter 29, Note 1 of the Harmonized Tariff Schedule of the United States ("HTSUS").  It advances several arguments as to why this Court should not classify the imported merchandise under Heading 2936 and should classify it under Heading 2106.  None have merit.

First, the defendant has now agreed to the applicable facts allowing this Court to hold in BASF's favor, classifying the merchandise under subheading 2936.90.01.  The parties agree that the imported merchandise consists of an isomeric mixture of beta-carotene and alpha-carotene with permissible impurities in a solvent.  *Compare* Plaintiff's Statement of Undisputed Material Facts (Pl's SUMF), ECF No. 69 at ¶¶ 9, 14, 21, 22, 23 *with* Defendant's Response to Plaintiff's Statement of Undisputed Material Facts (Def's RPSUMF), ECF No. 75 at ¶¶ 9, 14, 21, 22, 23.  The parties also agree that the soybean oil functions as a carrier for the beta-carotene from when it is first dissolved in the oil, through formulation into a stabilized, microencapsulated beadlet, through digestion by the human body, *compare* Pl's SUMF, ECF No. 69 at ¶ 26, 27, 58 *with* Def's RPSUMF, ECF No. 75 at ¶ 26, 27, 58, and thus through all stages of material handling of the imported merchandise. Finally, the agreed-to facts establish that Betatene contains an "added stabilizer (including an anticaking agent) necessary for their preservation or

2

transport" as allowed by Chapter 29, Note 1. *Compare* Pl's SUMF, ECF No. 69 at ¶¶ 16, 18, 19, 20, 36, 37, 38, 39, 40 *with* Def's RPSUMF, ECF No. 75 at ¶¶ 16, 18, 19, 20, 36, 37, 38, 39, 40. Thus, the facts before the Court confirm that Betatene consists of beta-carotene in a solvent with an added stabilizer necessary to preserve or transport the beta-carotene. *Compare* Pl's SUMF, ECF No. 69 at ¶¶ 16 *with* Def's RPSUMF, ECF No. 75 at ¶¶ 16 ("[b]eta-carotene is unstable and prone to oxidative degradation and decomposition and is potentially pyrogenic if exposed to oxygen"). The agreed-to facts demonstrate how the plain meaning of Heading 2936 and Chapter 29, Note 1, including Note 1(f), are satisfied, resulting in Heading 2936 as the legally appropriate tariff classification for Betatene.

Notwithstanding this, the defendant turns to the *Explanatory Notes to the Harmonized Commodity Description and Coding System*, ("*EN*s") to Chapter 29 Note 1 to argue that Betatene is not an article of Chapter 29. First it argues that Betatene's formulation does not simply stabilize the beta-carotene for preservation or transport because it also protects against mechanical forces that can arise during tableting. This argument is not supported by the facts, both agreed-to and sworn to in the interrogatories and depositions. Resistance to external stresses that could crack the beadlets and expose the beta-carotene therein to oxygen, moisture, temperature and other forces that would cause the beta-carotene to oxidize or otherwise degrade is a preservation function imparted by the stabilizing matrix. Mechanical forces that could crack the beadlets can occur at any time from formulation through subsequent material handling and use; it is not simply an

3

issue arising during tableting.  As such, the formulation of Betatene, including its matrix and antioxidants that stabilize the beta-carotene, was empirically designed to make a stable formulation of beta-carotene and includes no more of any ingredient than necessary to do so.  This included making a stabilized formulation that would preserve and protect the beta-carotene against mechanical stresses that could crack the beadlets at any time post formulation. *Compare* Pl's SUMF, ECF No. 69 at ¶ 38 *with* Def's RPSUMF, ECF No. 75 at ¶ 38.

Next defendant raises a variation of its previous argument, stating that the gelatin and sucrose are found in quantities greater than that necessary for stabilizing the beta-carotene.  Again, neither the facts nor the evidence before this Court supports this premise.  Betatene's formulation, both as to the ingredients used and amounts thereof, was empirically determined and tested to reach a stable formulation.  BASF uses no more of any ingredient that necessary to achieve this stable formulation.  The formulation contains no tablet ingredients that a vitamin tablet manufacturer needs for its finished product, and none of the ingredients are added for flavor or other palatability reasons.  Instead, the levels of gelatin and sucrose in Betatene are the levels needed to stabilize the approximate 7.5 percent beta-carotene in Betatene, which is the product before the Court.  Analogies to different beta-carotene formulations with different ingredient mixtures does nothing to overcome the evidence before the court confirming BASF chose the ingredients in Betatene in quantities necessary to achieve a stable product for preservation or transport and nothing more.

The defendant's last argument involves its belief that the stabilizing ingredients used to preserve the beta-carotene in Betatene render the beta-carotene particularly suitable for dietary supplements, which it deems to be a specific use. The factors analyzed by the Court of Appeals for the Federal Circuit in *Roche Vitamins, Inc. v. United States*, 772 F.3d 728 (Fed. Cir. 2014), show this is not the case. The product in that case, BetaTab 20% ("BetaTab"), was formulated beta-carotene stabilized for preservation or transport by a matrix made of gelatin and sucrose, with added anti-oxidants and anti-caking ingredients. It was designed and marketed for use in vitamin tablets. Notwithstanding the presence of a gelatin and sucrose stabilizing matrix, and the fact the intended use of the formulation was in vitamin tablets, the court still found it was a general use product, with that general use being as a source of provitamin A. The Federal Circuit classified the BetaTab in Heading 2936 as a provitamin put up in accordance with Chapter 29, Note 1.

The three factors reviewed by the *Roche Vitamins* court were pulled from the *ENs*, and each supports classifying Betatene under Heading 2936. First, the stabilizing ingredients are not added in an amount that exceeds that necessary to stabilize the beta-carotene in Betatene for preservation or transport. As discussed above, the types and amount of ingredients used to create a stable beta-carotene formulation was determined empirically. BASF uses no more of any ingredient than necessary to achieve this stable formulation, and none of the ingredients function as tableting excipients or are added for flavor.

Second, the presence of the stabilizer in Betatene does not alter the character

of the beta-carotene. As was the case with BetaTab in *Roche Vitamins*, the
Betatene's formulation does not change the beta-carotene's "functionality as
provitamin A or change the character of the beta-carotene as provitamin A." *Roche
Vitamins, Inc.*, 772 F.3d at 732. Not only does the sworn deposition testimony
establish this to be the case, but now the parties agree to this fact. *Compare
relevant portions of* Pl's SUMF, ECF No. 69 at ¶ 38 *with relevant portions of* Def's
RPSUMF, ECF No. 75 at ¶ 38 ("[n]othing in the imported merchandise's
formulation changes the beta-carotene's inherent character as a source of
provitamin A . . ."). In its *Cross-Motion*, defendant makes no attempt to argue that
Betatene's stabilizing ingredients "alter the character of the basic product [the beta-
carotene," a critical concession given that the ENs analyzed by the *Roche Vitamin*
court are written in the conjunctive and exclude stabilized substances from Chapter
29 **only if all three factors are proved**.

Defendant also falls short on the third factor analyzed by the *Roche Vitamins*
court. The *Roche Vitamins* court concluded that BetaTab was not particularly
suitable for specific use rather than general use because 1) the BetaTab stabilizer
ingredients were essentially the same as those used with other vitamins and beta-
carotene formulations used for coloration; 2) the BetaTab formulation contained no
ingredients specifically added for tableting; and 3) the BetaTab "can be used as a
source of vitamin A in foods, beverages, and vitamin products." *Roche Vitamins,
Inc.*, 772 F.3d at 732. The agreed-to facts and other evidence now before the court
establish that Betatene, which like BetaTab was formulated and marked for use in

tablets and capsules, "can be used as a source of vitamin A in foods, beverages, and vitamin products." *Id*. Like BetaTab, Betatene's formulation, which stabilizes the beta-carotene, does not affect or change the ability of the beta-carotene to be provitamin A, its general use.

Thus, all three factors analyzed in *Roche Vitamins* validate classification of Betatene under Heading 2936. Betatene is formulated beta-carotene, which is provitamin A. It is used as provitamin A. It must be classified as a provitamin.

Considering that BASF, in its *Motion*, *Response Memorandum* and various exhibits thereto, establishes that Betatene is classifiable under Heading 2936, as a matter of law it cannot be classified under Heading 2106. Heading 2106 is a residual, catch-all provision that only captures for classification purposes imported goods that are not "elsewhere specified or included." In this case, Betatene is "elsewhere specified or included" under Heading 2936. Accordingly, BASF is entitled to summary judgment, and this Court should classify the imported merchandise in subheading 2936.90.01.

## II.    ARGUMENT

A.    *Plaintiff's Motion Should Be Granted Because Betatene*
*Satisfies the Eo Nomine Language of Heading 2936 and*
*the Additional Requirements of Chapter 29, Note 1.*

In its *Motion*, BASF meticulously sets out how Betatene satisfies the

requirements for classification under Heading 2936.  *See Motion* at ECF. 67, at pp.

33 – 62.  Heading 2936 covers, in pertinent part, "Provitamins and vitamins,

natural or reproduced by synthesis . . . whether or not in any solvent."  Note 1 to

Chapter 29 limits the scope of the headings within Chapter 29 to the following, in

pertinent part, unless the context of the heading "otherwise requires":

> (b)  Mixtures of two or more isomers of the same organic
> compound (whether or not containing impurities) . . .;

> (e)  Products mentioned in (a), (b) or (c) above dissolved in other
> solvents provided that the solution constitutes a normal and
> necessary method of putting up these products adopted solely
> for reasons of safety or for transport and that the solvent does
> not render the product particularly suitable for specific use
> rather than for general use.

> (f)  The products mentioned in (a), (b), (c), (d) or (e) above with an
> added stabilizer (including an anticaking agent) necessary for
> their preservation or transport.

The parties agree that Betatene consist of a provitamin – 95 percent

naturally derived beta-carotene mixed with 3.5 percent of its isomer alpha-carotene,

(hereafter "beta-carotene"), which are forms of provitamin A.  *Compare* Pl's SUMF,

ECF No. 69 at ¶¶ 9, 14, 21, 22 *with* Def's RPSUMF, ECF No. 75 at ¶¶ 9, 14, 21, 22.

Furthermore, the parties agree that any lutein, zeaxanthin or other substance

remaining in this mixture are impurities present in the starting algal material and

provide no vitamin or provitamin activity.  *Compare* Pl's SUMF, ECF No. 69 at ¶ 23 *with* Def's RPSUMF, ECF No. 75 at ¶ 23.

Thus, the parties agree that the beta-carotene in Betatene is a provitamin (as contemplated by Heading 2936) and an isomeric mixture containing permissible impurities (as contemplated by Chapter 29, Note 1(b)).  Also, the parties agree that the beta-carotene is dissolved in soybean oil, which is a solvent.  *Compare* Pl's SUMF, ECF No. 69 at ¶¶ 26, 27, 44, 58 *with* Def's RPSUMF, ECF No. 75 at ¶¶ 26, 27, 44, 58.  As such, the beta-carotene in Betatene is a "[p]rovitamin . . . natural . . . in any solvent" as required for classification under Heading 2936.

Because the imported merchandise consists of a natural provitamin in a solvent as required by the *eo nomine* language of Heading 2936, if Betatene satisfies the applicable subsections of Chapter 29, Note 1, then judgment must enter for BASF, classifying the merchandise under Heading 2936.  As described above, the parties agree the beta-carotene in Betatene satisfies Chapter 29, Note 1(b).  Provitamins that satisfy Chapter 29, Note 1(b) remain in Chapter 29 if they satisfy any remaining applicable subsections of Chapter 29, Note 1.

Notes 1(c) and 1(d) are not implicated in this case.  Turning to Note 1(e), BASF in its *Motion* sets out its argument that the reference in Heading 2936 to "whether or not in **any** solvent" constitutes "context otherwise requir[ing]", which language limits the application of Chapter 29, Note 1.  *See, Motion*, ECF No. 68 at pp. 39-41. Thus, the *eo nomine* language of the heading must be construed as written to include all provitamins in any solvent for any reason, without application

of the restrictions set out in Chapter Note 1(e).  In other words, Chapter 29, Note 1(e) does not apply to goods of Heading 2936, but applies only to the remaining headings in Chapter 29, none of which contain language expanding those heading to include goods "whether or not in any solvent." *Id.* at 40-41.  Alternatively, and assuming *arguendo* that Note 1(e) applies notwithstanding the "context otherwise requires" limitation, BASF established that the beta-carotene in the soybean oil solvent satisfies the requirements of Note 1(e).  *Id.* at 41-52.

Defendant contested neither of BASF's arguments on the application of Chapter Note 1(e), instead limiting its position to "[t]he government does not agree that a provitamin of Heading 2936 can have any amount of soybean oil for any purpose," without providing argument, citation or other authority in support thereof.  *See*, *Cross Motion*, ECF No. 74 at p. 24. It did, however, admit certain key facts that establish that the beta-carotene in Betatene is dissolved in a solvent (soybean oil) and that the solvent carries (transports) the dissolved beta-carotene from the time it is first dissolved in the solvent after having been extracted from the algae, through all phases of beadlet formulation, as oily droplets within the beadlet, and until it is absorbed by the human body:

> 1.     "In Australia, the beta-carotene is then dissolved in soybean oil, resulting in a concentrated oily dispersion consisting of approximately 30 percent beta-carotene and 70 percent oil." *Compare* Pl's SUMF, ECF No. 69 at ¶ 26 *with* Def's RPSUMF, ECF No. 75 at ¶ 26.

> 2.     "The soybean oil is a solvent into which the beta-carotene is dissolved, and which functions as a carrier for the beta-carotene particles from this point on, through the formulation of the imported merchandise, and through

digestion by the human body." *Compare* Pl's SUMF, ECF No. 69 at ¶ 27 *with* Def's RPSUMF, ECF No. 75 at ¶ 27.

3.   "Each beadlet consists of millions of droplets of beta-carotene dissolved in the soybean oil." *Compare* Pl's SUMF, ECF No. 69 at ¶ 27 *with* Def's RPSUMF, ECF No. 75 at ¶ 27.

4.   "If a beadlet were cut in half and put under a high-powered microscope, the oily droplets containing the beta-carotene particles, now dispersed within the gelatin and sucrose matrix, would be visible." *Compare* Pl's SUMF, ECF No. 69 at ¶ 58 *with* Def's RPSUMF, ECF No. 75 at ¶ 58.

Regardless of the defendant's opinion that the reference in Heading 2936 to a solvent is somehow quantitively limited despite clear unrestricted statutory language to the contrary[2], the agreed-to facts establish that the beta-carotene in Betatene is dissolved in a solvent.   As such, BASF believes it has satisfied the *eo nomine* language of Heading 2936 by establishing that the beta-carotene, a provitamin, is in a solvent, and with Chapter 29, Note 1(e) in that this solvent plays the normal and necessary role of carrying the dissolved beta-carotene (if this court determines Note 1(e) applies to goods of Heading 2936 notwithstanding the unrestricted "whether or not in any solvent" statutory language found in that heading). *See Motion*, ECF No. 68 at pp. 35 to 57.

Chapter 29 Note 1(f) is the remaining applicable subsection.   This subsection provides that an isomeric mixture of a vitamin or provitamin dissolved in a solvent

---

[2] Statutory text, unless otherwise defined, is "generally interpreted in accordance with [its] ordinary meaning." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006).

remains in Chapter 29 even if it has "an added stabilizer (including an anticaking agent) necessary for their preservation or transport." In its *Motion*, BASF explained to this Court how the other inert ingredients – gelatin, sugar, mixed tocopherols, ascorbyl palmitate, and silicon dioxide – work together to stabilize the beta-carotene consistent with the requirement of Note 1(f). *See, Motion*, ECF No. 68 at pp. 53-62. Now the parties agree that the inert ingredients in Betatene play the role of stabilizer and anti-caking agent for the beta-carotene:

1. "The formulation of the imported merchandise stabilizes and preserves the beta-carotene, which if not stabilized and preserved would oxidize rapidly, degrade, or be contaminated, rendering the beta-carotene ineffective for any use." *Compare* Pl's SUMF, ECF No. 69 at ¶ 20 *with* Def's RPSUMF, ECF No. 75 at ¶ 20.

2. "Beta-carotene is unstable and prone to oxidative degradation and decomposition and is potentially pyrogenic if exposed to oxygen." *Compare* Pl's SUMF, ECF No. 69 at ¶ 16 *with* Def's RPSUMF, ECF No. 75 at ¶ 16.

3. Beta-carotene needs to be stabilized to be used commercially as a provitamin or to color." *Compare* Pl's SUMF, ECF No. 69 at ¶ 18 *with* Def's RPSUMF, ECF No. 75 at ¶ 18.

4. "A way to stabilize beta-carotene is to process it with other inert ingredients." *Compare* Pl's SUMF, ECF No. 69 at ¶ 19 *with* Def's RPSUMF, ECF No. 75 at ¶ 19.

5. "Sucrose and gelatin harden to create a protective matrix that embeds the oily beta-carotene and antioxidant droplets. *Compare relevant portions of* Pl's SUMF, ECF No. 69 at ¶ 36 *with relevant portions of* Def's RPSUMF, ECF No. 75 at ¶ 36.

6. "The gelatin (a protein) and the sucrose (a carbohydrate) function together to plasticize the matrix, which makes the beadlets less brittle, protects them from cracking during storage and handling, and prevents the particles from sticking together." *Compare* Pl's SUMF, ECF No. 69 at ¶ 37 *with* Def's RPSUMF, ECF No. 75 at ¶ 37.

12

7. "Together the gelatin and sucrose matrix stabilize the beta-carotene oily droplets in the beadlets that make up the imported merchandise from oxidation and degradation caused by temperature, moisture and stress." *Compare* Pl's SUMF, ECF No. 69 at ¶ 38 *with* Def's RPSUMF, ECF No. 75 at ¶ 38.

8. "Additionally, the antioxidants ascorbyl palmitate and mixed tocopherols stabilize the beta-carotene by preventing it from oxidizing." *Compare* Pl's SUMF, ECF No. 69 at ¶ 39 *with* Def's RPSUMF, ECF No. 75 at ¶ 39.

9. "Silicon dioxide is also introduced into the process during the drying phase, where it functions as an anti-caking agent and flow aid, keeping the individual beadlets from agglomerating to each other or sticking to production equipment. *Compare* Pl's SUMF, ECF No. 69 at ¶ 40 *with* Def's RPSUMF, ECF No. 75 at ¶ 40.

Considering the above, BASF respectfully summits that the uncontested facts establish that Betatene consists of a provitamin (beta-carotene) dissolved in a solvent (soybean oil) and formulated in a manner consistent with the plain meaning of Chapter 29, Note 1. Chapter Notes are statutory law, and as such are construed to reflect their ordinary meaning. *Libas, Ltd. v. United* States, 193 F.3d 1361, 1364 (Fed. Cir. 1999). In this case, the agreed-to facts establish that the beta-carotene in Betatene is in a solvent that carries and transports the beta-carotene particles forward through beadlet production and eventually into the human body, and that the remaining inert ingredients create "an added stabilizer (including an anticaking agent) necessary for their preservation or transport" of the beta-carotene. As such,

the ordinary meaning of Chapter 29, Note 1, including Note 1(f), is satisfied so that

Betatene is classifiable under Heading 2936.[3]

_____

[3] At page 12 of its *Cross-Motion*, ECF No. 74, defendant contests BASF's citation at page 20 of its *Motion*, ECF No. 68, to *Am. Net & Twine Co. v. Worthington*, 141 U.S. 468, 474 (1891) and *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997). These cases stand for the proposition that ambiguity in classification cases is resolved in favor of the importer. In response, the defendant argues that this "substantive canon did not survive the New Deal-era Supreme Court," and cites a law review article on tax law as support. *See Cross-Motion*, ECF No. 74 at p. 12. Regardless of the opinion offered by the author of that law review article, the Federal Circuit in the *Anhydrides & Chems., Inc.* decision, **issued in 1997**, thus well past the New Deal Supreme Court period, called out as applicable this rule of liberal construction in favor of importers. *Anhydrides & Chems., Inc*, 130 F.3d at 1486. **Thereafter in 2021**, *Anhydrides & Chems., Inc* was cited as authority for this proposition in *Logitech, Inc. v. United States*, 532 F. Supp. 3d 1358, 1364 (Ct Int'l Trade 2021) ("A corollary is 'the rule of construction of revenue statutes whereby unclear or ambiguous tariff classifications have traditionally been resolved in favor of the importer.' *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997) (*citing*, inter alia, *United States v. Greek Orthodox Church of Evangelismo*, 49 CCPA 35, 40 (1962) (referring to the 'rule of liberal construction in favor of the importer'))." It seems that, at least in Customs duty refund cases, this canon of statutory construction survives.

Defendant also cites General Rule of Interpretation ("GRI") 3(c) as support for its argument that the rule of liberal construction in favor of importers is no longer applicable. Defendant's argument is misplaced. GRI 3(c) resolves classification disputes when the imported merchandise is classifiable under two or more headings, in which case the heading last in numerical order would prevail, assuming the classification could not be resolved pursuant to GRI 3(a) or 3(b). In this case, however, GRI 3(c) has no application because Heading 2106 is a residual, catch all provision that applies only when no other tariff provision provides for the goods. In this regard, the issue before the Court is binary. If the imported merchandise is provided for by Heading 2936 as argued by BASF, then it is provided for elsewhere and cannot go into Heading 2106. As such, the imported merchandise will never be classifiable in two or more headings so GRI 3(c) will not be implicated in this case.

Furthermore, the "ambiguity" that the canon seeks to resolved in favor of the importer is any ambiguity that may arise when a court construes the meaning of a tariff heading and other section and chapter notes. Thus, any ambiguity as to the meaning of Heading 2936, or the meaning of "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . . :[o]ther, including

B.      The Explanatory Notes Support
        Classifying Betatene Under Heading 2936

Notwithstanding that the defendant has agreed to facts establishing that the imported Betatene is a provitamin in a solvent that is further stabilized by other ingredients, and as such admitted that the imported merchandise satisfies the clear statutory language of Heading 2936, and of Chapter 29, Note 1 and in particular Note 1(f), the defendant points to the *EN*s to Chapter 29, and in particularly Chapter 29, Note 1(f), to argue that Betatene is not an article of Chapter 29. Specifically, the defendant argues that Betatene does not satisfy the *ENs* because:

1. Betatene's formulation does not simply stabilize the beta-carotene for preservation or transportation;

2. The gelatin and sucrose in Betatene are added in quantities greater than necessary for stabilizing the beta-carotene for preservation or transportation; and,

3. Betatene is particularly suitable for specific use in dietary supplements but not suitable for general use.

Each of these arguments must be rejected as not legally sustainable for the following reasons, and this Court should enter judgment for BASF, classifying the goods under subheading 2936.90.01 as "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . . :[o]ther, including provitamins and natural concentrates."

provitamins and natural concentrates" is to be resolved in favor of the importer, BASF. Likewise, any ambiguity as to the meaning of Chapter 29, Note 1 is to be resolved in the importer's favor.

1.   *Explanatory Notes* Are Not Intended to
     <u>Limit the Statutory Language of the Tariff</u>

Plaintiff is mindful that the *Roche Vitamins* court found that the *ENs* to

Chapter 29, Note 1 "provide[d] further insight as to the proper classification of

merchandise under heading 2936." *Roche Vitamins, Inc. v. United States*, 772 F.3d

728, 731 (Fed. Cir. 2014).  While the *Roche Vitamins* court correctly noted that the

*ENs* are insightful, the *ENs* "are not Chapter Notes or Section Notes and are not

binding. Explanatory Notes 'may be generally useful as guides to the scope of

unclear HTSUS headings [but] they are not legally binding." *Sigma-Tau*

*HealthScience, Inc. v. United States*, 838 F.3d 1272, 1281 (Fed. Cir. 2016), *quoting*

*Archer Daniel Midland Co. v. United States*, 561 F.3d 1308, 1351 (Fed. Cir. 2009).

Yet, the defendant in its *Cross Motion* seeks to elevate the *ENs* to Chapter 29

Note 1, particularly as it relates to Note 1(f), to chapter note level by arguing that

Betatene cannot be classified under Heading 2936 because it does not satisfy the

language found in the *ENs*, notwithstanding that the beta-carotene is stabilized by

the other inert ingredients consistent with the plain meaning of the legally binding

Chapter 29, Note 1. *Compare* Pl's SUMF, ECF No. 69 at ¶ 20 *with* Def's RPSUMF,

ECF No. 75 at ¶ 20 ("The formulation of the imported merchandise stabilizes and

preserves the beta-carotene, which if not stabilized and preserved would oxidize

rapidly, degrade, or be contaminated, rendering the beta-carotene ineffective for

any use").  While BASF disagrees and argues that it does satisfy the *ENs* language

for the reasons set out later in this *Response Memorandum*, equally important for

this Court to understand is that the *ENs* are not to be employed to narrow the

language of the HTSUS, whether it be a heading or a chapter note. *See, Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1359 (Fed Cir. 2003) (limiting characteristics of examples in the *ENs* cannot narrow the language of the heading); *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1281 (Fed. Cir. 2016) (contradictory language in the ENs disregarded for purposes of construing the heading); *Apple Inc. v. United States*, 964 F.3d 1087, 1095, 1096 (Fed. Cir. 2020) ("Explanatory Notes cannot create an exception to an HTSUS heading . . . [as] they are not binding. . . . They cannot be used to 'narrow' or amend or create ambiguity in 'the language of [a] [HTSUS] heading'") *citing Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1359 (Fed Cir. 2003).

The unambiguous language of Chapter 29, Note f (1) provides as follows:

> (f)  The products mentioned in (a), (b), (c), (d) or (e) above with an added stabilizer (including an anticaking agent) necessary for their preservation or transport.

Note 1(f) does not limit the quantity of the stabilizer to that not exceeding a particular level necessary for stabilization.  Nor does it force out of Chapter 29 goods where the stabilizer renders the good particularly suitable for a specific use rather than a general use.  Had the drafter chosen to limit Chapter 29, Note 1(f) in such a manner they could have drafted language to that effect, much like they did for Chapter 29, Note 1(e).

The drafters did not write Note 1(f) in such a way but rather incorporated clear language capturing goods that have a stabilizer necessary for preservation or transport, without conditions.  As set out at pages 8 to 9 of this *Response*

*Memorandum,* no dispute exists between the parties that Betatene is beta-carotene in a solvent embedded in a matrix (i.e., an added stabilizer) necessary for preservation or transport.  *See, e.g.,* Pl's SUMF, ECF No. 69 at ¶ 20 *and* Def's RPSUMF, ECF No. 75 at ¶ 20 ("The formulation of the imported merchandise stabilizes and preserves the beta-carotene, which if not stabilized and preserved would oxidize rapidly, degrade, or be contaminated, rendering the beta-carotene ineffective for any use").  As such, reading additional restrictions into Chapter 29 Note 1, particularly Note 1(f), is not legally sustainable, and because Betatene satisfies the plain meaning of Heading 2936 <u>and</u> Chapter 29, Note 1, it must be classified under Heading 2936.

2.    Providing Mechanical Strength to the
<u>Matrix is a Stabilizing for Preservation Function</u>

Despite the clear, unconditional language of Chapter 29, Note 1(f), defendant argues that the "Betatene's gelatin-sucrose matrix not only stabilizes for preservation and transport but also prepares it for tableting."  *See*, *Cross Motion*, ECF No. 74 at p.14.  The argument unfolds as follows: The gelatin-sucrose matrix, because it provides stability against material forces and stresses, is doing more than merely stabilizing the beta-carotene for purposes of preservation or transport. Instead, it is preparing it for the stresses of direct-compression tableting, a function more than "merely stabilizing it for preservation or transport," and thus is contrary to the *ENs* to Chapter 29, Note 1.  *Id.*, ECF No. 74 at p. 17.

The facts before the Court, however, support the opposite conclusion. Protecting the beadlet against mechanical stress, which could crack the beadlet and expose the beta-carotene within the beadlet to the elements that would oxidize, degrade, or contaminate the beta-carotene, is a stabilizing function for purposes of preservation or transport for the following reasons.

First, the now agreed-to facts establish that both parties recognize how the gelatin and sucrose matrix stabilize the beta-carotene in the beadlets against external stress:

> Together the gelatin and sucrose matrix stabilize the beta-carotene oily droplets that make up the imported merchandise from oxidation and degradation caused by temperature, moisture and **stress**.

*Compare* Pl's SUMF, ECF No. 69 at ¶ 38 *with* Def's RPSUMF, ECF No. 75 at ¶ 38 (emphasis added).  This was conceded by sworn testimony made by defendant's spokesperson at its 30(b)(6) deposition:

> Q.    So earlier you talked about the protective nature of the matrix. Can you explain what you meant by that?
>
> A.    So our understanding of the protective matrix is that when sucrose and gelatin are mixed together, and when it is -- or when the mixture of gelatin and sucrose is combined with the oil droplet, it creates this dense outlier of the oil droplet. **And that protective matrix can protect the oil droplet from oxidation and other external stresses that may crack the beadlet.**

Plaintiff's Exhibit to *Response Memorandum* (hereafter Pl. Response Ex.) 1, Deposition Transcript of USCIT Rule 30(b)(6) of Defendant by Arim Kim ("*Kim*

*Dep.*") at pp. 39: 11- 40: 2 (emphasis added). The government's witness elaborated with more detail:

> Q. And do you know -- you mentioned a few things it was being stabilized against. I think you mentioned oxygen?
>
> A. Yes.
>
> Q. Do you -- can you -- can you tell me what else it stabilizes it against? The matrix?
>
> A. Oxygen, for one, because beta-carotene is prone to oxidation. **Our understanding that the matrix also protects it from any external stresses that it may face during the transportation process**. And because beta-carotene can be a pyrogenic, it also protects against that as well.

Id., *Kim Dep* at pp. 40: 19 − 41: 6 (emphasis added).

Notwithstanding the defendant's admissions that protecting the beta-carotene in the beadlet from physical stress constitutes stabilization, it now argues that "to be clear, 'mechanical strength' for tableting is not a form of stabilization for preservation . . .." *Cross Motion*, ECF No. 74 at p.14. Respectfully, BASF disagrees. The benefit of the beadlet's mechanical strength is not limited just to protecting against the forces that arise during tableting.  The beadlets also stabilize the beta-carotene for preservation or transport against all mechanical forces that arise during any phase of material handling of the product.

Resistance to mechanical-induced damage is as important to formulators such as BASF as is resistance to chemical-induced damage.  If a beadlet breaks anytime from when it is first created to when it is used in a finished application, then the beta-carotene within that beadlet will lose its efficacy because it will

20

oxidize and be destroyed.  Pl. Response Ex. 2, Deposition Transcript of Plaintiff's Expert Witness Dr. Marc Myers, ("Myers Dep.") at p. 104: 6-8 ("As soon as you crack [the beadlet] you have lost the benefit of why you are forming a beadlet").  The stabilizing benefit of the matrix will be lost, and the beta-carotene will oxidize and degrade.  Mechanical damage to the beadlet can result from the material handling by humans or by production facilities at any point during the material handling chain, not just when BASF's customers use it in tablets, capsules or other vitamin dosage forms or uses.   Pl. Response Ex. 3, Plaintiff's Response to Defendant's First Interrogatories and Request for Production Directed to Plaintiff, ("*Plaintiff's Interrogatory Responses*") at p. 10 ("Also, the plasticizing effect created by the interaction of the sucrose and gelatin gives mechanical stability to the beadlet, which **prevents damage during storage, handling or use**.") (emphasis added); Pl. Response Ex. 2, Myers Dep. at p. 104: 2-6 ("Stability can also – we talked earlier about stability being focused on – around tablet compression, but **mechanical strength can also play a role anywhere along the line of causing distress**") (emphasis added); *Compare* Pl's SUMF, ECF No. 69 at ¶ 37 *with* Def's RPSUMF, ECF No. 75 at ¶ 37 ("The gelatin (a protein) and the sucrose (a carbohydrate) function together to plasticize the matrix, which makes the beadlets less brittle, **protects them from cracking during storage and handling,** and prevents the particles from sticking together") (emphasis added).

Furthermore, the mechanical strength imparted by the matrix is to protect the beadlet and preserve the beta-carotene within it.  It is not intended to provide

any benefit to a downstream user of Betatene other than to maintain a stable Betatene product where the beta-carotene has been preserved and will continue to be preserved in the customer's end use application. *Compare* Pl's SUMF, ECF No. 69 at ¶ 54 *and* Def's RPSUMF, ECF No. 75 at ¶ 54 ("The imported merchandise does not contain any tableting excipients"). *See also*, *Motion*, ECF No. 68 at pp 46-49 (discussing how none of the ingredients in the Betatene are added specifically for tableting). If beadlets were to crack during tableting, or while being used in a two-piece hardshell (where mechanical stress is much less an issue) or when otherwise being handled, stored, processed, or used, the result is the same – the beta-carotene will be exposed to oxidative degeneration and decomposition, rendering it ineffective for use as provitamin A or as a colorant. *Compare* Pl's SUMF, ECF No. 69 at ¶ 20 *and* Def's RPSUMF, ECF No. 75 at ¶ 20 ("The formulation of the imported merchandise stabilizes and preserves the beta-carotene, which if not stabilized and preserved would oxidize rapidly, degrade, or be contaminated, rendering the beta-carotene ineffective for any use").

Therefore, mechanical stability is a stabilizing function provided to the beta-carotene by the protective matrix. To quote BASF's expert at his deposition:

> Q.    So protecting against the mechanical stresses you would agree is a stabilizing feature?
>
> A.    Correct, yeah.

Pl. Response Ex. 2, Myers Dep. at p. 116: 5-8.

Defendant's argument is further undercut by the very *ENs* cited as the basis for its position on this point. The *ENs* to Chapter 29, Note 1 state that vitamins or provitamins in solvents can be:

> stabilised for the purposes of preservation or transport :
>
> - by adding anti-oxidants,
>
> - by adding anti-caking agents (e.g., carbohydrates),
>
> - **by coating with appropriate substance (e.g., gelatin, waxes or fats), whether or not plasticised, or**
>
> - by adsorbing on appropriate substances (e.g., silicic acid) . . . (emphasis added).

The reference to the active ingredient (the beta-carotene) being stabilized by a plasticized gelatin is a reference to creating mechanical stability, as plasticity creates resistance to mechanical damage that could destabilize the active ingredient. Pl. Response Ex. 2, Myers Dep. at p. 68: 15-25 ("Q. Is plasticized gelatin another word for that? A. Reading through some of the documents and my report, we talk about gelatin and sucrose together can help to plasticize. . . . And the sugar can help the gelatin from getting too brittle to where it won't hold up to mechanical forces"). Thus, the *ENs* acknowledge that a plasticized gelatin matrix is an acceptable means of stabilizing a vitamin or a provitamin.

The roles of the inert ingredients in Betatene are no different than the roles played by the similar ingredients in the BetaTab formulation in the *Roche Vitamins* case. Both Betatene and BetaTab are optimized for use in tablets and hard capsules and are microencapsulated beadlets consisting of a gelatin and sucrose

matrix, with added antioxidants, which stabilize and preserve the beta-carotene
particles within that matrix, including against mechanical forces. *See Roche
Vitamins*, 772 F.3d at 732 (noting that the stabilizers used in BetaTab were
essentially the same as those used to stabilize other vitamins and other beta-
carotene products). *See also*, *Motion*, ECF No. 68 at pp 29-31 (discussing the *Roche
Vitamins* courts' analysis of the BetaTab product). At trial in the *Roche Vitamins*
case, a fact witness testifying for Roche Vitamins testified that the beadlets in the
BetaTab product were plasticized to increase their mechanical stability:

> Q.   You also mention that the matrix has sucrose in it.
>
> A.   Correct. The sucrose has a dual role. One role is used as a
>      plasticizer. The gelatin shows some brittleness. It's a
>      brittle material so we need to provide some elasticity to
>      this product.

*See* Pl Response Ex. 4, *Roche Vitamins Inc. v. United States*, court no. 04-00175
ECF 194 at p. 47.

Defendant's position that stabilizing the beadlets against mechanical stress
constitutes a level of stabilization beyond that necessary for preservation or
transport, therefore, cannot be legally sustained. As set out above, the BetaTab in
the *Roche Vitamins* case was formulated to withstand mechanical stress, including
when being tableted, yet was classified by the U.S. Court of Appeals for the Federal
Circuit under Heading 2936. As that court noted, the stabilizers used in the
BetaTab (gelatin, sucrose, antioxidants) "were essentially the same as those used to

stabilize other vitamins and beta-carotene products . . ..” *Roche Vitamins*, 772 F.3d at 732.

In the case of Betatene, it too is stabilized by gelatin, sucrose and antioxidants, including being stabilized to withstand external physical forces and the damaging effects such forces would cause on the beadlets and the beta-carotene within the beadlets.  The *ENs* recognize that plasticized gelatin stabilizes vitamins and provitamins for preservation or transport, and the testimony establishes that plasticizing creates non-brittle gelatin and sucrose beadlets that will withstand mechanical stress. Finally, as noted above, the parties agree that the beadlets protect the beta-carotene from external stress, which the record establishes includes stress experienced during storage, material handling or use, whether by human or machine.  *Compare* Pl’s SUMF, ECF No. 69 at ¶ 38 *with* Def’s RPSUMF, ECF No. 75 at ¶ 38; Pl. Response Ex.) 1, *Kim Dep.* at pp. 39: 11- 40: 2, 40: 19 – 41: 6; Pl. Response Ex. 3, *Plaintiff’s Interrogatory Responses* at pp. 10, 11.

Clearly, creating beadlets that can withstand mechanical stress arising anywhere along the material handling chain is a preservation or transport function. Such functionality does not exclude stabilized vitamins or provitamins from classification under Heading 2936.  *Roche Vitamins*, 772 F.3d at 733 (classifying beta-carotene stabilized in a gelatin and sucrose matrix, with antioxidants under Heading 2936 notwithstanding that the product (BetaTab) was developed specifically for use in vitamin tablets).

25

Defendant makes passing reference to emulsification as another argument for its unfounded position that the matrix in Betatene is providing more than stabilization for purposes of preservation or transport. *Defendant's Cross Motion*, ECF No. 74 at p.15. It offers no support – factual or legal -- for this position.

Gelatin is a natural hydrocolloid, and as such inherently can emulsify oil-in-water emulsions because of its surface activity. Zhang, Xu, Zhang, Wang, Lorenzo, Zhong, "Gelatins as Emulsifiers for Oil-In-Water Emulsions: Extraction, Chemical Composition, Molecular Structure, and Molecular Modification," *Trends in Food Science and Technology*, 106 (2020) at pp. 113-114. This occurs during the water phase of Betatene's production, before the particles are dried into the beadlets. During the water phase, the emulsion creates tiny droplets, "which are then **stabilized by the gelatin**, which is acting as an emulsifier" keeping the oil from separating from the water during processing by covering the surface of the oily droplets. Pl. Response Ex. 5, Deposition Transcript of USCIT Rule 30(b)(6) of BASF Corporation by Dr. Christian Koepsel ("*Koepsel Dep.*") pp. 47: 24 – 48: 23 (emphasis added). As such, during the water phase, the natural emulsifying effect of the gelatin stabilizes the tiny beta-carotene oily droplets in this emulsion by coating them to retain their stasis in the emulsion. *Id. See also*, Pl. Response Ex. 2, *Myers Dep.* at p. 75: 3-8. Thus, the gelatin provides a stabilizing function for beta-carotene during the formulation process and a stabilizing function for the beta-carotene once the beadlets are formed.

Furthermore, if the gelatin's natural ability to emulsify renders a plasticized matrix consisting of gelatin and sucrose something more than a stabilizer as contemplated in Chapter 29, Note 1 or the *ENs* to that Note, then the BetaTab in *Roche Vitamins* would have been excluded from Heading 2936. As Roche Vitamins' witness testified under cross examination regarding the gelatin in BetaTab:

> Q.  Is the gelatin in fact an emulsifier?
>
> A. Yes.
>
> Q. Is it, in fact, a water soluble emulsifier?
>
> A. Yes.

Pl Response Ex. 4, *Roche Vitamins Inc. v. United States*, court no. 04-00175 ECF 194 at p. 332.  Also incorrectly decided would be the rulings issued by United States Customs and Border Protection (USCBP) on the classification of vitamins A, E and $D_3$ in a gelatin and carbohydrate matrix.  *See* Pl. Ex. 2 to *Motion*, ECF No. 69-2. Like Betatene, those vitamin formulations consisted of fat-soluble vitamins in a gelatin and carbohydrate matrix.

In sum, defendant's position that the gelatin is doing something other than working in concert with sucrose and other inert ingredients to stabilize and preserve the beta-carotene cannot stand.  *Compare* Pl's SUMF, ECF No. 69 at ¶ 38 *with* Def's RPSUMF, ECF No. 75 at ¶ 38 ("Together the gelatin and sucrose matrix stabilize the beta-carotene oily droplets that make up the imported merchandise from oxidation and degradation caused by temperature, moisture and stress").  The gelatin, working with the other inert materials, first stabilizes the beta-carotene

oily droplets during production, and then with the sucrose creates the protective matrix, which stabilizes the beta-carotene in a manner not exceeding that necessary for preservation or transport of the beta-carotene. *See*, Pl. Response Ex. 5, *Koepsel Dep.* at p. 104: 25 – 105: 17 (testifying that BASF only uses as much of an ingredient as necessary to stabilize the beta-carotene). *See also*, Pl. Ex. 11 to *Motion*, ECF 69-11, *Myers Expert Report*, at p.11 ("Betatene® 7.5% N does not contain more inert ingredients tha[n] are necessary to stabilize and preserve the beta-carotene"). These facts are well established, and this Court should not entertain the defendant's attempt to cloud them with superfluousness.[4]

_____

[4] Also trying to cloud the facts is defendant's argument at page 15 of the *Cross-Motion*, to wit: that the gelatin is not added to Betatene solely for purposes of preservation or transport because a different BASF beta-carotene formulation, an oil dispersion consisting of 30 percent beta-carotene and 70 oil, has no gelatin or sucrose but a longer shelf life. These are different formulations – an oil dispersion versus very fine individually microencapsulated beadlets that are approximately 240 to 300 microns in size.

The Betatene formulation is the only one currently before this Court for classification, and as such the question posed by Chapter 1, Note 1(f) is whether the Betatene contains an added stabilizer for its preservation or transport, or as expanded by the *ENs*, whether such stabilizer exceeds that necessary for preservation or transport. Under the Note, the answer is yes it contains an added stabilizer for preservation or transport, but under the *ENs*, the answer is no, the stabilizer does not exceed that necessary for preservation or transport. *Compare* Pl's SUMF, ECF No. 69 at ¶ 38 *with* Def's RPSUMF, ECF No. 75 at ¶ 38 (confirming that the matrix stabilizes the beta-carotene). *See also*, Pl. Response Ex. 5, *Koepsel Dep*. p. 104: 25 – 105: 17 (testifying that BASF only uses as much of an ingredient as necessary to stabilize the beta-carotene).

That a different formulation has a different shelf life has no bearing on the fact that the ingredients stabilizing the beta-carotene in the Betatene product are in amounts allowed pursuant to the heading and chapter note and are not in excess of those amounts as per the *ENs*. Taking the defendant' position literally means that no vitamin or provitamin formulation, where the vitamin or provitamin is stabilized in microencapsulated beadlets (including the BetaTab in *Roche Vitamins*), would be

3.    The Stabilizer in Betatene Does Not Exceed That Necessary for
the Stabilization of the Beta-Carotene for Preservation or Transport

Having failed to establish that the gelatin and sucrose used to make the matrix were added for functionality "other than" preservation or transport, defendant raises a related argument that the stabilizing ingredients "exceed" that necessary for stabilization. This argument has no more foundation than the defendant's earlier one, and this Court should hold that the Betatene is put up in a stabilizer that is no more than necessary to stabilize the beta-carotene in Betatene for preservation or transport.

The only sworn evidence directly on this point before the Court was offered by BASF. In its interrogatory responses, BASF swore in its responses that:

1. When developing Betatene, the stability of the product was tested, and the **composition, percentage and cost of ingredients were changed until satisfactory stability was achieved**. *See* Pl Response Ex. 3, *Plaintiff's Interrogatory Responses* at p. 11 (emphasis added).

2. The ingredients in Betatene were chosen by BASF to **work together to stabilize and preserve the beta-carotene**. *Id.* (emphasis added).

---

classified under Heading 2936 because beadlets have more surface area than oil dispersions and thus a shorter shelf life. *See* Pl. Response Ex. 2, *Myers Dep.* at 118: 3-19. Because of their increased surface area, the beadlets allow more potential exposure to oxygen than would an oil dispersion packaged in a container flushed with nitrogen. *Id.* Also, packaging plays a role in shelf life, and the longer shelf life attributable to the oil dispersion may be attributable to its external packaging in a sealed container flushed with an inert gas, which provides a physical and chemical barrier against oxygen. *Id.* ("So if we had a half open container of the oil and you didn't put a nitrogen flush on it, the product will now no longer have a five-year shelf life").

3. The "processing ingredients are present in amounts **no more than necessary to accomplish [stability]**, and **if the formula was altered, or an ingredient removed, then the stability of the beta-carotene would be compromised**." *Id.* (emphasis added).

4. **Betatene does not contain any tableting ingredient,** such as fillers, binders, excipients, or disintegrants, that tablet manufacturers must add to the vitamin tablets they produce using Betatene as a source of provitamin A. *Id.* (emphasis added)

5. **None of the ingredients in Betatene are added for flavor or palatability reasons**. *Id.* (emphasis added)

6. "**The inactive formulation ingredients in Betatene 7.5 % N are present in amounts no more than necessary to stabilize and preserve the beta-carotene**." *Id.* at p.14 (emphasis added).

7. "BASF has **cost considerations** relating to the formulation ingredients and **uses no more of any ingredient than is necessary to make a stable formulation**." *Id.* (emphasis added).

Then, during its 30(6) deposition, Dr. Christian Koepsel, whose job title at BASF is "Expert for Formulation," confirmed under oath that BASF only uses as much ingredient as necessary to stabilize the beta-carotene. Pl. Response Ex. 5, *Koepsel Dep*. at p. 105: 8-12. He then explained one reason why this was:

Q. Would you ever use any more than is necessary to stabilize the beta-carotene?

A. No because due to cost reasons we typically use only the amount of ingredients which are necessary.

*Id.* at 105: 12-17. Thereafter, BASF's expert echoed this position in his expert witness report:

30

> Betatene® 7.5% N does not contain more inert ingredients tha[n]
> are necessary to stabilize and preserve the Beta-carotene.  BASF,
> when formulating Betatene® 7.5% N has cost considerations and
> uses no more than is necessary to make a stable formulation.

Pl. Ex. 11 to *Motion*, ECF No. 69-11, *Meyers Expert Report* at p. 11.

Thus, the sworn evidence currently before the Court establishes that the ingredients that make up the stabilizing matrix were determined empirically to be only that amount necessary to stabilize the beta-carotene for preservation or transport.  Furthermore, the sworn proof establishes that nothing in the formula satisfies the roles played by tablet excipients in vitamin tablets or was added to provide flavor or similar reasons in the finished product.  *Compare* Pl's SUMF, ECF No. 69 at ¶ 54 *with* Def's RPSUMF, ECF No. 75 at ¶ 54 ("[t]he imported merchandise does not contain any tableting excipients").

Given this high hurdle to surmount, the defendant's arguments on this issue should be rejected.  First, defendant points to other beta-carotene formulation on the market where the amount of beta-carotene present in the formulation is more than that found in Betatene but where the gelatin and sucrose is less.  *Cross Motion*, ECF No. 74 at p. 17.  As addressed in BASF's *Motion*, companies optimize different beta-carotene formulations for a range of commercial applications, and that different ingredients may be used to create stabilized formulations that are kosher, halal, vegetarian or free of genetically modified organisms, *etc. Motion*, ECF No. 68 at pp. 15-16.  Levels of the active ingredient (in this case, beta-carotene) vary in formulations too, as end users have different needs.  A 7.5 percent or a 10 percent

31

formulation might be preferred to a 20 percent one if less vitamin activity were desired for a given application.

The point being that while formulations are different, the roles the gelatin and sucrose (or other protein and carbohydrates, which serve the same roles in other formulations) play in creating a stabilizing matrix in microencapsulated beadlet formulations are the same.  But if a formulator increases the amount of beta-carotene in a microencapsulation beadlet formulation then less room remains in the beadlet for the other ingredients, and as such the matrix must contain reduced levels of the inerts.[5]  Likewise, where the formulation starts with less beta-carotene, such as in Betatene's 7.5 percent formulation, the remaining matrix ingredients must be adjusted upwards to create the beadlet.  Failing to properly formulate microencapsulated beadlets in the 240-to-300-micron range as required for Betatene results in compromised beadlets that cannot provide the appropriate level of stability to protect the beta-carotene. *See* Pl Response Ex. 3, *Plaintiff's Interrogatory Responses* at p. 11 ("if the formula was altered, or an ingredient removed, then the stability of the beta-carotene would be compromised").

 During the government's 30(b)(6) deposition, the defendant's witness was asked what levels of gelatin and sucrose would be needed to make

---

[5] Other ingredients used in various formulas also take up space in the matrix, resulting in lower amounts of gelatin and/or sucrose to make room for these other ingredients.  For example, the BetaTab product in *Roche Vitamin*s has a significant amount of cornstarch in its matrix, the presence of which, coupled with 20 percent beta-carotene, results in less room for gelatin and matrix, which is reflected in the formulation.  *See*, Pl. Confidential Ex. 6 to *Motion*, ECF No. 69-1. Yet, the formulation designed by Roche Vitamins stabilized the beta-carotene in BetaTab.

microencapsulated beadlets containing 7.5 percent of stabilized beta-carotene, such as that found in Beatene. The answer was "I don't know because I am not an expert or a scientist." Pl. Response Ex. 1, *Kim Dep.* at pp. 57: 23- 58: 5. BASF respectfully requests that this Court heed the government's concerns and turn to the experts and scientists in this case. To repeat what has been stated above and in the *Motion*:

1. Dr. Christian Koepsel, BASF's in-house "Expert for Formulation," with a thesis in carotenoids and 30 years of experience in the field formulating beta-carotene and other vitamin products including Betatene, testified under oath that BASF only uses as much of any ingredient in the Betatene as necessary to stabilize the beta-carotene, and that BASF would not use more than was necessary because (like any business) it has cost concerns. Pl. Response Ex. 5, *Koepsel Dep.* at p. 105: 8-17.

2. Dr. Marc Myers, a PhD food scientist with over 30 years of experience, concurred, writing in his expert report that the inert ingredients in Betatene were in amounts no more than necessary to stabilize the beta-carotene, and that cost consideration supported that conclusion. Pl. Ex. 11 to *Motion*, ECF No. 69-12, *Meyers Expert Report* at p. 11.

3. BASF (the largest chemical company in the world by sales), in its sworn interrogatory responses, states that the stability of Betatene was determined empirically; that the inert ingredients were chosen to stabilize the beta-carotene; that no more of the inert ingredients are used than necessary to create a stable formulation; and, that altering the formulation or removing an ingredient would compromise the stability of the beta-carotene in Betatene. Pl Response Ex. 3, *Plaintiff's Interrogatory Responses* at p. 11.

4. The parties agree that Betatene does not contain any tableting excipients used by vitamin tablet manufacturers when making finished vitamin tablets for consumer use. *Compare* Pl's SUMF, ECF No. 69 at ¶¶ 53, 54 *with* Def's RPSUMF, ECF No. 75 at ¶ 53, 54.

These experts and scientists confirm that Betatene's formulation does not contain stabilizing ingredients in excess of that necessary to create a stable formulation for preservation and transport.

Second, to rebut BASF's evidence that it uses no more ingredients than necessary to make a stable formulation because of cost reasons, defendant rehashes its argument that a matrix providing stabilization against mechanical stress is not providing a stabilizing function for preservation or transport. *See*, *Cross Motion*, ECF No. 74 at p. 18. As support, defendant quotes a portion of a question it posed to BASF's expert witness at his deposition, which with he agreed: "Betatene contains inert ingredients only at minimum levels to provide the desired flexibility and durability for tablet compression."[6] *Id.*

But as discussed at pages 18 to 29 of this *Response Memorandum*, providing protection against mechanical stress is a stabilizing function, regardless of where the stress occurs on the material handling chain. Protecting against outside mechanical stresses is equally important during beadlet production, storage, handling or ultimate use in tableting, encapsulating or other applications. Given that the uncontroverted, sworn to facts establish that the Betatene formulation was empirically determined to stabilize the beta-carotene using no more of the inert ingredients than necessary to create a stable product, this empirically derived

---

[6] The rest of the question that BASF's expert agreed with was that the "Betatene 7.5% N product contains other inert ingredients only at the minimum level necessary to both stabilize the beta-carotene throughout transport, storage and whatnot . . .." *Cross Motion*, ECF No. 74 at p. 18. The record as addressed in this *Response Memorandum* and the *Motion* supports the veracity of that statement.

formulation factored mechanical stress arising during material handling of the Betatene into its calculation when it determined the type and amount of inert ingredients used to create the stabilizing matrix in Betatene. As such, Betatene's stabilizing matrix does not exceed that necessary for stabilizing the beta-carotene, including stabilizing it against mechanical stress, as that is what the formulators determined was necessary to stabilize the beta-carotene against both chemical and mechanical concerns.[7] *See* Pl Response Ex. 3, *Plaintiff's Interrogatory Responses* at p. 11 (The "processing ingredients are present in amounts **no more than necessary to accomplish [stability]**, and **if the formula was altered, or an ingredient removed, then the stability of the beta-carotene would be compromised**") (emphasis added). These facts are uncontroverted.

---

[7] Defendant's claim on page 18 of its *Cross Motion* that "[i]t cannot be the case, though, that formulations ranging from 1 to 7.5 to 10 to 20 to 30 percent beta-carotene by weight all contain no more additives than necessary for beta-carotene's stabilization" again implies without factual support that BASF, when producing its various beta-carotene formulations, somehow adds more ingredients than are needed to stabilize the different amounts of beta-carotene in its different formulations. The sworn facts before this case prove otherwise, as Betatene – the product before the Court – does not contain any matrix ingredients more than that needed to stabilize the beta-carotene. As for other formulations that contain different quantities of beta-carotene, which formulations are not before the Court, regardless of the amount of beta-carotene in the formulation or the type of formulation, the beta-carotene must be stabilized to protect it against oxidative degradation and decomposition and to make it commercially viable as a provitamin or a colorant. *Compare* Pl's SUMF, ECF No. 69 at ¶¶ 15, 16, 17, 18, 19 *with* Def's RPSUMF, ECF No. 75 at ¶ 15, 16, 17, 18, 19. Like the 7.5% Betatene product, those other formulations are empirically composed to meet those goals and to stabilize the beta-carotene using the various ingredients chosen for those formulations in the amounts necessary to achieve stabilization. Pl. Response Ex. 5, *Koepsel* Dep. p. 105: 8-17.

4.  The Overwhelming Weight of Evidence Establishes
    That Betatene is Suitable for General Use as Provitamin A

Defendant's next argument is that Betatene is particularly suitable for specific use in dietary supplements but not suitable for general use, and thus, according to the *ENs* to Chapter 29, Note 1, cannot be classified under Heading 2936.  This argument should be rejected.  Defendant misstates the criteria set out in the *ENs* and then disregards the facts and testimony that show that the general use of the imported product – to be provitamin A – has not been affected having been stabilized by the various types of ingredients identified in the *ENs* (*i.e.*, gelatin, sucrose, antioxidants).

In its *Motion*, BASF addresses the structure of the *ENs* to Chapter 29, Note 1 and the application of those *ENs* to the facts of this case.  *See, Motion* ECF No. 68 at pp. 53-62.  The *ENs* speak to "products of this heading" remaining in Heading 2936 if those products are stabilized for preservation or transport, and if those stabilizing ingredients meet certain criteria.  *Id.* at 53-54. These additional criteria limit the stabilized products of Heading 2936 to those where the stabilizing ingredients:

1.  Are not added in amounts that exceed that necessary for
    preservation or transport, **and**,

2.  Do not alter the character of the basic product **and**,

3.  Do not render it particularly suitable for specific use rather
    than general use.

BASF addressed defendant's argument on criterion 1 at pages 18 to 35 of this *Response Memorandum*, which is incorporated by reference herein.  The

36

uncontroverted facts establish that the inert ingredients in Betatene are present in amounts no more than necessary to stabilize the beta-carotene; that this formulation was empirically derived to create a stabilizing matrix; and the stability of the beta-carotene would be compromised if the formulation was altered or an ingredient removed.  See, Pl. Response Ex. 1, *Koepsel Dep.* at p. 105: 8-17; Pl Response Ex. 3, *Plaintiff's Interrogatory Responses* at p. 11. Plaintiff has proved that the ingredients of the stabilizer are present in amounts that do not exceed that necessary for preservation or transport, thus satisfying criterion 1.

a.    *The Character of the Basic Product*
      *(Beta-Carotene) Has Not Been Altered by the Stabilizer*

This leaves criteria 2 and 3, and defendant sets out its various arguments as to why it believes that Betatene is a specific use product.  *See, Cross Motion*, ECF No. 74 at pp. 19-23.  In trying to do so, however, defendant falls well short of establishing that the character of the beta-carotene in Betatene has been altered by the stabilizing ingredients (criterion 2), much less to the level of creating a product suitable for a specific use other than its general use as provitamin A (criterion 3).

While not needing to address criterion 1 as that issue was not contested on appeal, the *Roche Vitamins* appeals court recognized that criteria 2 and 3 are read in the conjunctive, so that both criteria must be met, (along with criterion 1, as that too is in the conjunctive with criteria 2 and 3) for any exclusionary effect of the *ENs* to apply.  *Roche Vitamins, Inc. v. United States*, 772 F.3d 728, 732-33 (Fed. Cir. 2014).  In *Roche Vitamins*, the Federal Circuit noted as to criterion 2 that it was

uncontroverted that the "manufacturing process does not change BetaTab's

functionality as provitamin A or change the character of the beta-carotene as

provitamin A." *Id.* at 732.

This Court must reach the same conclusion for Betatene on criterion 2, which

may explain why the defendant in its *Cross Motion* fails to address, at all, the "alter

the character of the basic product" criterion in its argument.   As BASF stated in

pertinent part at pages 45 to 47 of its *Motion*:

> As for the first factor highlighted by the *Roche Vitamins* court,
> neither the solvent nor any other ingredient in Betatene causes it
> to lose its status as provitamin A or its ability to function as
> provitamin A.  PSUMF at ¶49.  Both experts and BASF's fact
> witness recognized that nothing about the formulation had
> altered the beta-carotene's ability to be provitamin A.  Dr. Cantor,
> the defendant's expert, testified as follows:
>
>> Q.  What, if anything, about the formulation of the
>> imported merchandise has changed the Beta-Carotene
>> molecule in th[e] imported merchandise's inherent ability
>> to be a colorant and/or to be a source of provitamin A?
>>
>> A.  In this case, I would say that the Beta-Carotene was
>> not chemically modified.  It will remain a source of
>> vitamin A . . ..
>
> Pl. Ex. 8, ECF No. 67-9, *Cantor Dep.* at p. 135: 15-22; *see also, id.*,
> at p. 81: 2-7 (Q . . . And what about the formulation of the
> imported product prevents it from being used as provitamin A?
> A. Okay.  I mean, it's going to be converted – I mean, it is
> provitamin A its going to get converted to vitamin A").
>
>  Dr. Myers, plaintiff's expert, testified as follows on this issue:
>
>> Q.    Now is there anything about the formulation
>> process where these inerts you just testified to which are
>> brought in to stabilize the beta-carotene, do they at all
>> change either or both of those inherent characteristics
>> [source of provitamin A and ability to color]?

A.    No. . . . There's no physical or chemical changes that are occurring to the beta-carotene. It is still maintaining the structure that it has from the time it was extracted out of the algae till it is in the final formulation.

Q.    So the formulation and processing has not chemically modified the beta-carotene"

A.    That is correct.  It has not changed.

Pl. Ex. 10, ECF No. 67-11, *Myers Dep*. at p. 111: 21 – 112: 13.  *See also* Pl. Ex. 11, ECF No. 67-12, Expert Report of Expert Witness Dr. Marc A. Myers, ("*Myers Expert Report*"), p. 10.

Finally, Dr. Kopesil, BASF's fact witness, also testified that the formulation did not stop it from functioning as provitamin A:

Q.    And likewise, what, if anything, about the formulation of the Betatene 7.5 percent N would prevent it from functioning as a source of provitamin A?

A.    Nothing.  It will function as a provitamin A source.

Pl. Ex. 9, ECF No. 67-10, *Koepsel Dep*. at p. 103: 10-16; *see also id*. at p. 107: 19-23 ("Q.  Is there anything about the formulation process that does anything to change the – the chemistry of the beta-carotene mo[lecule]?  A. No").

If this was not enough proof that Betatene's formulation does not change its functionality as provitamin A or alter the character of the beta-carotene from that of provitamin A, the parties now agree this to be the case:

1.    "The beta-carotene molecules are not chemically modified by this formulation process.  *Compare* Pl's SUMF, ECF No. 69 at ¶ 45 *with* Def's RPSUMF, ECF No. 75 at ¶ 45.

2.    "Nothing in the imported merchandise's formulation changes the beta-carotene's inherent character as a source of provitamin A . . .." *Compare relevant portions of* Pl's SUMF, ECF No. 69 at ¶ 46 *with relevant portions of* Def's RPSUMF, ECF No. 75 at ¶ 46.

39

Thus, the sworn testimony and agreed-to facts clearly establish that the formulation of Betatene does not chemically modify the beta-carotene or render it unable to be provitamin A, its general use. For these reasons, to borrow from the *Roche Vitamin's* court, the "manufacturing processing does not change [Betatene's] functionality as provitamin A or change the character of the beta-carotene as provitamin A."

In sum, the facts support this Court finding that Betatene's stabilizing formulation **does not** alter the inherent nature of beta-carotene to be provitamin A. Defendant's argument using the *ENs* to Chapter 29, Note 1, therefore, fails even before reaching criterion 3 as criteria 1, 2 and 3 are written in the conjunctive, and the facts support BASF's position as to criteria 1 and 2.

> b. *The Added Stabilizer Does Not Render the Beta-Carotene Particularly Suitable for Specific Use Rather than General Use, as the Beta-Carotene in Betatene Retains its General Use as Provitamin A*

The facts support BASF's position on criterion 3 too. That criterion looks to see if the stabilizing ingredients render the beta-carotene particularly suitable for specific use rather than general use. On this point, the *Roche Vitamins* court noted that although BetaTab (like Betatene) was designed and sold for use in vitamin tablets that did not make it a specific use product. The formulation did not specifically prepare it for tableting, as the "stabilizers used in BetaTab were essentially the same as those used to stabilize other vitamins and other beta-

carotene products that were marketed as colorants." *Roche Vitamins,* 772 F.3d at 732. Furthermore, the *Roche Vitamins* court noted that BetaTab contained no ingredients specifically added for tableting, like tablet excipients. *Id.* Finally, the court noted that BetaTab "can thus be used as a source of vitamin A in foods, beverages, and vitamin products," *id*, notwithstanding that BetaTab was developed by Roche Vitamins "specifically 'for use in high potency and anti-oxidative vitamin tablets.'" *Id*. at 729, *quoting Roche Vitamins, Inc. v. United States*, 922 F. Supp. 2d 1353, 1361 (Ct. Int'l Trade 2013).

Betatene satisfies the three factors set out in *Roche Vitamin* on criterion 3. The *Roche Vitamins* court observed that BetaTab's formulation used stabilizers essentially the same as those used to stabilize other vitamins and provitamin, including beta-carotene marketed as colorants, and the same is true for Betatene. BASF addressed this issue at pages 48 to 50 of its *Motion*, which argument is incorporated by reference herein. Now, the parties agree that to be the case, albeit stating an objection as to the form of the stated fact:

> The type of formulation used to produce the imported merchandise is used in many different provitamins and vitamin formulations to stabilize and preserve those provitamins and vitamins, including fat soluble vitamins first dissolved in an oil . . ..

*Compare* Pl's SUMF, ECF No. 69 at ¶ 57 *with* Def's RPSUMF, ECF No. 75 at ¶ 57. As was the case with BetaTab in *Roche Vitamins*, Betatene is formulated with the same types of stabilizers used to "stabilize other vitamins and other beta-carotene products that were marketed for use as colorants." *Roche Vitamins,* 772 F.3d at 732. Simply stated, the stabilizer in Betatene stabilizes against both chemical (i.e.

oxygen) and mechanical (stress) forces, and the inert ingredients used to make the stabilizer in Betatene are essentially the same as those used to stabilize other vitamins and provitamins; for example, BetaTab. *See*, *Response Memorandum* at pp. 12 to 13. The facts show that these ingredients do not specially prepare Betatene for tableting any more than they specially prepared BetaTab for tableting.

Regarding the *Roche Vitamins* court's observation that BetaTab was not a specific use product because its formulation contained no ingredients specifically added for tableting, the same is true for Betatene. It contains no ingredients added for tableting, a fact that is now uncontested: "The imported merchandise does not contain any tableting excipients." *Compare* Pl's SUMF, ECF No. 54 at ¶ 57 *with* Def's RPSUMF, ECF No. 75 at ¶ 54. *See also*, *Motion*, ECF No. 68 at pp. 47-48. Thus, the Betatene formulation contains no tablet excipients or other ingredients need by vitamin tablet manufacturers to make tablets.

The final factor cited by the court in *Roche Vitamins* for confirming that the stabilizer had not rendered the beta-carotene applicable for general use was whether BetaTab "can be used as a source of vitamin A in foods, beverages, and vitamin products." *Roche Vitamins,* 772 F.3d 728, 732. Betatene satisfies this factor. Again, the parties have now agreed to facts establishing that nothing about Betatene's formulation or its stabilizing matrix prevents it from its general use as a source of provitamin A:

> 1. "Nothing about the formulation of the imported merchandise prevents it from being used as sources of provitamin A or as a colorant." *Compare* Pl's SUMF, ECF No. 69 at ¶ 49 *with* Def's RPSUMF, ECF No. 75 at ¶ 49.

2. "Nothing about the formulation of the imported merchandise prevents it from being used as a source of provitamin A in foods, beverages and dietary supplements." *Compare* Pl's SUMF, ECF No. 69 at ¶ 50 *with* Def's RPSUMF, ECF No. 75 at ¶ 50.

3. "Nothing about the formulation of the imported merchandise prevents it from being used as a source of provitamin A in other pill forms, such as chewable gummies." *Compare* Pl's SUMF, ECF No. 69 at ¶ 51 *with* Def's RPSUMF, ECF No. 75 at ¶ 51.

4. Nothing about the formulation of the imported merchandise prevents it from being used to color beverages, soups and other foods." *Compare* Pl's SUMF, ECF No. 69 at ¶ 52 *with* Def's RPSUMF, ECF No. 75 at ¶ 52.

Agreement on these facts was the obvious outcome considering the testimony and evidence on this issue by experts for both BASF and the defendant, as well as BASF's highly knowledgeable fact witness. That evidence and testimony is set out at pages 50 to 52, and 59 to 61 of BASF's *Motion*, which pages are incorporated by reference. In a nutshell, the experts and witnesses who were deposed agreed that the Betatene's formulation did not prevent the beta-carotene from functioning as provitamin A in tablets, hard capsules, gummies, effervescents, beverages, or foods, or chemically modify the beta-carotene to alter its inherent characteristic of being provitamin A. *Id*. Like BetaTab, which was specifically developed for use in vitamin tablets, and so marketed, but could be used as a provitamin A source in different applications because its stabilizing ingredients had not changed the beta-carotene's inherent nature of being provitamin A, Betatene's formulation does nothing to prevent its use as provitamin A in different applications because its stabilizing

ingredients have not changed the beta-carotene's general use as provitamin A. Its inherent functionality as provitamin A remains.

Defendant's arguments on the general versus specific use fail under the weight of *Roche Vitamins* and its analysis on this issue. First, the defendant argues that the design of the Betatene beadlet, using gelatin plasticized with sucrose to encase the beta-carotene for stability purposes as a microencapsulation with antioxidants, makes it particularly suitable for dietary supplements. *Cross Motion*, ECF No. at 74, p. 19. It does not, however, distinguish the Betatene formulation from that of BetaTab, which like Betatene, consists of a plasticized gelatin and sucrose matrix encasing beta-carotene for stability purposes as a microencapsuled beadlet with antioxidants. To repeat: BetaTab was developed, designed and marketed as a source of beta-carotene for purposes of sales to makers of vitamin tablets and capsules. *Roche Vitamins,* 772 F.3d 728, 732. Yet, because it contained no ingredients specifically needed for tableting and used the same types of ingredients for its stabilizer as used by other vitamins and beta-carotene formulations, and its stabilizing matrix did not change or alter the beta-carotene's general use as provitamin A, it was classified under Heading 2936 and Chapter 29, Note 1. *Id.* If the design of BetaTab's stabilizing matrix satisfied the plain meaning of Heading 2936 and Chapter 29, Note 1, then so does the design of Betatene's stabilizing matrix.

Next, defendant argues that Betatene is not suitable for general use because BASF's "expert offered no opinion as to Betatene's suitability for general use", based

on the expert report not including the word "suitable." *Cross Motion*, ECF No. 74 at p. 19. While defendant is correct that the word "suitable" is not used in Dr. Myer's expert witness statement, he does "offer my opinion" that, for example, 1) the formulation does not chemically modify the beta-carotene; 2) the formulation does not render Betatene only usable in tablets or capsules, but it can also be used as provitamin A in other applications including functional foods and beverages, and 3) "nothing about the formulation prevents it from other general use applications as provitamin A and/or as a colorant." Pl. Ex. 11 to *Motion*, ECF 69-11, *Myers Expert Report*, p.11.

These statements were substantiated during his deposition, and all constitute his opinion that the formulation of Betatene does not alter, change or otherwise impact on the beta-carotene's status as provitamin A, its general use. *See* Pl. Response Ex. 2, *Myers Dep*. at p. 111: 21 – 112: 13; p. 114: 10-18. Of course, the testimonies of the other witnesses were consistent with Dr. Myer's testimony on how the formulation does not impact on the ability of the beta-carotene in Betatene to fulfill its general use as provitamin A. *See,* Pl. Response Ex. 6, *Cantor Dep*. at pp. 135: 15-22; 81: 2-7; 116: 11-20; 117: 8-13; 118: 16-24; 125: 17-25. *See also*, Pl. Response Ex. 5, *Koepsel Dep*. at p. 103: 10-16; 106: 23 – 107: 5; 107: 6-23. BASF has more than met its burden to produce evidence establishing that Betatene's formulation does not impair the general use of the beta-carotene as provitamin A.

Then defendant argues that to use Betatene as a colorant, it must be deformulated because it is not water dispersible, in contrast with BetaTab, which is

dispersible in water above 20°C. *Cross Motion*, ECF No. 74 at pp. 20, 23. But the deposition testimony of both expert witnesses, Dr. Koepsel, and the agreed-to facts establish that Betatene, like BetaTab, is water dispersible and in fact does impart color in a liquid. Starting with Dr. Koepsel:

> Q. But is it [the Betatene] dispersible in water?
>
> A. It is.
>
> Q. So if we put it in water with some temperature, gave it some shear, what would happen to the water?
>
> A. It will color.
>
> Q. What color would the water be?
>
> A. Slightly orange.

Pl. Response Ex. 5, *Koepsel Dep.* at pp. 103: 22-104: 5

> Turning next to Dr. Myers:

> Q. So the matrix can be broken down with warm water and with shear. What happens once the matrix is broken down?
>
> A. So you are going to again, because beta-carotene has a color so its going to disperse into the product.

Pl. Response Ex. 2, *Myers Dep.* at pp. 91: 6-11. *See also*, Pl. Ex. 11 to *Motion*, ECF 69-11, *Myers Expert Report*, p.11 ("In addition, Betatene® 7.5% N can be used to color foodstuffs. For use as a colorant, Betatene® 7.5% N can be dissolved in warm water. On dissolution of the matrix, the suspension of Beta-carotene in the liquid provides an orange color").

Next with Dr. Cantor:

> Q.  But looking at the Betatene product, if you put that in warm
>     water and applied some shear to it, what would happen?
>
> A.  The water would penetrate the gelatin shell and have some of
>     it leach out.
>
> Q.  And would the water turn red or orange?
>
> A.  Yes.

Pl. Response Ex. 6, *Cantor Dep.* at p. 78: 15-21.

Finally, from the now agreed-to facts: "Nothing about the formulation of the imported merchandise prevents it from being used to color beverages, soups, and other foods." *Compare* Pl's SUMF, ECF No. 69 at ¶ 52 *with* Def's RPSUMF, ECF No. 75 at ¶ 52. Thus, like BetaTab, Betatene is water dispersible in warm water (or other liquids, such as beverages or soups), and will impart color to that water or other liquid in keeping with one of its general uses, as a colorant. Also, it will impart provitamin A to that liquid too, in keeping with its other general use as provitamin A. Pl. Response Ex. 5, *Koepsel Dep.* at p. 104: 8-24; Pl. Response Ex. 2, *Myers Dep.* at p. 89: 7-22; *See,* Pl. Response Ex. 6, *Cantor Dep.* at p. 79: 9-19. The beta-carotene's general uses as provitamin A or as a colorant have not been hampered by its stabilizing matrix even when used in a liquid medium.

Defendant argues that because Betatene, like BetaTab, was formulated and marketed for use in tablets and capsules (as a source of provitamin A, its general use), the potential to use these products in other applications, such as other vitamin dosage forms or in foods, beverages or as a colorant, are simply "theoretical

possibilit[ies]." *Cross Motion*, ECF No. at 74 at p. 21. What these "theoretical possibilities" show is that Betatene's formulation, which stabilizes the beta-carotene, does not affect or change the ability of the beta-carotene to fulfill its general use as provitamin A or as a colorant.[8] This is the standard for determining *suitability* for general use for purposes of Chapter 29, Note 1 as per *Roche Vitamins*. *Roche Vitamins*, 772 F.3d at 732.

In sum, defendant fails to establish even one of the criteria in the *ENs* to Chapter 29, Note 1, much less all three as required by the *ENs*. The ingredients used to create the stabilizer in Betatene are not in amounts that exceed that necessary for preservation or transport, do not alter the character of the beta-carotene as provitamin A, and do not render it particularly suitable for a specific rather than its general use as provitamin A. Betatene is formulated beta-carotene

---

[8] Defendant argues that using Betatene in non-tableting applications is commercially unrealistic. *Cross Motion*, ECF No. 74 at p. 21. But as Dr. Cantor testified to numerous times, using Betatene in different applications is the manufacturer's decision. *See*, Pl. Response Ex. 6, *Cantor Dep*. at p. 116: 11-16 (using it to fortify foods: "[m]anufacturers can do what they want. If someone wants to do that and – and people accept it, you know then ok"); p. 117: 8-13 (using it in effervescent tablets: "[i]f the manufacturer wanted to do that, they can do that"); p. 118: 16-24 (using it in beverages: "[a]gain, manufacturers can do whatever they want. It depends upon what's going to make them the best income"); p. 125: 17-25 (using it in foods or as a colorant: "[n]othing prevents any manufacturer from doing whatever they want . . ."). Manufacturers have different reasons for choosing ingredients, and the ability of a product to be used across product categories is attractive. Pl. Response Ex. 2, *Myers Dep*. at p. 50: 15-20 ("And my procurement person might say, hey, I don't really want to have three different types of beta-carotene. I just want one type. And you pick the one that is most important and limiting that can go across applications"). In this case, because, in fact, Betatene can impart provitamin A and color in a host of different applications, it can be used across different end use applications if a manufacturer so chooses.

(provitamin A) used as provitamin A. It should be classified as provitamin A under subheading 2936.90.01.

As discussed above, during his deposition, the defendant's expert Dr. Cantor was asked what would happen if Betatene were added to warm water and stirred. He confirmed it would impart color to the water. Pl. Response Ex. 6, Deposition Transcript of Defendant's Expert Witness Dr. Stuart Cantor, ("*Cantor Dep.*") at p. 78: 15-21. Then asked what would happen if he were to drink the now colored water and his body needed vitamin A, he testified:

> A. It would absorb it to some level.
>
> Q. Would it convert from provitamin A to vitamin A?
>
> A. Uh-huh.
>
> Q. I need you to say yes.
>
> A. Yes.

Similarly, after confirming that if Betatene were added to warm water and stirred it would color the water orange, Pl. Response Ex. 5 *Koepsel Dep.* at pp. 103: 22-104: 5, Dr. Koepsel was asked the same question regarding the impact on humans if they drank the now colored water. His answer was the same as Dr. Cantor's: "It would act as a provitamin A source." *Id.* at p. 104: 12-13.

These responses confirm that nothing in Betatene's formulation changes the beta-carotene's inherent general character as a source of provitamin A or its ability to color. It is still provitamin A and it can still color, notwithstanding having been formulated to stabilize the beta-carotene and to render it commercially suitable for

use as a source of provitamin A. *Compare* Pl's SUMF, ECF No. 69 at ¶ 9, 10, 11, 18 *with* Def's RPSUMF, ECF No. 75 at ¶ 9, 10, 11, 18. It should be classified under Heading 2936 like the other formulated beta-carotene products that have been stabilized for preservation or transport by a gelatin and sucrose matrix containing antioxidants and which are used for their provitamin activity. *Roche Vitamins,* 772 F.3d at 733.

### C.   Betatene is Elsewhere Specified or Included in Heading 2936

Defendant then turns its argument to Heading 2106, its proffered classification and the one in which Betatene was liquidated. *Cross Motion*, ECF No. 74 at p. 25. This heading provides for "[f]ood preparations not elsewhere specified or included." This heading, however, must yield to classification under heading 2936 as a matter of law.

Heading 2016 is a residual, catch-all provision. It is a "basket" provision, applicable to goods "not elsewhere specified or included." As such, this provision is only appropriate where no tariff category covers the merchandise more specifically. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002); *EM Indus., Inc. v. United States*, 22 CIT 156, 999 F. Supp. 1473, 1480 (1998). In fact, the subheading advocated by defendant, subheading 2106.90.99, is the broadest of catch-all, basket, residual provisions, capturing "[f]ood preparations not elsewhere specified or included: [o]ther: [o]ther."

In its *Motion* and *Response Memorandum*, BASF proves that Betatene satisfies the requirements of the *eo nomine* Heading 2936 and Chapter 29, Note 1.

50

In turn, this means that Betatene is a "[p]rovitamin . . .natural . . . in any solvent" and as such is "elsewhere specified or included" under Heading 2936 and thus excluded from Heading 2106. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002). As a matter of law, Heading 2936 covers the merchandise, and subheading 2936.90.01 is the classification at the eight-digit level of the tariff.

This result makes practical sense too. Betatene is provitamin A (formulated beta-carotene) to be used as provitamin A. In its condition as imported, it is not a dietary supplement or a food supplement. *See*, *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (goods are classified in their condition as imported and not in a post-importation condition). In its condition as imported, Betatene is not a food or foodstuff because its active ingredient, beta-carotene, "is only used and ingested in very small quantities because it is quite a powerful source as a precursors of vitamin A." Pl. Ex. 11 to *Motion*, ECF 69-11, *Myers Expert Report*, p. 11. As the ENs to Heading 21.06 recognize, "16) Preparations, often referred to as food supplements or dietary supplements, consisting of, or based on, **one or more vitamins**, minerals, amino acids, concentrates, extracts, isolates or the like . . ." (emphasis added). Thus, the *ENs* recognize vitamins as a different article of commerce from that of a food supplement or dietary supplement of Heading 2106. This is another reason to reject defendant's classification under the residual, catch-all heading (2106) as an "other food preparation," and instead classify it as a provitamin under the *eo nomine* tariff heading covering natural provitamins in solvents (Heading 2936).

## III.   CONCLUSIONS

For the reasons stated herein, summary judgment should be entered in favor of BASF.  The Court should hold that the imported product -- Betatene® 7.5% N – be classified under subheading 2936.90.01, HTSUS, and order CBP to reliquidate the subject entries with that classification and to refund the excess duties paid by BASF, with interest as provided for by law.


Respectfully submitted,

/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email:  rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*


Dated: March 17, 2025
New York, NY

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Standard Chambers Procedures of the U.S. Court of International Trade, this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment contains 12,798, as determined by Microsoft Word. This word count is within the limit of 14,000 words set forth in Rule 2(B) of the USCIT's Standard Chambers Procedures.

<u>/s/Frederic D. Van Arnam, Jr.</u>

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email:  rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*

Dated: March 17, 2025
New York, NY